UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| DEMONTRAY HUNTER, by and through his next friend, Rena Hunter; RUSSELL D. SENN, by and through his next friend, Irene Senn; TRAVIS S. PARKS, by and through his next friend, Catherine Young; VANDARIUS S. DARNELL, by and through his next friend, Bambi Darnell; FRANK WHITE, JR., by and through his next friend, Linda White; MARCUS JACKSON, by and through his next friend Michael P. Hanle; TIMOTHY D. MOUNT, by and through his next friend, Dorothy Sullivan; HENRY P. MCGHEE, by and through his next friend, Barbara Hardy, individually and on behalf of all others similarly situated; and the ALABAMA DISABILITIES ADVOCACY PROGRAM, | CASE NO. 2:16-cv-00798-MHT-CSC |
| | |
| Plaintiffs, | CLASS ACTION FOR DECLARATORY AND INJUNCTIVE RELIEF |
| v. | |
| JAMES V. PERDUE, in his official capacity as Commissioner of the Alabama Department of Mental Health, | |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

M. Geron Gadd
ALABAMA DISABILITIES ADVOCACY PROGRAM
400 South Union Street, Suite 280
Montgomery, AL 36104
Telephone:  (334) 240-0994

J. Patrick Hackney
William Van Der Pol, Jr.
Lonnie J. Williams
ALABAMA DISABILITIES ADVOCACY PROGRAM
500 Martha Parham West
Box 870395
Tuscaloosa, AL 35487-0395
Telephone:  (205) 348-4928

Henry F. (Hank) Sherrod III
HENRY F. SHERROD III, P.C.
119 South Court Street
Florence, AL 35630
Telephone:  (256) 764-4141

Randall C. Marshall
ACLU OF ALABAMA FOUNDATION
P.O. Box 6179
Montgomery, AL 36106-0179
Telephone:  (334) 420-1741

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................i

I.      PRELIMINARY STATEMENT...............................................................................1

II.     STATEMENT OF FACTS.......................................................................................3

        A.  Individual Plaintiffs.....................................................................................3

        B.  Plaintiff Alabama Disabilities Advocacy Program.......................................8

        C.  Defendant James V. Perdue.........................................................................9

        D.  Legal Provisions for Inpatient Competency Evaluations and Competency
            Restoration Treatment for Incapacitated Defendants in Alabama.......................10

        E.  ADMH's Provision of Competency Services at Taylor Hardin and Bryce..............12

        F.  Alabama's County Jails Do Not Provide Competency Services to Plaintiffs............15

        G.  Injuries Sustained by Plaintiff as a Result of ADMH's Failure to Provide
            Timely Competency Services.....................................................................20

III.    ARGUMENT..........................................................................................................21

        A.  Plaintiffs Are Likely To Succeed on the Merits of Their Claim That ADMH's
            Failure to Timely Provide Them Competency Services Constitutes a Denial
            of Due Process Guaranteed by the Fourteenth Amendment.............................22

            1.  Plaintiffs' detention in county jails while awaiting transfer to an
                Institution suitable for inpatient Competency Service punishment
                forbidden by the Due Process Clause.................................................23

            2.  ADMH's failure to provide Plaintiffs competency evaluations and
                restorative treatment negates any relationship between the nature and
                duration of Plaintiffs' detention and its purpose and therefore violates
                due process..................................................................................29

            3.  ADMH's failure provide timely competency evaluations and
                Restorative treatment to Plaintiffs is not excused by limited capacity
                and/or resources............................................................................32

        B.  Plaintiffs Will Suffer Irreparable Injury Absent Issuance of a Preliminary
            Injunction Mandating that ADMH Immediately Provide Them Inpatient
            Competency Evaluations and Restorative Treatment.....................................33

C.   The Injury Plaintiffs Will Suffer Absent an Injunction Requiring That They
Be Provided Timely Competency Services Outweighs Any Injury to
Commissioner Perdue as a Result of Being Required to Comply with the Law………34

D.   Issuance of the Injunction Sought Here Will Advance the Public Interest…………..35

E.   Waiver of the Security Required for Issuance of Injunctive Relief is
Appropriate in This Case……………………………………………………………36

IV.    CONCLUSION…………………………………………………………………………..37

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Advocacy Center for the Elderly and Disabled v. La. Dep't of Health
 and Hosps.,* 731 F. Supp. 2d 604 (E.D La. 2010)…..............................15, 23, 25, 33, 34, 35, 36

*Alabama Disabilities Advocacy Program v. J.S. Tarwater Developmental Ctr.,*
 97 F.3d 492 (11th Cir. 1996) ...........................................................................................8

*Alabama Disabilities Advocacy Program v. SafetyNet Youthcare, Inc.,*
 65 F.Supp.3d 1312 (S.D. Ala. 2014)................................................................................8

*Alabama Disabilities Advocacy Program v. Wood*, 584 F. Supp. 2d 1314
 (M.D. Ala. 2008)................................................................................................................8

*Anderson v. City of Atlanta*, 778 F.2d 678 (11th Cir. 1991)……………………………….…33

*Bell v. Wolfish*, 441 U.S. 520 (1979)……………………………………….…..……...…23, 26, 27

*Bonner v. Pritchard*, 661 F.2d 1206 (11th Cir. 1981) ...........................................................33, 36

*City of Atlanta v. Metro Atlanta Rapid Transit Auth.*, 636 F.2d 1084
 (5th Cir. Unit B Feb. 1981)…………………………………………………………………36

*Complete Angler, LLC v. City of Clearwater, Fla.*, 607 F. Supp. 2d 1326 (M.D. Fla. 2009)…...36

*Disability Law Ctr. v. Utah*, Case No. 2:15-cv-00645-RJS, 2016 U.S. Dist.
 LEXIS 47420 (D. Utah Apr. 7, 2016)...........................................................................20, 24, 31

*Doe v. Stincer*, 175 F.3d 879 (11th Cir. 1999) ..............................................................................8

*Dunn v. Dunn*, --- F. Supp. 2d ---, 2016 U.S. Dist. LEXIS 166251
 (M.D. Ala. Nov. 25, 2016)………………………………………………….……………...…8

*Finney v. Mabry*, 534 F. Supp. 2d 1026 (E.D. Ark. 2002)…………………………………….33

*Haddad v. Arnold*, 784 F. Supp. 2d 1284 (M.D. Fla. 2010) ...............…………………………22

*Heller v. Doe ex rel. Doe*, 509 U.S. 312 (1993)…………………………………………………26

*Home Oil Co. v. Sam's E., Inc.,* 252 F. Supp. 2d 1302, (M.D. Ala. 2003)...................................15

*Horton v. St. Augustine,* 272 F.3d 1318 (11th Cir. 2001) ...............................................................22

*Jacoby v. Baldwin County,* 835 F.3d 1338 (11 Cir. 2016)..............................................................23

*Jackson v. Indiana,* 406 U.S. 715 (1972) ...................................................................27

*Lynch v. Baxley*, 744 F.2d 1452 (11th Cir. 1984) ...................................2, 15, 26, 27, 28

*Mercedes-Benz U.S. Int'l, Inc. v. Cobasys, LLC.*, 605 F. Supp. 2d 1189
   (N.D. Ala. 2009) ...................................................................................................22

*Moore v. Morgan*, 922 F.2d 1553 (11th Cir. 1985)……………………………...………………32

*Nobby Lobby, Inc. v. City of Dallas*, 970 F.2d 82 (5th Cir. 1992)……………………………35

*Ohlinger v. Watson*, 652 F.2d 775 (9th Cir. 1980)……………………………………28, 29, 30

*Oregon Advocacy Center v. Mink*, 322 F.3d 1101
   (9th Cir. 2003) ...........................................................16, 23, 24, 28, 29, 30

*Sharp v. Weston*, 233 F.3d 1166 (9th Cir. 2000)……………………………….……………28, 29

*Smith v. Sullivan*, 611 F.2d 1039 (5th Cir. 1980)…………………………….……………32

*Terry ex rel Terry v. Hill*, 232 F. Supp. 2d 934 (E.D. Ark. 2002) .............................23, 24, 25, 33

*Trueblood v. Wash. State Dep't of Soc. & Health Servs.*, Case No. C14-1178-MJP,
   2016 U.S. Dist. LEXIS 108637 (W.D. Wash. Aug. 15, 2016) ...................................13

*Trueblood v. Wash. State Dep't Of Soc. & Health Services*, 73 F. Supp. 3d
   1311 (W.D. Wash. 2014) ...........................................................24

*Trueblood v. Wash. Dep't of Soc. & Health Servs.* 101 F. Supp. 3d 1010
   (W.D. Wash. 2015) ...........................................................29

*Trueblood v.Wash State Dep't of Soc. & Health Services*, 822 F.3d
   1037 (9th Cir. 2016)...........................................................30

*Youngberg v. Romeo*, 457 U.S. 307 (1987)…………………………….……………...………………26

**STATUTES AND REGULATIONS**

Fed. R. Civil P. Rule 65(c)...........................................................36, 37

Protection and Advocacy for Persons with Mental Illness Act of 1986,
   42 U.S.C. §§ 10801 ...........................................................8

Developmental Disabilities Assistance and Bill of Rights Act of 2000,
   24 U.S.C. § 15041............................................................8

Ala. Code § 22-50-2 (1975) ...........................................................9

Ala. Admin. Code §§ 580-1-1-.01 ............................................................9

Ala. Admin. Code §§ 580-1-1-.03 ............................................................9

Ala. Admin. Code §§ 580-1-1-.04 ............................................................9

Ala. Admin. Code §§ 580-1-1-.06 ............................................................9

Ala. Admin. Code §§ 580-1-1-.08 ............................................................9

Ala. R. Crim. P. 11.1 ..............................................................................28

Ala. R. Crim. P. 11.3(b) ..........................................................9, 10, 16, 34, 35

Ala. R. Crim. P. 11.6 ................................................9, 10, 11, 12, 16, 21, 34, 35

Ala. R. Crim. P. 11.6(c)(2)(i) ...........................................................11, 21

Ala. R. Crim. P. 11.6(c)(2)(ii)...............................................................21

Ala. R. Crim. P. 11.6(c)(2)(iii) ........................................................11, 21

Ala. R. Crim. P. 11.6(c)(3)(i)........................................................10, 11, 16

Ala. R. Crim. P. 11.6(c)(3)(ii)................................................................11

Ala. R. Crim. P. 11.6(d) ....................................................................11, 12

Ala. R. Crim. P. 11.6(d)(1) .....................................................................12

Ala. R. Crim. P. 11.6(d)(2) .....................................................................11

Ala. R. Crim. P. 11.6(f) .........................................................................12

Ala. R. Crim. P. 11.6(g) ........................................................................12

## OTHER CITATIONS

Alabama Department of Mental Health, *Snapshot of Taylor Hardin
As It Stands Today*, ADMH Facilities, http://www.mh.alabama.gov
/ADHR/medicalprofessions/OurLocations.aspx#hardin. ...........................................12

Amy Yurkanin, *Long Waits As Gridlock Grips Alabama Mental Health
System*, Al.com (Aug. 17, 2016, 2:21 PM), http://www.al.com/news
/birmingham/index.ssf/2016/08/mental_illness_part_2.html .........................12, 13, 14, 15, 16, 24

Bandon Moseley, *Perdue Wants to Talks (sic) To People Across the
State About Mental Health*, Alabama Political Reporter (June 6, 2016),
http://www.alreporter.com/perdue-wants-to-talks-to-people-across-
the-state-about-mental-health. ...........................................................................................................24

Lee Roop & Challen Stephens, *As Alabama Cuts Mental Health Care,
Sheriffs Say Jails Overwhelmed*, Al.com (Aug. 15, 206, 10:24AM),
http://www.al.com/news/huntsville/index.ssf/2016/08/alabama_sheriffs-
on_the_front.html...............................................................................................................15, 16, 17

Michele Gerlach, Perdue: Mental Health Near Crisis, Andalusia Star
News (Jan. 13, 2016, 12:1 AM), http://www.andalusiastarnews.
com/2016/01/13/perdue-mental-health-near-crisis/....................................................................24

Paul Gattis, *Sheriff on Alabama's Mental Health Crisis: 'It All Falls Back
on Jails*', Al.com (Aug. 23, 2016, 7:03 AM), http://www.al.com/news/huntsville/index.ssf/
2016/08/sheriff_on_alabamas_mental_hea.html .........................................................................16

## I.       PRELIMINARY STATEMENT

Demontray Hunter, Russell Senn, Travis Parks, Vandarius Darnell, Frank White, Marcus Jackson, Timothy Mount, and Henry McGhee (together, the "Individual Plaintiffs") and the Alabama Disabilities Advocacy Program ("ADAP") (collectively, "Plaintiffs")[1] filed this action on behalf of themselves and dozens of mentally ill and/or intellectually disabled pretrial detainees in Alabama who are languishing in county jails awaiting court-ordered inpatient competency evaluations and competency restoration treatment (together, "Competency Services"). Plaintiffs and putative class members have a mental illness and/or intellectual disability that is sufficiently acute that a circuit court has either questioned their competency to stand trial and committed them to the custody of the Alabama Department of Mental Health ("ADMH") for an inpatient mental evaluation or found them incompetent to stand trial and committed them to ADMH's custody for competency restoration treatment. ADMH, grappling with a demand for Competency Services that exceeds the capacity of its psychiatric hospitals – Taylor Hardin Secure Medical Facility ("Taylor Hardin") and Bryce Hospital ("Bryce") – effectively warehouses individuals awaiting court-ordered competency services in county jails until a bed becomes available. For the Plaintiffs and putative class members, this wait often exceeds 237 days (approximately 8 months).

While awaiting transfer to an appropriate institution for Competency Services, Plaintiffs and putative class members remain subject to the conditions and restrictions imposed upon all other jail inmates, with access only to those services generally available to other inmates. Yet the conditions and restrictions of confinement imposed on inmates in county jails are especially onerous for persons – including Plaintiffs and putative class members – with severe mental illness.

---

[1] As set forth in Section II.b, *infra*, Plaintiff ADAP is asserting the claims of its constituents in this action. References to ADAP as a party in Sections II and III, *infra*, should be read as a reference to its constituents or their circumstances.

*See Lynch v. Baxley*, 744 F.2d 1452, 1458 (11th Cir. 1984).  Jails are not, and cannot be, therapeutic environments that provide the individualized psychiatric, pharmacological, and psychotherapeutic services necessary to effectively address serious mental illness and/or intellectual disabilities. *Cf.* Declaration of Joel Dvoskin dated December 21, 2016 ("Dvoskin Decl.") at ¶ 4.  They often lack the staff and resources necessary to respond to the psychiatric needs and behavioral challenges of persons with severe mental illness and/or intellectual disabilities in ways that are not solely punitive. *Id*.  Individuals with severe mental illness and/or intellectual disabilities spend a disproportionately significant amount of time in solitary confinement and/or protective custody – isolation which often exacerbates mental illness and makes restoring competency more difficult. Alabama's county jails, poorly suited to meet even the mental health needs of inmates whose competency has not been questioned, are woefully ill-equipped to provide the care that circuit courts have determined that the Plaintiffs and putative class members need.

The human cost to the Plaintiffs and putative class members of being confined in jails for long periods of time after a court has ordered their commitment for Competency Services is a legally cognizable harm; it constitutes a well-established violation of the Due Process Clause of the Fourteenth Amendment.  Through this action, Plaintiffs seek a declaratory judgment that Defendant James V. Perdue, Commissioner of ADMH, has violated their respective due process rights by causing them to remain incarcerated in a county jail for a protracted period of time after they were committed to ADMH's custody for Competency Services and by failing to timely provide them the Competency Services for which they were committed to ADMH custody. Plaintiffs seek an injunction, preliminarily and permanently thereafter, requiring Defendant Perdue, by and through ADMH, to timely provide the Plaintiffs and putative class members Competency Services.

## II.    STATEMENT OF FACTS

### A.    The Individual Plaintiffs

The individual Plaintiffs and putative class members are mentally ill criminal defendants who have not been convicted of a crime; they are, as such, pretrial detainees. *See* Am. Compl. ¶¶ 96-98, 104-06, 112, 118-19, 124-26, 131-33, 139-41, 144, 147; Declaration of M. Geron Gadd dated December 22, 2016 ("Gadd Decl."), Exs. 1 (Case Action Summary for Mr. Hunter), 4 (Case Action Summary for Mr. Senn), 9 (Case Action Summary for Mr. Parks), 10 (Case Action Summary for Mr. Darnell), 12 (Case Action Summary for Mr. White), 14 (Case Action Summary for Mr. Jackson), 16 (Case Action Summary for Mr. Mount), 18 (Case Action Summary for Mr. McGhee).  Plaintiffs and putative class members have been committed to the custody of ADMH for inpatient competency evaluations or competency restoration therapy and treatment. *Id*. Each of the individual Plaintiffs is, or was, on the waiting list for admission to Taylor Hardin for inpatient treatment, and is, or was, awaiting admission for inpatient Competency Services in a county jail. *See* Am. Compl. ¶¶ 99, 107, 113, 120, 127, 134, 142, 148; Gadd Decl., Ex. 22 (September 16-22, 2016 waiting list for admission to Taylor Hardin).

Demontray Hunter, after being criminally charged, was found incompetent to stand trial by the Jefferson County Circuit Court on April 14, 2016.  Am. Compl. ¶ 97; Gadd Decl., Ex. 2 (Mr. Hunter's commitment order).  Mr. Hunter was committed to the custody of ADMH for competency restoration treatment on the same day.  *Id*.  The circuit court's commitment order continued the case against Mr. Hunter until he is restored to competency.  *Id*.  Mr. Hunter was transferred to Taylor Hardin on December 7, 2016, after spending nearly eight months in the Houston County Jail awaiting transfer.  Am. Compl. ¶ 96.  Mr. Hunter began exhibiting symptoms of mental illness after he witnessed his brother kill his father.  Am. Comp. ¶ 95. He has been diagnosed with schizophrenia, paranoid type, with active psychosis.  *Id*.  While housed in the Jefferson County

Jail, Mr. Hunter experienced auditory hallucinations and/or delusional thinking, nervousness, paranoia, and insomnia. Am. Compl. ¶ 102. Mr. Hunter did not take medication regularly while in the jail. Am. Compl. ¶ 100. He was placed in segregation approximately three times. Am. Compl. ¶ 101. Mr. Hunter was housed with other inmates with mental illness in a clustered cellblock. Am. Compl. ¶ 101.

Russell Senn, after being criminally charged, was found incompetent to stand trial by the Pike County Circuit Court on February 5, 2016. Am. Compl. ¶ 105; Gadd Decl., Ex. 5 (Mr. Senn's commitment order). He was committed to ADMH's custody for competency restoration treatment on the same day. *Id.* The circuit court's commitment order continued the case against Mr. Senn until he is restored to competency. *Id.* Mr. Senn was transferred to Taylor Hardin during the last week of October 2016, after spending over eight months in the Pike County Jail. Am. Compl. ¶ 107. Mr. Senn has a history of psychiatric institutionalization and outpatient treatment with the U.S Department of Veterans Affairs. Am. Compl. ¶ 103. Mr. Senn has been diagnosed with mood disorder and psychosis. He struggles with suicidal ideation, severe insomnia, and medication compliance. *Id.* While Mr. Senn was incarcerated in the Pike County Jail, clinicians at the East Alabama Mental Health Center prepared an outpatient treatment plan for him on March 8, 2016, over a month after he was committed to ADMH custody for competency restoration services. *See* Am. Compl. ¶ 108-09; Gadd Decl. ¶ 8, Exs. 7-8 (Mr. Senn's March 8, 2016 treatment plan). Mr. Senn's treatment goals did not include competency restoration. While his treatment plan included medication management, Mr. Senn did not take his prescribed medication regularly while incarcerated in the Pike County Jail. Am. Compl. ¶ 108. Mr. Senn's clinical records reflect that, on June 25, 2016, he was found to be making insufficient progress toward his treatment goals and that he had not been "seen" since his intake appointment on March 8. *See* Am. Compl. ¶ 108; Gadd Decl. ¶ 9, Ex. 8 (Mr. Senn's June 25, 2016 treatment notes).

4

Travis Parks, after being criminally charged, was found incompetent to stand trial by the Houston County Circuit Court on January 21, 2016. Am. Compl. ¶ 111-12; Gadd Decl., Ex. 9 (case action summary).  He was committed to the custody of ADMH for competency restoration treatment the same day. *Id*.  The court entered a second order committing Mr. Parks to Taylor Hardin on August 29, 2016.  Am. Compl. ¶ 112.  Mr. Parks was transferred to Taylor Hardin on October 18, 2016, after spending eight months in the Houston County Jail.  Am. Compl. ¶ 113. Mr. Parks has a long history of mental illness and has required extensive inpatient and outpatient mental health treatment throughout the past decade, including significant pharmacological treatment and  extensive home- and community-based services.    Am. Compl. ¶ 110.  Mr. Parks has been diagnosed with chronic paranoid schizophrenia with acute exacerbation.  *Id*.  Mr. Parks has not always been compliant with his medication regimen and has attempted suicide in the past. *Id*.  While housed in the Houston County Jail, he engaged in problematic behavior which resulted in his being placed in segregation. Am. Compl. ¶ 115.   In the jail, Mr. Parks also experienced auditory hallucinations, paranoia, mania, anxiety levels which prevented him from eating, and adverse side effects of his medications.  Am. Compl. ¶ 116.

Vandarius Darnell, after being criminally charged, was found incompetent to stand trial by the Walker County Circuit Court on August 9, 2016.  Am. Compl. ¶ 118-19; Gadd Decl., Ex. 11 (Mr. Darnell's commitment order).  He was committed to the custody of ADMH for competency restoration treatment the same day.  *Id*.  Mr. Darnell remains in the Walker County Jail awaiting transfer to a suitable institution for competency restoration treatment. Am. Compl. ¶ 120.  He is currently on the waiting list for admission into Taylor Hardin. *Id*.  Mr. Darnell has an extensive history of mental illness necessitating outpatient treatment and psychiatric hospitalizations.  Am. Compl. ¶ 117.   Mr. Darnell has been diagnosed with catatonic schizophrenia and bipolar schizoaffective disorder with significant mania.  *Id*.  While housed in the Walker County Jail, Mr.

Darnell has struggled with medication noncompliance and has engaged in disruptive behavior resulting in his being frequently assigned to different cells and fighting with other inmates. Am. Compl. ¶ 121-22.   During the periods that he refuses to take his prescribed medications, he experiences mania, paranoia, delusions, auditory and visual hallucinations, and insomnia.   *Id.*

Frank White, Jr., after being criminally charged, was found incompetent to stand trial by the Talladega County Circuit Court on August 19, 2016.  Am. Compl. ¶ 124-25; Gadd Decl., Ex. 13 (Mr. White's commitment order).  He was committed to the custody of ADMH for competency restoration treatment on the same day.  *Id.*  The circuit court continued Mr. White's criminal case until he is restored to competency.  *Id.*  Mr. White remains in the Walker County Jail awaiting transfer to a suitable institution for competency restoration treatment. Am. Compl. ¶ 127.  He is currently on the waiting list for admission into Taylor Hardin.  *Id.*  Mr. White has been diagnosed with schizophrenia and fetal alcohol syndrome, and an intellectual disability.  Am. Compl. ¶ 123. Mr. White has a long history of outpatient mental health services and has been hospitalized on several occasions.  *Id.*  While housed in the Talladega County Jail, Mr. White had significant difficulties with other inmates and has been placed in protective custody.  Am. Compl. ¶ 129.

Marcus Jackson, after being criminally charged, was found incompetent to stand trial by the Jefferson County Circuit Court on July 19, 2016.  Am. Compl. ¶ 131-32; Gadd Decl., Ex. 15 (Mr. Jackson's commitment order).  He was committed to the custody of ADMH for competency restoration treatment on the same day.  *Id.*  The circuit court's commitment order continued Mr. Jackson's criminal case until he is restored to competency.  *Id.* Mr. Jackson remains in the Jefferson County Jail awaiting transfer to a suitable institution for competency restoration treatment. Am. Compl. ¶ 134.  He is currently on the waiting list for admission into Taylor Hardin. *Id.*  Mr. Jackson has been diagnosed with bipolar disorder, schizoaffective disorder, schizophrenia, and narcolepsy. Am. Compl. ¶ 130.  Mr. Jackson required extensive outpatient treatment prior to

his arrest. *Id*. While housed in the Jefferson County Jail, Mr. Jackson reported suicidal thoughts to jail officials and was placed in isolation. Am. Compl. ¶ 136. He was physically attacked and injured by another inmate and after the encounter was placed in a cellblock with other persons with mental illness. *Id*. Mr. Jackson takes prescription medication, but does not receive other individualized treatment. Am. Compl. ¶ 135. Mr. Jackson is fearful of others and has difficulty in social exchanges, including encounters with other inmates. Am. Compl. ¶ 137.

Timothy Mount, after being criminally charged, was found incompetent to stand trial by the Montgomery County Circuit Court on July 8, 2016. Am. Compl. ¶ 139-40; Gadd Decl., Ex. 17 (Mr. Mount's commitment order). He was committed to the custody of ADMH for competency restoration treatment on the same day. *Id*. The circuit court's commitment order continued Mr. Mount's criminal case until he is restored to competency. *Id*. Mr. Mount remains in the Montgomery County Jail awaiting transfer to a suitable institution for competency restoration treatment. Am. Compl. ¶ 142. He is currently on the waiting list for admission into Taylor Hardin. *Id*. Mr. Mount has been diagnosed with an intellectual disability, depression, seizure disorder, and cerebral palsy. Am. Compl. ¶ 138. Mr. Mount required extensive educational accommodations and community-based services prior to his arrest. *Id*. While housed in the Montgomery County Jail, Mr. Mount is housed in an isolation cell and does not recall meeting with any clinician or other service provider. Am. Compl. ¶ 143.

Henry McGhee, after being criminally charged, was suspected of being incompetent to stand trial and ordered to receive a mental evaluation on September 25, 2015. *See* Am. Compl. ¶ 144-45; Gadd Decl., Ex. 19. Mr. McGhee was evaluated on an outpatient basis and the appointed psychologist recommended that he receive further inpatient evaluation. Am. Compl. ¶ 145-46. A forensic evaluation was filed and the court again directed that Mr. McGhee be evaluated on an inpatient basis. *Id*. Mr. McGhee is on the waiting list for admission into Taylor Hardin for an

inpatient evaluation.  *See* Am. Compl. ¶ 148; Gadd Decl., Ex. 22.  Mr. McGhee has been on suicide watch as a result of his attempts to harm himself and in disciplinary segregation for a significant portion of his incarceration at the Tuscaloosa County Jail.  Am. Compl. ¶ 149-50.  Mr. McGhee becomes confused easily and experiences paranoia.  Am. Compl. ¶ 150.  Both have worsened during his incarceration in the Tuscaloosa County Jail.  Am. Compl. ¶ 152.

> **B.    Plaintiff Alabama Disabilities Advocacy Program**

The Alabama Disabilities Advocacy Program ("ADAP") is the State of Alabama's designated protection and advocacy ("P&A") organization under the Protection and Advocacy for Persons with Mental Illness Act of 1986 (the "PAIMI Act"), 42 U.S.C. §§ 10801 *et seq*., and the Developmental Disabilities Assistance and Bill of Rights Act of 2000 (the "PADD Act"), 24 U.S.C. § 15041 *et seq*.  Am. Compl. ¶ 24; *Doe v. Stincer*, 175 F. 3d 879, 883 (11th Cir. 1999); *Alabama Disabilities Advocacy Program v. J.S. Tarwater Developmental Ctr.*, 97 F. 3d 492, 495 (11th Cir. 1996); *Dunn v. Dunn*, --- F. Supp. 3d ---, 2016 U.S. Dist. LEXIS 6949585, *3, *7 (M.D. Ala. Nov. 25, 2016); *Alabama Disabilities Advocacy Program v. SafetyNet Youthcare, Inc*., 65 F. Supp. 3d 1312, 1321-22 (S.D. Ala. 2014), on reconsideration in another part, 2015 U.S. Dist. LEXIS 16343 (S.D. Ala. Feb. 22, 2015); *Alabama Disabilities Advocacy Program v. Wood*, 584 F. Supp. 2d 1314, 1315 (M.D. Ala. 2008).  As Alabama's designated P&A, the PAIMI Act authorizes ADAP to pursue legal remedies involving system-wide change on behalf of identifiable groups of similarly situated persons with mental illness, including persons suspected of being incompetent and those found incompetent to stand trial who are awaiting Competency Services while incarcerated.  Am. Compl. ¶ 25.  The PADD Act likewise authorizes ADAP to litigate claims on behalf of persons with intellectual disabilities, individually and systemically.  *Id*.  Each of the individual Plaintiffs and putative class members is a constituent of ADAP under the PAIMI Act and/or the PADD Act and has standing to assert the claims prosecuted by ADAP in this action.

Am. Compl. ¶ 26.  Specifically, ADAP's claims here include those of its constituents who have a mental illness and/or intellectual disability, have been ordered to receive inpatient Competency Services, and are awaiting receipt of those services in a county jail. Am. Compl. ¶ 27.

Through this action, ADAP seeks to fulfill one of its central organizational mandates: to advocate for institutionalized persons with disabilities.  Am. Compl. ¶ 28.   Each of the individual Plaintiffs and putative class members faces imminent serious harms including, among others, decompensation while incarcerated without appropriate psychiatric treatment; the risk that competency restoration will be more difficult if not impossible as a result of the intensification of mental illness while incarcerated without appropriate psychiatric care; and the unjustified extension of the period in which they are incarcerated based on the inability of the circuit court in their criminal cases to consider their release prior to their inpatient evaluation and/or treatment. Am. Compl. ¶ 27.

### C.      Defendant James V. Perdue

Defendant James V. Perdue is the Commissioner of ADMH. Am. Compl. ¶ 30.  As ADMH Commissioner, Defendant Perdue is charged, under Alabama law, with directing, supervising, and controlling ADMH's provision of mental health care to persons with mental illness and intellectual disabilities throughout Alabama.  Ala. Code § 22-50-2 (1975); Ala. Admin. Code §§ 580-1-1-.01 (commissioners and divisions of department), 580-1-1-.03 (persons served by the Department of Mental Health), 580-1-1-.04 (agency head), 580-1-1-.06 (authority of commissioner), 580-1-1-.08 (agency is under direction, supervision, and control of commissioner).  ADMH is the sole state agency in the State of Alabama designated to administer or supervise the provision of inpatient competency evaluations and competency restoration treatment pursuant to Alabama Rules of Criminal Procedure 11.3 and 11.6.   Commissioner Perdue has the authority to devise and

implement the policies, procedures, and practices necessary to ensure that Taylor Hardin and Bryce operate so as to provide timely court-ordered Competency Services.  Am. Compl. ¶ 31, 34.

### D. Legal Provisions for Inpatient Competency Evaluations and Competency Restoration Treatment for Incapacitated Defendants in Alabama

Alabama Rule of Criminal Procedure 11 governs circuit courts' commitment of a criminal defendant to ADMH custody for Competency Services.  Rule 11.3(b) authorizes the court to order that a defendant be examined in a state institution and to commit the defendant to ADMH "for a reasonable period of time necessary to conduct the examination."  Ala. R. Crim. P. 11.3(b).  Rule 11.3(b) expressly prohibits a court from committing a defendant for inpatient evaluation "for a time longer than that reasonably necessary to conduct the examination."

Rule 11.6 specifies the procedure for the restoration of an incapacitated defendant's competency, both where there is a likelihood that the defendant will be restored to competency within a reasonable period of time and where there is not.  Where the court holds the prescribed competency hearing and finds that the defendant is incompetent but that *there is a substantial probability* that the defendant will become competent within a reasonable period of time, the court "shall order the defendant committed to the custody of [ADMH] *for therapy and treatment, in an institution suitable to receive such persons*, for a period not to exceed six months or until the defendant's earlier restoration to competency,"  if the court also finds that the defendant's being at large poses a threat of substantial harm to the defendant or others, that the defendant is mentally ill and absent treatment will continue to deteriorate, and the defendant is unable to make a rational decision whether treatment is desirable.  Ala. R. Crim. P. 11.6(c)(3)(i) (emphasis added).

Where a court holds the prescribed competency hearing and finds that the defendant is incompetent to stand trial and there is *no substantial probability* that the defendant will become competent within a reasonable period of time, the court "shall order the defendant committed to

the custody of [ADMH] for a period not to exceed six months or until the defendant's earlier restoration to competency" if the court also finds that the defendant's "being at large poses a real and present threat of substantial harm to the defendant or to others," and that the "defendant is mentally ill or has a mental defect" and that absent treatment the defendant will continue to deteriorate, and is "unable to make a rational and informed decision as to whether treatment is desirable[.]" Ala. R. Crim. P. 11.6(c)(2)(i).  Where the court later finds that, "as a result of an ongoing supervised regimen of medical treatment or therapy, the risk of harm threatened by the defendant's being at large has been sufficiently minimized," the court "shall order the defendant released on conditions" that are "necessary to ensure the defendant continues to receive treatment." Ala. R. Crim. P. 11.6(c)(2)(i), 11.6(d)(4).

Where a court finds a defendant incompetent to stand trial and that the defendant's *being at large does not pose a risk of substantial harm* to the defendant or others, if the defendant is *not likely to become competent* within a reasonable period of time, the court *shall dismiss the charges against the defendant* without prejudice and *release* the defendant. *See* Ala. R. Crim. P. 11.6(c)(2)(iii) (emphasis added). If the defendant *is likely* to become competent within a reasonable period of time, the court *shall release the defendant upon conditions* necessary to ensure the defendant's receipt of therapy and treatment design to restore the defendant's competency. *See* Ala. R. Crim. P. 11.6(c)(3)(ii) (emphasis added).

When a defendant has been deemed incompetent and committed to ADMH custody based on the threat of harm the defendant's being at large poses to the defendant or others, and, after providing intensive treatment to the defendant, "it is the opinion of treating clinicians that the defendant . . . no longer poses a threat of harm," ADMH shall file a notice of release from commitment with the court.  Ala. R. Crim. P. 11.6(d)(2).  The court then must hold a hearing on

whether the risk of harm has been minimized such that the defendant may be released from an inpatient facility on appropriate conditions. Ala. R. Crim. P. 11.6(g).

Rule 11.6 also provides for periodic review of the defendant's condition following the commitment to determine whether continued inpatient treatment is necessary or the defendant can be released to outpatient treatment under appropriate conditions. Ala. R. Crim. P. 11.6(d), (g). The commitment of an incompetent defendant for restorative treatment shall not exceed six months pursuant to an original order; that order may be renewed for no more than one year. Ala. R. Crim. P. 11.6(d)(1). Alabama Rule of Procedure 11.6 requires any person responsible for the therapy and treatment of an incapacitated defendant subject to commitment to report on the defendant's status no less frequently than every ninety-one days. Ala. R. Crim. P. 11.6(f).

E.     **ADMH's Provision of Competency Services at Taylor Hardin and Bryce**

ADMH is the sole state agency authorized to provide Competency Services pursuant to Alabama Rule of Criminal Procedure 11. ADMH provides inpatient competency evaluations and restorative treatment at Taylor Hardin and Bryce.[2]  Taylor Hardin, the State's sole forensic psychiatric hospital, has a capacity of 115 beds.  *See* Alabama Department of Mental Health, *Snapshot    of    Taylor    Hardin    As    It    Stands    Today*,    ADMH    Facilities, http://www.mh.alabama.gov/ADHR/medicalprofessions/OurLocations.aspx#hardin (the snapshot is attached as Exhibit 21 to the Gadd Declaration).  Taylor Hardin "is so full that it overflows into Bryce."  Amy Yurkanin, *Long Waits As Gridlock Grips Alabama Mental Health System*, Al.com (Aug.          17,          2016          2:21          PM), http://www.al.com/news/birmingham/index.ssf/2016/08/mental_illness_part_2.html  (hereinafter

---

[2] The Mary Starke Harper Center is the third psychiatric hospital operated by ADMH.  The Harper Center provides inpatient psychiatric services to elderly consumers in Alabama.  ADMH has not, historically, provided competency services in the Harper Center.  Am. Compl. ¶ 69-70.

"Long Waits as Gridlock Grips ADMH") (a copy of Long Waits as Gridlock Grips ADMH is attached as Exhibit 23 to the Gadd Declaration).  Taylor Hardin serves only male patients. Bryce has a capacity of 268 beds and serves all women requiring Competency Services and those men requiring Competency Services whom the clinicians at Taylor Hardin determine can be treated in a less secure facility.

Officials at Taylor Hardin maintain a weekly list of persons awaiting admission for a range of inpatient psychiatric services.  *See* Gadd Decl., Ex. 22 (September 16-22, 2016 Taylor Hardin waiting list).  Taylor Hardin's weekly waiting list includes persons awaiting inpatient competency evaluations, competency restoration treatment, as well as persons awaiting intensive psychiatric treatment where those individuals have been adjudicated not guilty by reason of insanity, been convicted of crimes, reached the end of a term of imprisonment, and/or referred for inpatient treatment by the Alabama Department of Corrections.  *Id.*  The order of the waiting list is determined by the date Taylor Hardin officials receive the commitment order or referral, not the date of the commitment order or referral.  *Id.*  The waiting list does not reflect an attempt by Taylor Hardin officials to triage or otherwise manage admissions by total length of time the prospective patient has been waiting for services (for example, where a significant period of time elapses between the date of the order and the date it is received).[3]  *Trueblood*, 2016 WL 4268933, *10. As a result, the total waiting period for admission that Plaintiffs and putative class members will

---

[3] In *Trueblood v. Wash. State Dep't of Soc. & Health Servs*., Case No. C14-1178-MJP, 2016 U.S. Dist. LEXIS 108637, at *32 (W.D. Wash. Aug. 15, 2016), the court cited the Department of Social and Health Services' disregard of the court's requirement, in issuing an earlier injunction, that it "adopt a triage system to process class members more efficiently" as a factor supporting the issuance of a permanent injunction requiring the Department to provide in-jail evaluations within fourteen days and competency restoration services within seven days. Among the factors the court recommended the Department consider in formulating a triage process are:  a preliminary assessment of the acuity of the prospective patient's mental health condition, the type of treatment needed, or the degree of care needed and resources required to provide that treatment, or other considerations.

experience is defined by the total number of persons on the waiting list, irrespective of the type of treatment sought or source of referral, not by the number of persons awaiting inpatient competency evaluations and competency restoration treatment.

"At the end of June [2016], 46 people were on the waiting list to get into [Taylor Hardin], many of them for months."  Yurkanin, *Long Waits As Gridlock Grips ADMH*, *supra*.  The September 16-22, 2016 waiting list included 52 prospective patients. Eleven of the 52 persons then on the waiting list were awaiting inpatient competency evaluations.  *See* Gadd Decl., Ex. 22. Twenty-five of the 52 persons on the same waiting list had been found incompetent to stand trial and were awaiting competency restoration services.  *Id*.  Two of the persons on the September 16-22, 2016 waiting list who had been found incompetent to stand trial had been released on bond and one was in federal custody out-of-state.  *Id*.  As such, 33 people on the September 16-22, 2016 waiting list for admission into Taylor Hardin were awaiting competency evaluations or restoration treatment in a county jail.  *Id*.

The Taylor Hardin waiting list also reflects the number of days each person on the list has been waiting for admission.  As reflected in the September 16-22, 2016 waiting list, members of the putative class seeking admission for inpatient competency evaluations had been waiting anywhere between six days and 199 days for services.  *See* Gadd Decl., Ex. 22.  Members of the putative class awaiting competency restoration services had been waiting anywhere between 24 days and 237 days.  *Id*. Plaintiff Travis Parks, then third on the waiting list, had been waiting 234 days for competency restoration services.  *Id*.  Plaintiff Russell Senn, seventh on the waiting list, had been waiting 219 days for admission.  *Id*.  Plaintiff Demontray Hunter, twenty-fourth on the waiting list, had been waiting 100 days.  *Id*.  Plaintiff Marcus Jackson, thirty-seventh on the waiting list, had been waiting 56 days.  *Id*.  Plaintiff Vandarius Darnell, forty-first on the waiting list, had been waiting 37 days.  *Id*.  Plaintiff Frank White, forty-ninth on the waiting list, had been waiting

20 days. *Id*. Mr. Mount, then No. 34 on the waiting list, had been waiting for 69 days. *Id*. Mr. McGhee was No. 32 on the list, and he had been waiting for 78 days. *Id*. Mr. Parks, Mr. Senn, and Mr. Hunter were not transferred to Taylor Hardin for several weeks, one month, and two months, respectively, following the preparation of the September 16-22 waiting list. As such, their total wait time for admission into Taylor Harden was far longer than reflected on the September 16-22, 2016 waiting list.

Officials at Bryce also maintain a waiting list of persons seeking admission for inpatient services. "The wait list for Bryce [] . . . peaked at almost 60 patients [] earl[y] [in 2016]." Yurkanin, *Long Waits as Gridlock Grips ADMH*, *supra*. The Bryce waiting list includes women awaiting inpatient competency evaluations and competency restoration treatment, as well as those seeking inpatient psychiatric care as a result of civil commitments and voluntary institutionalization. *See* Am. Compl. ¶ 69-70, 79-80.

### F. Alabama's County Jails Do Not Provide Competency Services To Plaintiffs and Putative Class Members.

The mental health crisis currently plaguing Alabama county jails has been extensively reported, as have sheriffs' descriptions[4] of their struggle to address it. *See* Lee Roop & Challen Stephens, *As Alabama Cuts Mental Health Care, Sheriffs Say Jails Overwhelmed*, Al.com (Aug. 15, 2016 10:24 AM), http://www.al.com/news/huntsville/index.ssf/2016/08/alabama_sheriffs_on_the_front.html

---

[4] "At the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence, including hearsay evidence." *Home Oil Co. v. Sam's E., Inc*., 252 F. Supp. 2d 1302, 1307 (M.D. Ala. 2003) (citing *Sierra Club, Line Star Chapter v. F.D.I.C*., 992 F.2d 545, 551 (5th Cir. 1993); *see also Advocacy Center for the Elderly and Disabled v. La. Dep't of Health and Hosps*., 731 F. Supp. 2d 603, 607-08 (E.D. La. 2010) (denying motion to strike declarations submitted in support of motion for preliminary injunction by attorneys serving as counsel of record in action where the declarations described interviews with incompetent defendant awaiting competency restoration treatment in a parish jail).

(hereinafter  "Jails Overwhelmed") (a copy of Jails Overwhelmed is attached as Exhibit 24 to the Williams Decl.); Paul Gattis, *Sheriff on Alabama's Mental Health Crisis:  'It All Falls Back on Jails'*,       AL.com       (Aug.       23,       2016       7:03       AM), http://www.al.com/news/huntsville/index.ssf/2016/08/sheriff_on_alabamas_mental_hea.html (hereinafter "It Falls Back on Jails") (a copy of It Falls Back on Jails is attached as Exhibit 25 to the Williams Decl.); Yurkanin, *Long Waits as Gridlock Grips AMDH*, *supra*.[5]  Despite sheriffs' efforts to address the needs of persons with serious mental illness in Alabama's county jails, Plaintiffs and putative class members do not, and cannot, be provided court-ordered Competency Services in county jails.

First, Plaintiffs and putative class members have been ordered to receive inpatient competency evaluations and restorative treatment because their needs cannot be met in an outpatient setting or jail. *Cf*. Ala. R. Crim. P. 11.3(b) (court may commit defendant for inpatient evaluation if the defendant cannot be examined on an outpatient basis, an outpatient setting is unavailable, or the appointed examiner reports that confinement for evaluation is indispensable to a clinically valid diagnosis and report); Ala. R. Crim. P. 11.6(c)(3)(i) (the court "shall order the defendant committed to the custody of [ADMH] for therapy and treatment, in an institution suitable to receive such persons").

Second, the mental health services available to Plaintiffs and putative class members in county jails are designed to stabilize their mental condition and ensure their safety in the jail setting.  *Cf. Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1106 (9th Cir. 2003) ("Jails can

---

[5] The current mental health crisis in Alabama county jails may be distinctive in its urgency, yet the inferior conditions for individuals with mental illness in Alabama's county jails relative to its prisons was acknowledged by the Eleventh Circuit three decades ago in *Lynch v. Baxley*, 744 F.2d 1452, 1460 (11th Cir. 1984) (citing *Newman v. Alabama*, 466 F. Supp. 628, 630 (M.D. Ala. 1979), wherein district court "found it to be undisputed by the state that the conditions in the county jails are worse than any that exist in the state prisons").

16

provide medication management for people who are willing to take medications . . . [and] [w]hen resources permit basic clinical psychiatry and intervention.  Such treatment is designed to stabilize the inmate.").   County jails provide Plaintiffs and putative class members basic medication management.  *See* Am. Compl. ¶ 86-88.  Yet county jails' medication management services are limited:  jails, for legitimate penalogical reasons, do not offer the full range of pharmacological options to treat inmates (i.e., they do not provide controlled substances), *see* Am. Compl. ¶ 88; they lack the staff to closely monitor side effects and provide an optimal medication regime to treat inmates' mental illness, *see* Am. Compl. ¶ 86-87; and, except in rare circumstances, they do not forcibly medicate. *See* Dvoskin Decl. ¶ 4 (inmates often refuse medication in the jail setting and reasons for same).

Jails likewise provide Plaintiffs and putative class members limited responses to suicidal ideation or suicide attempts, which focus almost exclusively on isolation and observation by correctional officers.  *See* Am. Compl. ¶ 92. Even where suicide prevention includes counseling, that counseling occurs only at extended intervals and for the limited purpose of preventing self-injury.  Escambia County Sheriff Grover Smith explained that the county jail provides limited monthly counseling to a young female inmate with mental illness, but the psychologist "is not [in the jail] for treatment, but for prevention and making sure no one hurts themselves."  Roop, *Jails Overwhelmed*, *supra*.

Even where, in larger metropolitan areas, county jails employ more clinical staff, jail officials tend to rely on medication management and isolation to deal with individuals whose mental illness manifests in difficult behaviors.  *See* Am. Compl. ¶ 89-93.  For example, Houston County Sheriff Donald Valenza reported that the Houston County Sheriff's Department has a doctor and medical assistant who can serve the county jail.  Roop, *Jails Overhwhelmed*, *supra*. However, Plaintiff Travis Parks, who has an extensive history of severe mental illness and

struggled with its symptoms while incarcerated in the Houston County Jail, spent much of his time in segregation. Am. Comp. ¶ 115.  Madison County Sheriff Blake Dorning has also reported that inmates who destroy jail property and throw feces at guards, ultimately, are held in solitary confinement.  Roop, *Jails Overwhelmed, supra*.

Finally, county jails do not provide the individualized, intensive care that psychiatric hospitals provide to persons receiving inpatient competency services.  *See* Dvoskin Decl. ¶ 4 (the standard of care for incompetent defendants who remain in custody in virtually all jurisdictions is a transfer to a state forensic psychiatric hospital, which has seven characteristics not shared by jails).  Dr. Dvoskin[6] has identified seven components of the competency restoration care provided by psychiatric hospitals – all of which relate to the ability of clinicians to appropriately individualize care:

- *Adequate clinical personnel*. Many jails lack adequate psychiatric, psychological, social work, and nursing services necessary to individualize care and implement treatment goals related to restoring competency. *See* Dvoskin Decl. ¶ 4(i). While county jails in Alabama's larger metropolitan areas may employ a psychiatric clinician and or have access to one (such as in Jefferson County or Houston County), the county jails in Alabama's smaller county jails often do not have a full-time clinician on staff, instead contracting with a provider who visits the jail at regular intervals, e.g., weekly.  *See* Am. Compl. ¶ 87.

- *Therapeutic environment*. Most jails are unable to create a therapeutic environment for incompetent inmates.  Dvoskin Decl. ¶ 4(ii).  Even where, as in Jefferson County, incompetent or otherwise severely mental ill inmates are housed in mental health

---

[6] "Dr. Joel Dvoskin [is] a clinical psychologist with experience in prison mental health treatment and an expert in clinical, forensic, and correctional psychology and administration of mental health facilities[.]"  *Advocacy Ctr. for the Elderly & Disabled v. La. Dep't of Health & Hosps.*, 731 F. Supp. 2d 603, 611 (E.D. La. 2010).

cellblocks, those inmates do not receive psychotherapy or other services which could transform clustered housing into a therapeutic environment.  *See* Am. Compl. ¶ 89 (mental health cellblocks); Am. Compl.  ¶ 101, 136 (Mr. Hunter and Mr. Jackson were, at various points, housed in the medical unit but did not receive services beyond medication management).

- *Individualized treatment*.  The treatment plans prepared for county jail inmates tend to be palliative in nature, designed to enable the inmate to manage his or her confinement rather than restorative or otherwise rehabilitative.  *Cf*. Dvoskin Decl. ¶ 4(iii); Am. Compl. ¶ 94 (treatment planning usually confined to mediation management).  The treatment plan prepared by a local community mental health center for Plaintiff Russell Senn during his incarceration at the Pike County Jail focused on addressing his chronic and severe insomnia rather than restoring him to competency or addressing the symptoms of his mood disorder and psychosis.  Am. Compl. ¶ 108; Gadd Decl., Exs. 7-8.

- *Patient perceptions of safety*.  Inmates rarely perceive county jails as safe spaces, and are therefore less likely to accept psychotropic medication that leaves them less alert.  Dvoskin Decl. ¶ 4(iv).  Plaintiff Marcus Jackson generally struggles with fearfulness of others as a result of his mental illness, but he is particularly vigilant for his safety after being attacked and injured by another inmate in the Jefferson County Jail.  Am. Compl. ¶ 136-37.

- *Absence of stigma*.  "The stigma of mental illness that exists throughout our society is even worse in jails, where inmates, and even staff, frequently refer to inmates with mental illness in demeaning terms."  Dvoskin Decl. ¶ 4(v).

- *Understanding the behavioral manifestations of mental illness*.  "Many jails are insensitive to the frequent minor disciplinary violations . . . that usually accompany psychosis, treating such infractions as if they were intentional rule violations."  Dvoskin

19

Decl. ¶ 4(vi).  The Plaintiffs and putative class members are often placed in segregation, for short disciplinary periods, when their behavior is disruptive, when they engage in physical conflicts with other inmates, and when they fail to follow the rules. Am. Compl. ¶ 101, 115, 122, 129, 136, 143, 149-51.

- ***Addressing the needs of persons with severe mental illness who, if they have symptoms of psychosis, are less likely to be considered for discretionary release***.  *See* Dvoskin Decl. ¶ 4(vii).  For example, Mr. Darnell's commitment order recites the court's finding that, based on his history of mental illness and current criminal charges, he posed a danger to himself or others requiring his continued incarceration.  *See* Gadd Decl., Ex. 11.

Alabama's county jails do not aspire to provide Competency Services to Plaintiffs and putative class members.  They are neither equipped nor funded to do so.  However, their inability to provide Competency Services is of profound human import to Plaintiffs and putative class members who are languishing in jails awaiting Competency Services.  It is also, as discussed in Section III below, legally significant in that Plaintiffs are denied care to which they are entitled.

### G.   Injuries Sustained by Plaintiffs and Class Members as a Result of ADMH's Failure to Provide Timely Competency Services

ADMH's failure to transfer Plaintiffs and putative class members to a suitable institution for competency services results in their being indefinitely confined in county jails. Alabama Sheriffs and federal courts have commonly recognized that "[j]ail is not where these people [with mental illness] need to be." Gattis, *It Falls Back On Jails, supra.*  Plaintiffs and putative class members have deteriorated and are likely to continue to do so while they remain in county jails awaiting treatment; this is because they are not receiving adequate psychiatric care.  *Cf.* Dvoskin Decl. ¶ 5 (absent adequate treatment, particularly where inmates refuse medication, inmates' mental with severe mental illness can decompensate); *Disability Law Ctr. v. Utah*, Case No. 2:15-

cv-00645-RJS, 2016 U.S. Dist. LEXIS 47420, *30 (D. Utah Apr. 7, 2016) ("Plaintiffs have sufficiently alleged facts showing that the mental health condition of many incompetent defendants deteriorates while in jail, making it unlikely that they will attain competency in the foreseeable future."). Moreover, "continued incarceration could exacerbate [Plaintiffs'] mental conditions." *Disability Law Center*, 2016 U.S. Dist. LEXIS at *62 (accepting Dr. Dvoskin's testimony that the "mental condition of psychotic inmates can be exacerbated by confinement in jail.").

ADMH's failure to provide Plaintiffs and putative class members timely Competency Service also results in their unjustifiable incarceration for far longer than would otherwise be justified by the proceedings against them. Where a criminal defendant is found incompetent and a court determines that there is no reasonable probability that he or she will be restored to competency within a reasonable period, if his or her being at large poses no threat of substantial harm to self or others, the court must dismiss the charges against the defendant and order his or her release. Ala. R. Crim. P. 11.6(c)(2)(ii), (iii). Where incapacitated defendants await restorative treatment, they are held for an unnecessary period of time before they could be restored to competency and tried. Some, of course, may accept plea bargains prior to trial and would immediately begin serving any period of imprisonment. For those who are restored to competency and proceed to trial, those who ultimately would be acquitted will have been incarcerated far longer than necessary to adjudicate their guilt.

## III.   ARGUMENT

Plaintiffs are entitled to preliminary injunctive relief under well-established Eleventh Circuit standards. A party seeking preliminary injunctive relief must establish that (1) it has a substantial likelihood of success on the merits, (2) the movant will suffer irreparable injury unless the injunction is issued, (3) the threatened injury to the movant outweighs the possible injury that the injunction may cause to the opposing party, and (4) if issued, the injunction would not disserve

the public interest, before the district court may grant such relief.  *Horton v. St. Augustine*, 272 F.3d 1318, 1326 (11th Cir. 2001) (citing *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000)); *Haddad v. Arnold*, 784 F. Supp. 2d 1284, 1295 (M.D. Fla. 2010).  A typical preliminary injunction is prohibitive in nature and seeks simply to maintain the status quo pending a resolution of the case.  *See Mercedes-Benz U.S. Int'l, Inc. v. Cobasys, LLC*, 605 F. Supp. 2d 1189, 1196 (N.D. Ala. 2009).  "Where a preliminary injunction is sought to force another party to act, rather than simply to maintain the status quo, it becomes a "mandatory or affirmative injunction" and the burden on the moving party increases." *Haddad*, 784 F. Supp. 2d at 1295 (quoting *Exhibitors Poster Exch. v. Nat'l Screen Serv. Corp*., 441 F.2d 560, 561 (5th Cir. 1971)).  A mandatory injunction "should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party." *Id*.

A.   **Plaintiffs Are Likely to Succeed on the Merits of Their Claim that ADMH's Failure to Timely Provide Them Competency Services Constitutes a Denial of Due Process Guaranteed By the Fourteenth Amendment.**

Plaintiffs' indefinite detention in county jails that do not, and cannot, provide them the competency services for which they were committed to ADMH's custody violates due process because Plaintiffs' continued detention in these jails constitutes punishment and because ADMH's failure to provide Plaintiffs' competency evaluations and restorative treatment negates any relationship between the nature and duration of Plaintiffs' detention and its purpose.  Plaintiffs' likelihood of establishing that their detention in county jails pending admission into Taylor Hardin or Bryce violates due process on both grounds justifies the issuance of injunctive relief even under the heightened standard applicable to preliminary mandatory injunctions.

   1.   ***Plaintiffs' detention in county jails while awaiting transfer to an institution suitable for inpatient Competency Services constitutes punishment forbidden by the Due Process Clause.***

ADMH's failure to transfer Plaintiffs and putative class members from Alabama county jails to suitable environments for inpatient evaluations and competency restoration treatment constitutes constitutionally impermissible punishment.  As incapacitated criminal defendants and persons suspected of lacking competency, Plaintiffs have a fundamental liberty interest in being free from incarceration absent a lawful conviction. *See, e.g.*, *Mink*, 322 F.3d at 1121.  As such, they  "may not be punished prior to an adjudication of guilt in accordance with due process of law."  *Jacoby v. Baldwin County*, 835 F.3d 1338, 1344, 1347 (11th Cir. 2016) (quoting *Bell v. Wolfish*, 441 U.S. 520, 545 (1979)).  "[W]hether a condition of pretrial detention amounts to punishment turns on whether the condition is imposed for the purpose of punishment or whether it is incident to some legitimate government purpose." *Jacoby*, 835 F.3d at 1345 (quoting *Magluta v. Samples*, 375 F.3d 1269, 1273 (11th Cir. 2004) (internally citing *Bell*, 441 U.S. at 538)).  "A court permissibly may infer that the purpose of the governmental action is punishment if the restriction or condition is not reasonably related to a legitimate goal – if it is arbitrary or purposeless."  *Jacoby*, 835 F.3d at 1345 (quoting Bell, 441 U.S. at 539); *see also Advocacy Center for the Elderly & Disabled v. Louisiana Dep't of Health & Hospitals*, 731 F. Supp. 2d 603 (E.D. La. 2010); *Terry ex rel Terry v. Hill*, 232 F. Supp. 2d 934, 941-44 (E.D. Ark. 2002) (applying *Bell* and holding that the "lack of inpatient mental health treatment, combined with the prolonged wait in confinement, transgresses the constitution").

ADMH has not articulated and cannot articulate a legitimate purpose for Plaintiffs' continued detention in county jails that are ill-equipped to address their needs and may intensify them.  ADMH officials, including Defendant Perdue, instead have repeatedly confirmed that the reason Plaintiffs remain in county jails is logistical:  "Every day [Taylor Hardin] is full."  *See*

Brandon Moseley, *Perdue Wants to Talks (sic) To People Across the State About Mental Health*, Alabama Political Reporter (June 6, 2016), http://www.alreporter.com/perdue-wants-to-talks-to-people-across-the-state-about-mental-health/ (a copy of *Perdue Wants to Talk* is attached as Exhibit 26 to the Gadd Declaration); *see also* Michele Gerlach, *Perdue: Mental Health Near Crisis*, Andalusia Star News (Jan. 13, 2016 12:15 AM), http://www.andalusiastarnews.com/2016/01/13/perdue-mental-health-near-crisis/ (reporting Commissioner Perdue's statements that he had never seen more than two vacancies at Taylor Hardin and both were filled within 24 hours) (a copy of *Mental Health Near Crisis* is attached as Exhibit 27 to the Gadd Declaration); Yurkanin, *Long Waits as Gridlock Grips ADMH*, *supra*. Simply put, Plaintiffs' continued detention does not serve a legitimate purpose of the State. *Cf. Mink*, 322 F.3d at 1121 (holding that the state hospital had no "legitimate state interests in keeping mentally incapacitated criminal defendants locked up in county jails for weeks or months" while they awaited transfer to the hospital so they could receive competency restoration treatment); *Disability Law Center v. Utah*, 180 F. Supp. 3d 998, 1011 (D. Utah 2016) (concluding that neither of the state's asserted interests "is reasonably related to the restrictions and conditions of incompetent defendants' pretrial detention"); *Trueblood v. Wash. State Dep't Of Soc. & Health Services*, 73 F. Supp. 3d 1311, 1315 (W.D. Wash. 2014) (finding the State had no legitimate interest in keeping incompetent criminal defendants in county jails for weeks or months while they awaited transfer to a state hospital to receive competency restoration treatment, and rejecting the State's argument that they had a "legitimate interest in reasonable delays before provision of competency services"); *Terry ex rel. Terry v. Hill*, 232 F. Supp. 2d 934, 943 (E.D. Ark. 2002) (holding that the delay in transferring court-ordered pretrial detainees to the state hospital for competency restoration treatment "is not related to any legitimate goal" and "is purposeless"). The

24

Court may therefore infer that the purpose of Plaintiffs' continued detention in county jails while they wait for inpatient competency services is impermissible punishment that violates due process.

Other federal courts squarely presented this question, in closely analogous factual circumstances, have concluded that the protracted detention of pretrial detainees awaiting inpatient competency evaluations and restorative care in county jails constitutes impermissible punishment that violates detainees' due process rights under the Fourteenth Amendment.  In *Terry ex rel. Terry v. Hill*, a class of persons charged with criminal offenses who were suffering from mental illness and had been ordered to undergo an inpatient mental evaluation or committed to the Arkansas State Hospital for treatment, claimed that their detention in county jails for eight months for competency evaluations and six months for treatment violated due process.  *See Id.*, 232 F. Supp. 2d at 935, 938, 943.  The Terry court decided that plaintiffs had established the state's liability for due process violations, holding that that "lack of inpatient mental health treatment, combined with the long wait in confinement, transgresses the constitution.  The lengthy and indefinite periods of incarceration, without any legal adjudication of the crime charged, caused by the lack of space at [Arkansas State Hospital], is not related to any legitimate goal, is purposeless and cannot be constitutionally inflicted upon members of the class."  *Id.* at 943-44.

In *Advocacy Center for the Elderly & Disabled v. Louisiana Department of Health & Hospitals*, 731 F. Supp. 2d 603, 623 (E.D. La. 2010), on plaintiffs' motion for a preliminary injunction, found that plaintiffs – the Louisiana P&A and an individual plaintiff who had been found incompetent to stand trial and was awaiting transfer to the state's forensic hospital for competency restoration treatment in a parish jail – had established their likelihood of succeeding on the merits of their due process claim.  The court observed that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish."  *Id.*, 732 F. Supp. 2d at

25

623 (quoting *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1987).  The court acknowledged that that the "[plaintiff-]Detainees are in parish jails because they are alleged to have committed crimes. But they have not been convicted of those crimes, and thus cannot be subject to conditions designed to punish."  *Id.* at 623 n. 132 (citing *Bell*, 441 U.S. at 535).  The court found that "by virtue of their detention in parish jails, the Incompetent Detainees who have been convicted of no crimes are being held in conditions substantially similar to those designed to punish."  *Id.* at 623. Rejecting the Louisiana State Department of Health & Hospitals' contention that they had "established a proactive and non-punitive system for dealing with the Detainees," *id.*, the district court concluded, consistent with the "Supreme Court['s] observ[ation] that 'confinement in a prison is more punitive and hence more onerous than confinement in a mental hospital," *id.* (quoting *Heller v. Doe ex rel. Doe*, 509 U.S. 312, 315 (1993)), that the plaintiffs' continued confinement in parish jails constituted punishment and agreed that issuance of the requested injunction was appropriate.  *Id.* at 623-24, 627.

In practical terms, the mental health treatment crisis presently before the court differs in few material respects from the situation it addressed three decades ago in *Lynch v. Baxley*.  *See* 744 F.2d 1452 (11th Cir. 1984) (on appeal from Middle District of Alabama).  In *Lynch*, a class of mentally ill persons subject to emergency detentions pending involuntary commitment proceedings challenged the State's practice of holding emergency detainees in county jails when space was not available in local mental health facilities.  "The district court found that Alabama was properly detaining the class members in jail in order to protect the mentally ill and society." *Id.*, 744 F.2d at 1458.  "Plaintiff-appellants concede[d] that both justifications for commitment are legitimate and that confinement may be necessary." *Id.*  They argued, however, that "[e]mergency detention should not be inconsistent with treating the mentally ill individual or protecting society, to whom plaintiffs belong." *Id.*

The Eleventh Circuit acknowledged that "[t]emporary confinement in jail is particularly harmful to those who are mentally ill.  Those detained in jail are surrounded by accused criminals and jailers rather than professionals trained to deal with mental problems." *Id*.  (crediting expert's undisputed deposition testimony that jail exacerbates the mental problems of the people detained there and thereby lengthens the time it takes to treat them).  The Eleventh Circuit concluded that "Alabama does have a compelling interest in the emergency detention of those who threaten 'immediate and serious violence to themselves or others," *id*., but found that "such detention is not the least restrictive means for achieving that goal." *Id*. at 1458-59.  In its substantive due process analysis, the Eleventh Circuit followed the holding in *Jackson v. Indiana*, 406 U.S. 715, 738 (1972), that "[d]ue process requires, at a minimum, some rational relation between the nature and duration of confinement and its purpose." *Lynch*, 744 F.2d at 1460.  The district court rejected the plaintiff-appellants' challenge to confinement in jail based on its finding that "those being temporarily held under commitment petitions were more like pretrial detainees charged with committing a crime." *Id*.  The Eleventh Circuit rejected this conclusion because "[s]uch an assessment ignores the fact that pretrial detainees are taken into custody because of their own actions and understand the procedures surrounding their detention.  By contrast, the mentally ill are apprehended and held because they have mental health problems and other people believe that commitment is necessary." *Id*.  The Eleventh Circuit concluded that

> Plaintiff-appellants do not seek freedom from restraint but rather conditions of restraint which do not exacerbate their mental condition.  Since emergency detention is justified only until a probable cause determination can be made, those awaiting commitment proceedings are entitled to confinement which is not inconsistent with being released or committed.  Jail is a place of incarceration for those accused of crimes.  If pretrial detainees cannot be punished because they have not yet been convicted, *Bell v. Wolfish*, 441 U.S. 520 (1979), then emergency detainees cannot be subjected to conditions of confinement substantially worse than they would face upon commitment.

*Lynch*, 744 F.2d at 1461.

27

The Plaintiffs and putative class members in this case differ from the *Lynch* plaintiffs in that they have been criminally charged and are, as such, pretrial detainees. But they are pretrial detainees who have been committed to the custody of ADMH for competency evaluations or restorative treatment. For each of the Plaintiffs awaiting competency restoration treatment, their criminal cases have continued until their competency has been restored or competent clinicians have determined that their competency cannot be restored. As a matter of law, each of the individual Plaintiffs and members of the putative class has a sufficiently compromised mental state that they are suspected of being incompetent or have been found to be incompetent. That is, as a matter of law, their mental condition is such that they "lack sufficient present ability to assist in [their] defense by consulting with counsel with a reasonable degree of rational understanding of the facts and the legal proceedings against [them]." Ala. R. Crim. P. 11.1. As such, they are more like the mentally ill emergency detainees in *Lynch* who were unable to "understand the procedures surrounding their detention."[7]

Plaintiffs have been committed to the custody of ADMH for restorative treatment and are, like the *Lynch* plaintiffs, confined in county jails for no reason other than the lack of available beds at Taylor Hardin and Bryce. The question before the Court in this case is therefore deceptively similar to the question presented in *Lynch*: may the State of Alabama, and ADMH specifically, essentially warehouse mentally ill persons who have not been convicted of a crime and against

---

[7] In *Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1121 (9th Cir. 2003), the Ninth Circuit observed that "incapacitated criminal defendants have a liberty interest in receiving restorative treatment." In support of its conclusion, the *Mink* court relied on its decisions in the civil commitment context, observing that "[w]e have held that civilly committed persons must be provided with mental health treatment that gives them 'a realistic opportunity to be cured or improve the mental condition for which they were confined.'" *Id.* (quoting *Sharp v. Weston*, 233 F.3d 1166, 1172 (9th Cir. 2000) (citing *Ohlinger v. Watson*, 652 F.2d 775, 779 (9th Cir. 1980)). For further discussion of Plaintiffs' liberty interest in receiving the competency services ordered by the circuit court in the criminal proceedings against them and due process violation resulting from the denial of that treatment while Plaintiffs remain in jail, *see* Section III.A.2, *infra*.

whom criminal proceedings have been continued in Alabama's county jails until space becomes available to provide them the intensive inpatient mental health treatment that an Alabama court has ordered them to receive.

> **2.      ADMH's failure to provide Plaintiffs competency evaluations and restorative treatment negates any relationship between the nature and duration of Plaintiffs' detention and its purpose and therefore violates due process.**

Plaintiffs' continued detention in county jails without receiving court-ordered competency evaluations and restorative services likewise violates due process because, absent their receipt of the treatment for which they were committed, their indefinite detention in county jails bears no reasonable relation to the purpose for which they were committed to ADMH's custody.  As pretrial detainees who have been committed to ADMH custody for competency services, the Plaintiffs and putative class members have a liberty interest in receiving the competency services for which they were committed.  *See Mink*, 322 F.3d at 1121; *Trueblood v. Wash. Dep't of Soc. & Health Servs.*, 101 F. Supp. 3d 1010, 1020 (W.D. Wash. 2015).  "As part of a right to treatment and care, institutionalized persons have liberty interests in reasonable care and safety, reasonably non-restrictive conditions, and such other treatment as may be required to comport fully with the purpose of confinement."  *Trueblood*, 101 F. Supp. 3d at 1020-21; *see also Mink*, 32 F.3d at 1121 (quoting holding in *Sharp v. Weston*, 233 F.3d 1166, 1172 (9th Cir. 2000), in turn quoting *Ohlinger v. Watson*, 652 F.2d 775, 779 (9th Cir. 1980), that "civilly committed persons must be provided with mental health treatment that gives them 'a realistic opportunity to be cured or improve the mental condition for which they were confined").  Crucially, "a determination of constitutionally adequate treatment for Plaintiffs and class members must be measured not by that which must be provided to the general prison population, but by that which must be provided to those committed

for mental incompetency." *Trueblood*, 101 F. Supp. 3d at 1021 (citing *Ohlinger*, 652 F.2d at 778-79).

Again, "whether the substantive due process rights of incapacitated criminal defendants have been violated must be determined by balancing their liberty interests in [] restorative treatment against the legitimate interests of the state." *Id*. (quoting *Mink*, 322 F.3d at 1121). "Although the specifics of the calculus may vary, the framework set out in *Jackson*, and applied to restorative competency services in *Mink*, is equally applicable to individuals awaiting competency evaluations. Weighing the parties' respective interests, there must be a 'reasonable relation' between the length of time from the court order to the inception of the competency evaluation." *Trueblood v. Wash. State Dep't of Soc. & Health Servs*., 822 F.3d 1037, 1043 (9th Cir. 2016). In *Mink*, *Trueblood*, and *Disability Law Center*, the courts concluded that the interests of detainees in timely receiving services outweighed any interest that the states may have had in delaying their treatment. *Mink*, 322 F.3d at 1121-22; *Trueblood*, 101 F. Supp. 3d at 1022; *Disability Law Center*, 2016 U.S. Dist. LEXIS 47420, at *31.

The *Trueblood* court's reasoning is instructive here. In *Trueblood*, the court found that the state's "primary governmental interest" relative to the Plaintiffs and putative class members, who, like Plaintiffs and putative class members here, were awaiting inpatient competency evaluations and restorative treatment, was "to bring those accused of a crime to trial." *Id*. at 1021-22. "In furtherance of that goal, the state has a legitimate interest in evaluating a potentially incompetent defendants' competency so as to determine whether he or she may stand trial, and in restoring the competency of those found incompetent so that they may be brought to trial."). *Id*. at 1022. The *Trueblood* court further found that the state "has a corresponding interest in an efficient and organized competency evaluation and restoration system, the administration of which uses public resources appropriately." *Id*. Weighing all of these interests, the court not only found that

Plaintiffs had established the state's liability for violating due process, but also that a seven-day

maximum period of incarceration prior to the Plaintiffs' receipt of competency services advanced

the state's interests.  *Id*. at 1022.  Because "people who are incarcerated for long periods before

they receive services require longer and more intensive care, resulting in higher costs to [the

Department of Social and Health Services]," the state's interests in bringing people to trial in a

cost-effective system was advanced by quickly providing Plaintiffs the competency services to

which they were entitled.  *Id*.  The *Trueblood* court's reasoning bears extended citation here:

> Class members' criminal trials are delayed by long periods of incarceration,
> especially where the incarceration causes class members to require a longer
> treatment period.  Not only does this contravene the State's interest in swiftly
> bringing the accused to trial, it results in significant costs to the public, who pay for
> the incarceration and the extended treatment.  Holding someone in solitary
> confinement, a common occurrence with class members, is especially taxing on jail
> resources and expensive to the public. While it is the counties rather than DSHS
> who directly fund the jails, the public bears the costs nonetheless.  An efficient
> system that moves people through the competency process quickly will thus
> increase the speed at which competent people are brought to trial, will increase the
> percentage of incompetent people who can be restored and thus brought to trial,
> and will reduce the amount of money that the public spends incarcerating people.
> The state's interest in an efficient and cost-effective system is furthered by
> requiring it to adopt sound management practices with measurable results rather
> than by allowing a poorly managed system to continue to allow itself to be thrown
> into crisis every time a minor roadblock presents itself.  A properly functioning
> forensic system must be able to plan for and accommodate fluctuations in demand,
> not be destroyed by them.

*Id*., 101 F. Supp. 3d at 1022-23.

Plaintiffs and putative class members are entitled to receive the competency services for

which they were committed to ADMH's custody under the due process clause.  They, like their

counterparts in Washington, Oregon, Utah, Louisiana, and Arkansas, are subject to deteriorating

mental conditions with each day that passes, and in certain material respects, their confinement in

jail exacerbates their mental illness. Alabama generally, and ADMH specifically, has an interest

in the determination of the Plaintiffs' competency, and, where found lacking, its restoration, so

that these individuals may be brought to trial.  As such, the interests of Plaintiffs and the State are aligned:  both have an interest in the determination and restoration of Plaintiffs' competency so that they may be brought to trial as appropriate.  As such, due process requires that they be timely provided the treatment for which they were committed to ADMH custody.  *Cf.* Dvoskin Decl. ¶ 4-5, 7.

Moreover, Alabama, no less than Washington, has an interest in meeting its constitutional obligations in the most cost-effective manner possible.  While its failure to provide constitutionally mandated competency services in a timely manner is the product of the lack of capacity and resources provided to ADMH to provide these services, the *Trueblood* court's analysis conveys the penny-wise and pound-foolish nature of Alabama's system.  While matters of funding and policy are matters for the legislature, the fact that providing Plaintiffs and putative class members the services sought in this action, over and above being mandated by due process, are actually in the mutual interest of Plaintiffs and the State of Alabama should persuade the court that issuance of the injunction sought here will work no substantial or compelling injury to ADMH or the State of Alabama more broadly.

> **3.** ***ADMH's Failure to Provide Timely Competency Evaluations and Restorative Treatment to Plaintiffs Is Not Excused By Limited Capacity and/or Resources.***

Plaintiffs are also likely to prevail on the merits of their due process claims because ADMH's failure to provide timely competency services to Plaintiffs cannot be excused by ADMH's lack of capacity or resources to treat them.  The Eleventh Circuit has repeatedly recognized that lack of resources does not excuse the failure to meet constitutional standards of confinement.  *See, e.g., Moore v. Morgan*, 922 F.2d 1553, 1557 n.4 (11th Cir. 1991) (citing *Smith v. Sullivan*, 611 F.2d 1039, 1043-44 (5th Cir. 1980) ("[I]t is well established that inadequate funding will not excuse the perpetuation of unconstitutional conditions of confinement.")); *see*

*also Bonner v. Pritchard*, 661 F.2d 1206, 1207-08 (11th Cir. 1981) (adopting as precedent the pre-split decisions of the Fifth Circuit Court of Appeals); *Anderson v. City of Atlanta*, 778 F.2d 678, 687 (11th Cir. 1985) (holding that lack of funds for facilities could not justify lack of competent medical care or treatment of inmates).

The court in *Terry ex rel. Terry v. Hill*  acknowledged the financial origins of Arkansas State Hospital's inability to timely provide appropriate mental health care to class members, but found that "limited resources cannot be considered an excuse for not maintain the institution according to at least minimum constitutional standards." *Id.*, 232 F. Supp. 2d at 944 (quoting *Finney v. Mabry*, 534 F. Supp. 2d 1026, 1041 (E.D. Ark. 2002)).  Granting plaintiff-detainees' motion for a preliminary injunction mandating that Louisiana's Department of Health & Hospitals provide timely competency restoration services to pretrial detainees, the court in *Advocacy Center for the Elderly & Disabled v. Louisiana Department of Health & Hospitals* similarly found that delays caused by the Department's lack of resources did not excuse its violation of due process. *Id.*, 731 F. Supp. 2d at 626 (quoting *Smith v. Sullivan*, *supra*).  Any appeal by Commissioner Perdue to ADMH's lack of resources as a basis for its failure to timely treat Plaintiffs and putative class members, while perhaps true as an explanation of ADMH's current operation, may not be accepted in this action as a defense to liability or the preliminary injunction sought here.

### B.   Plaintiffs Will Suffer Irreparable Injury Absent Issuance of a Preliminary Injunction Mandating that ADMH Immediately Provide Them Inpatient Competency Services.

Plaintiffs and putative class members will suffer irreparable injury as a result of their continued detention in county jails without receiving court-ordered inpatient competency services. As discussed in Section II.F and II.G above, incapacitated defendants with mental illness and those whose competency is questioned are likely to deteriorate while incarcerated in jails without adequate treatment. This deterioration makes it likely that it will take longer to restore them to

competency and increases the risk that they will not be able to be restored to competency.  *See* Dvoskin Decl. ¶ 5; *Advocacy Center for the Elderly & Disabled*, 731 F. Supp. 2d at 625-26.  This threat of further deterioration, together with the deterioration Plaintiffs have already experienced due to the long periods that they have already been incarcerated without treatment, supports a finding of irreparable harm in this case.  *Id.* (finding plaintiffs demonstrated that they would suffer irreparable harm if the preliminary injunction did not issue where their arguments were based on the threat of further deterioration described by Dr. Dvoskin).

> **C.    The Injury Plaintiffs will Suffer Absent an Injunction Requiring that They be Provided Timely Competency Services Outweighs Any Injury to Commissioner Perdue as a Result of Being Required to Comply with the Law.**

Absent the issuance of an injunction, Plaintiffs and putative class members will suffer a series of significant harms.  First, they will continue to wait for urgently needed intensive and individualized mental health treatment in county jails.  They will continue to struggle with the symptoms of inadequately treated mental illness and face the imminent risk that their illness will worsen and/or become more difficult to treat once they begin receiving appropriate care. Second, they will bear the risk of spoliation of exculpatory evidence in their criminal cases as witnesses relocate and/or pass away and tangible evidence degrades.  Third, they will suffer the continued constitutional injury associated with their ongoing deprivation of due process in contravention of the Fourteenth Amendment.

ADMH, in contrast, will suffer no compelling injury as a result of being enjoined to provide the Individual Plaintiffs and putative class members timely competency services.  The issuance of the preliminary injunction sought by the individual Plaintiffs and ADAP would not require Commissioner Perdue or ADMH to perform any act that ADMH is not already legally obligated to perform.  Alabama Rules of Criminal Procedure 11.3 and 11.6 authorize Alabama circuit courts to commit defendants who are suspected of being incompetent or found incompetent to AMDH's

custody for competency services.  Once circuit courts issue commitment orders pursuant to Rules 11.3 and 11.6, as they have for the individual Plaintiffs and putative class members, ADMH is legally obligated to provide the services sought here.  Any injury ADMH purports to suffer as a result of the injunction, therefore, could only arise from the requirement that ADMH provide the Plaintiffs and putative class members competency services immediately rather than in the future.

The only "injury" ADMH could claim to suffer if required to provide Competency Services to persons on the waiting lists immediately is that it would have to divert resources to do so. Federal courts do not, however, recognize as an "injury" the costs associated with, or the diversion of resources required by, any requirement that a state agency provide required services sooner rather than later.  Section III.A.3, supra (lack of resources insufficient to justify failure to provide timely services).

The overwhelming injuries that Plaintiffs will suffer absent the injunction far outweigh any injury claimed by ADMH as a result of its issuance.  This imbalance of potential harms strongly favors issuance of the injunction.

> **D.** **Issuance of the Injunction Sought Here Will Advance the Public Interest.**

The court's issuance of a preliminary injunction requiring ADMH to provide Plaintiffs and putative class members competency restoration services will advance the public interest and, as such, Plaintiffs respectfully urge the Court to grant their request for a preliminary injunction. "[T]here is a strong public interest in protecting the Fourteenth Amendment rights of those in state custody who have not been convicted of a crime. *Advocacy Center for the Elderly & Disabled*, 731 F. Supp. 2d at 626, 626 n. 147 (citing *Nobby Lobby, Inc. v. City of Dallas*, 970 F.2d 82, 83 (5th Cir. 1992) ("the public interest is always served when public officials act within the bounds of the law and respect the rights of the citizens they serve")).  There is also a strong public interest in "having those charged with criminal offense proceed speedily to trial. *Advocacy Center for the*

*Elderly & Disabled*, 731 F. Supp. 2d at 626.  Both interests will be vindicated by issuance of the preliminary injunction sought by Plaintiffs here.

      **E.**      **Waiver of the Security Required for Issuance of Injunctive Relief Is Appropriate in This Case.**

Plaintiffs respectfully request that the Court waive the requirement of a security interest for injunctive relief in this case.  Rule 65(c) of the Federal Rules of Civil Procedure provides that "the court may issue a preliminary injunction only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." *Id.*  Courts have "recognized an exception to this requirement for litigants who bring suit in the public interest." *Advocacy Center for the Elderly & Disabled*, 731 F. Supp. 2d at 626-27 (citing *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. Unit B Feb. 1981)); *cf. Bonner*, 661 F.2d 1206, 1207-08 (11th Cir. 1981).  Waiver of the bond requirement is also "particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right." *Advocacy Center for the Elderly & Disabled*, 731 F. Supp. 2d at 627 (citing *Complete Angler, LLC v. City of Clearwater, Fla.*, 607 F. Supp. 2d 1326, 1335 (M.D. Fla. 2009)).  Plaintiffs here have brought suit on behalf of themselves and a class of dozens of similarly mentally ill pretrial detainees alleging the violation of their due process rights.  Plaintiffs are, as such, asserting the same constitutional interests justifying waiver of the security requirement in *Advocacy Center for the Elderly & Disabled v. Louisiana Department of Health & Hospitals*. *Id.*, 731 F. Supp. 2d at 626-27.  Plaintiffs are also, like the plaintiffs in *Advocacy Center for the Elderly & Disabled*, "highly unlikely . . . [to] be able to afford the costs and damages suffered by defendants if they are later determined to have been wrongfully detained." *Id.*  Each of the Plaintiffs has been found indigent in the criminal cases pending against them and, as a result, appointed counsel. *See, e.g.,* Gadd Decl., Exs. 3 (Hunter indigence order),

6 (Senn indigence order); 20 (McGhee indigence order).  Plaintiffs therefore respectfully request that the court waive Rule 65(c)'s security requirement in this case.

## IV.    CONCLUSION

For the reasons set forth in Section III above, Plaintiffs Demontray Hunter, Russell Senn, Travis Parks, Vandarius Darnell, Frank White, Jr., Marcus Jackson, Timothy Mount, and Henry McGhee, through their respective next friends, together with Plaintiff Alabama Disabilities Advocacy Program respectfully request that the Court issue an order granting the preliminary injunction requested in Plaintiffs' Motion.

Dated: December 23, 2016                      Respectfully submitted,

/s/ M. Geron Gadd _____
M. Geron Gadd (ASB-0601-J98S)
ALABAMA DISABILITIES ADVOCACY PROGRAM
400 South Union Street, Suite 280
Montgomery, AL 36104
Telephone:  (334) 240-0994
Facsimile:   (334) 240-0996
Email:  mggadd@adap.ua.edu

J. Patrick Hackney (ASB-6971-H51J)
William Van Der Pol, Jr. (ASB-2112-114F)
Lonnie J. Williams (ASB-2866-I35W)
ALABAMA DISABILITIES ADVOCACY PROGRAM
500 Martha Parham West
Box 870395
Tuscaloosa, AL 35487-0395
Telephone:  (205) 348-4928
Facsimile:   (205) 348-3909
Email:  jphackney@adap.ua.edu
          wvanderpoljr@adap.ua.edu
          lwilliams@adap.ua.edu

Henry F. (Hank) Sherrod III (ASB-1200-D63H)
HENRY F. SHERROD III, P.C.
119 South Court Street
Florence, AL 35630
Telephone:  (256) 764-4141
Facsimile:   (877) 864-0802
Email:  hank@alcivilrights.com

Randall C. Marshall (ASB-3023-A56M)
ACLU OF ALABAMA FOUNDATION
P.O. Box 6179
Montgomery, AL 36106-0179
Telephone:  (334) 420-1741
Facsimile:  (334) 269-5666
rmarshall@aclualabama.org

*Attorneys for Plaintiffs Demontray Hunter, Russell D. Senn,*
*and Travis S. Parks, Vandarius S. Darnell, Frank White, Jr.,*
*Marcus Jackson, Timothy D. Mount, and Henry P. McGhee*

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that I have caused a copy of the foregoing to be served

on the individuals named below by filing with the Clerk of Court using the EC/CMF system which

will automatically send notification by electronic mail to same, this 23rd day of December, 2016.

M. Geron Gadd
Alabama Disabilities Advocacy Program
400 South Union Street, Suite 280
Montgomery, Alabama 36104
mggadd@adap.ua.edu

J. Patrick Hackney
William Van Der Pol, Jr.
Lonnie Williams
Alabama Disabilities Advocacy Program
500 Martha Parham West
Box 870395
Tuscaloosa, AL 35487-0395
jphackney@adap.ua.edu
wvanderpoljr@adap.ua.edu
lwilliams@adap.ua.edu

Henry F. (Hank) Sherrod III
Henry F. Sherrod III, P.C.
119 South Court Street
Florence, AL 35630
hank@alcivilrights.com

Randall C. Marshall
ACLU of Alabama Foundation
P.O. Box 6179
Montgomery, AL 36106-0179

Thomas B. Klinner
Edward C. Hixson
Ashley L. Nichols
Nancy S. Jones
Alabama Department of Mental Health
RSA Union Building
100 North Union Street
Montgomery, Alabama 36104
Tommy.Klinner@mh.alabama.gov
Eddie.Hixson@mh.alabama.gov
Ashley.Nichols@mh.alabama.gov
Nancy.Jones@mh.alabma.gov

rmarshall@aclualabama.org

/s/ M. Geron Gadd
M. Geron Gadd (ASB-0602-J98S)
Counsel for Plaintiffs