IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| DEMONTRAY HUNTER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:16cv798-MHT |
| | ) | (WO) |
| LYNN T. BESHEAR, in her | ) | |
| official capacity as the | ) | |
| Commissioner of | ) | |
| the Alabama Department of | ) | |
| Mental Health, | ) | |
| | ) | |
| Defendant. | ) | |

## FINAL SETTLEMENT APPROVAL OPINION AND ORDER

The claim presented in this litigation is that the
Alabama Department of Mental Health (ADMH) fails to
provide timely competency mental-health evaluations and
restoration treatments to pretrial detainees. The
claim rests on the Due Process Clause of the Fourteenth
Amendment, as enforced through 42 U.S.C. § 1983.

The plaintiffs are pretrial detainees who have been
found incompetent to stand trial and committed to the
custody of the ADMH for competency restoration if
possible; a pretrial detainee who may be incompetent

and has been committed for an inpatient mental evaluation; and the Alabama Disabilities Advocacy Program (ADAP), Alabama's protection and advocacy organization for people with mental illness and disabilities. The defendant is the Commissioner of the ADMH, sued in her official capacity only.

Briefly, plaintiffs claim that the ADMH fails to provide timely competency evaluations and restoration services because demand for those services exceeds the Department's capacity to provide them through the psychiatric hospitals it operates. They alleged that the pretrial detainees remained incarcerated in a county jail for up to eight months after a court order committing them to the Department for treatment or evaluation. They sought declaratory and injunctive relief. Jurisdiction is proper under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights).

The parties submitted a joint motion for preliminary approval of a settlement. The court granted preliminary approval; provisionally certified a

putative plaintiff class; required notice to class members and their representatives; entertained objections and comments from the members and their representatives; and held a fairness hearing.

For the reasons that follow, the court will grant final approval of the settlement and the parties' request to enter a consent decree.

## I. DESCRIPTION OF PROPOSED SETTLEMENT

The settlement agreement runs some 43 pages. It provides for the following.

*Timely Provision of Court-Ordered Mental Evaluations and Competency Restoration Treatment*: The ADMH is required to provide court-ordered mental evaluations and competency restoration treatment within specified time periods:

(1) Mental Evaluations: By 12 months after final approval, the Department must conduct both inpatient and outpatient mental evaluations within 45 calendar days of the date

of ADMH's receipt of the circuit court order mandating the evaluation, and the clinician must submit a report with the findings from the evaluation to the circuit court within 45 days of conducting the evaluation. By 24 months after final approval, the time periods are reduced to 30 days.

(2) Competency Restoration Therapy and Treatment: By 12 months after final approval, the Department must admit persons found incompetent to stand trial and committed to its custody for treatment into an institution suitable for treatment within 45 days. By 24 months after final approval, the time period is reduced to 30 days.

(3) Order of Evaluations and Treatment: As a general rule, the Department will continue to provide services to those persons it is ordered to evaluate or treat based on the date of receipt of the court order. The agreement

generally prohibits the Department from meeting the agreement's time periods by prioritizing, for admission into a state forensic hospital, persons who have been found incompetent to stand trial and ordered to receive treatment over persons who have been found not guilty by reason of insanity and ordered to receive inpatient psychiatric services. If, in exceptional circumstances, the Department 'skips' persons found not guilty by reason of insanity to treat persons found incompetent, the skip will affect the Department's compliance rate. The agreement authorizes, but does not require, the Department to treat persons earlier than dictated by the date of receipt of court order (i.e., 'line jumping').

(4) Substantial Compliance: The agreement defines the standard to determine whether the Department is in 'substantial compliance' with the agreement. By 12 months after final

approval, the average time period for the
provision of inpatient and outpatient mental
evaluations and competency restoration
treatment must not exceed the applicable time
frame by 20 %. For example, for a service that
is to be provided within 45 days, the average
time period must not exceed 54 days. By 24
months after final approval, the average time
period may not exceed the applicable time frame
by 12 %. For example, for a service that is to
be provided within 30 days, the average time
period must not exceed 34 days. This section
also defines the treatment of, for the purposes
of calculating the Department's average monthly
compliance rate, and establishes a dispute
resolution process, concerning individuals who
are next in line to receive a service but are
'skipped' by the Department because of an
obstacle to providing the service at that time.

*Increase in Capacity*:  The ADMH will increase its bed capacity to provide court-ordered inpatient mental evaluations and competency restoration treatment. Within 24 months after final approval, the Department must add and operate 101 total new beds: 49 hospital forensic beds and 52 community forensic beds.  Of those, 44 beds must be operational within 12 months after final approval (24 hospital forensic beds and 20 community beds).  Five of the community forensic beds must be suitably located for registered sex offenders; all community forensic beds must be distributed in group homes throughout the State of no greater than 16 beds.

*Training*:  The Department will offer initial and periodic training to state circuit court personnel, county sheriffs, and members of the Alabama State Bar concerning the procedures for mental evaluations and competency-restoration treatment.

*Monitoring*:  ADAP will monitor the ADMH's compliance with the consent decree, and will be

entitled to access relevant documents and to conduct interviews with staff and persons referenced in the agreement. ADAP will prepare quarterly reports on the Department's compliance containing written recommendations for any necessary changes, and the parties will meet and confer to address any reported deficiencies.

*Dispute Resolution Process*: The parties are to meet and confer to resolve any disputes that arise during the implementation and monitoring periods of the agreement. If the parties are unable to resolve the dispute, they will submit disputes to the magistrate judge, with appeal to the district court.

*Termination:* The consent decree will terminate after three years unless either plaintiffs or the parties jointly request, and the court grants, an extension.

*Amendment*: The parties may mutually amend the agreement in writing signed by the parties and approved by the court.

*Funding*: The parties acknowledge that implementation of the agreement is subject to the availability and receipt of appropriated funds, but the lack of funding or third-party cooperation does not preclude the court from entering an order to achieve compliance. The Department and ADAP agree to make good-faith efforts to seek all necessary funding.

*Attorneys' Fees*: Finally, the Department will pay plaintiffs' attorneys $ 275,000 in fees and costs for services rendered through March 13, 2017. Thereafter, the Department will pay plaintiffs' attorneys additional fees of $ 275 per hour for services rendered through final approval, and $ 195 per hour for monitoring services rendered by attorneys (subject to caps).

## II. DISCUSSION

Judicial policy favors the settlement of class-action cases. *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984). Nevertheless, the court

retains an important role in evaluating and approving such settlements, pursuant to multiple provisions of Federal Rule of Civil Procedure 23. First, because the settlement contemplates the certification of a class, the court must determine whether the requirements of subparts (a) and (b) of the rule are met. Second, subpart (e) imposes both procedural and substantive requirements that must be satisfied before the court may approve a settlement that binds absent class members. Third, because the settlement includes an agreed-upon award of attorneys' fees and costs to plaintiffs' counsel, the court must determine their suitability for appointment as class counsel pursuant to subpart (g) and the reasonableness of the fee award reasonable pursuant to subpart (h).

## A. Class Certification: Rule 23(a) and (b)(2)

The court previously granted provisional certification of a settlement class defined to include "All persons who have been, or will be during the

period that this Agreement remains in effect, charged with a crime, within the meaning of Rule 1.4(b) of the Alabama Rules of Criminal Procedure, in a court of competent jurisdiction in the State of Alabama, and detained in an Alabama city or county jail or Alabama Department of Corrections facility while awaiting a court-ordered Mental Evaluation or court-ordered Competency Restoration Treatment (i) For whom a Circuit Court has determined that reasonable grounds exist for a mental examination into the person's competency to stand trial under Rule 11 of the Alabama Rules of Criminal Procedure and committed the person to the custody of ADMH under Rule 11.3 of the Alabama Rules of Criminal Procedure by court order for an inpatient evaluation, whether or not the court's order references any provision of law in so ordering; or (ii) Who is found incompetent to stand trial under Rule 11 of the Alabama Rules of Criminal Procedure and committed to the custody of ADMH under Rule 11.6 of the Alabama Rules of Criminal Procedure by court order for

Competency Restoration Therapy, whether or not the court's order references any provision of law in so ordering." Preliminary Settlement Approval Order (doc. no. 67) at 2-3.

Having considered the parties' post-settlement brief on this topic, the court now concludes that final certification of this settlement class is appropriate.

In order for any certification motion to succeed, the putative class representatives must show that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). In addition, a class must clear one of three additional hurdles; because the named plaintiffs in this case seek certification of a Rule 23(b)(2) class, they must also show that "the party opposing the class

has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). These requirements apply with "equal force" to uncontested certification of a class for purposes only of settlement. *Austin v. Hopper*, 15 F. Supp. 2d 1210, 1224 (M.D. Ala. 1998) (Thompson, J.).

Class certification also requires an examination of two preliminary hurdles, which will be considered first: standing and ascertainability.

### i. Standing

"[A]ny analysis of class certification must begin with the issue of standing"; only once the court finds that the named plaintiffs have standing may it consider whether they have "representative capacity, as defined by Rule 23(a), to assert the rights of others." *Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir. 1987). To show Article III standing, the named

plaintiffs must show that they have been injured, that their injuries are fairly traceable to the defendant's conduct, and that a judgment in their favor would likely redress their injuries. *See Mulhall v. UNITE HERE Local 355*, 618 F.3d 1279, 1286 (11th Cir. 2010). The standing inquiry looks for the existence of a dispute at the *beginning* of the litigation, that is, at the time of filing the complaint. *See Focus on the Family v. Pinellas Suncoast Transit Auth.,* 344 F.3d 1263, 1275 (11th Cir. 2003).

The named pretrial-detainee plaintiffs clearly have standing to assert the claim in the complaint and now resolved in the settlement agreement.[1]   Each is a

---

1. Although several named pretrial-detainee plaintiffs were no longer awaiting admission at the time of the amended complaint and all named pretrial-detainee plaintiffs are no longer awaiting admission at this time--in other words, their claim is now arguably moot--the existence of a current dispute is an aspect of the mootness inquiry, not standing. Further, there is a well-recognized exception to mootness where the class members consist of pretrial detainees.   In *Gerstein v. Pugh*, 420 U.S. 103, 111 n.11 (1975), the Supreme Court concluded that the termination of claims by class representatives, through (continued...)

pretrial detainee in the custody of the Department, and (allegedly) has been made to wait for admission to an ADMH-facility for a competency examination or competency restoration treatment for periods of time that are so substantial as to violate the Fourteenth Amendment. A judgment in plaintiffs' favor would have remedied these alleged violations, just as will this consent decree.

---

the conviction of the pretrial detainees serving as named plaintiffs, does not moot the claims of the unnamed class members that were pretrial detainees awaiting a probable-cause determination. The Court recognized that "[p]retrial detention is by nature temporary, and it is most unlikely that any given individual could have his constitutional claim decided on appeal before he is either released or convicted. The individual could nonetheless suffer repeated deprivations, and it is certain that other persons similarly situated will be detained under the allegedly unconstitutional procedures." *Id*. Under these circumstances, the 'capable of repetition, yet evading review' exception to mootness applied: any given pretrial detainee might not remain in custody long enough for a district judge to certify the class and the "constant existence" of class members suffering the deprivation is certain. *Id.; see also Cty. Of Riverside v. McLaughlin*, 500 U.S. 44, 51-52 (1991) (finding claims of pretrial detainees awaiting probable-cause determinations not moot even though (continued...)

### ii. Clearly Defined and Ascertainable

Class certification pursuant to Rule 23 has been construed to include an additional, implicit requirement that the class is "adequately defined and clearly ascertainable." *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012)). However, because *Little* reached that conclusion in the context of a subpart (b)(3) damages class, there is "serious reason to doubt that the judicially created ascertainability requirement applies to Rule 23(b)(2) [injunctive-relief] classes." *Braggs v. Dunn*, 317 F.R.D. 634, 671 (M.D. Ala. 2016) (Thompson, J.).

The court need not conclude whether the ascertainability requirement applies here, because even if the requirement did apply, the proposed class definition would satisfy it. The settlement class is limited to persons who have been charged with a crime,

_____

named plaintiffs' claims had been rendered moot prior to class certification).

committed to the custody of ADMH for an inpatient
mental evaluation or competency restoration treatment,
and await evaluations while being detained in an
Alabama city or county jail or ADOC facility.
Accordingly, the class is ascertainable by reference to
the circuit court orders committing criminal detainees
to ADMH custody. *See Strawser v. Strange*, 307 F.R.D.
604, 611 (S.D. Ala. 2015) (Granade, J.) (finding that
class is ascertainable where members can be identified
by reference to applications for marriage licenses).
No further inquiry is required other than the review
and application of objective criteria to these public
records; this satisfies the ascertainable requirement.

### iii. Rule 23(a)

#### 1. Numerosity

Rule 23(a)(1)'s requirement of numerosity is
satisfied if joinder--the usual method of combining
similar claims--would be impracticable. Although there
is no strict threshold, classes containing more than 40

members are generally large enough to warrant certification. *See, e.g., Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986); *see also* William B. Rubenstein, *Newberg on Class Actions* § 3.12 (5th ed.). "[P]laintiff[s] need not show the precise number of members in the class," given that the numerosity requirement is "less significant" where "class wide discrimination has been alleged." *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir. 1983).

The parties submitted evidence, in the form of waiting-list records for the ADMH's Taylor Hardin Secure Medical Facility, indicating that, as of April 27, 2017, there were 32 current class members. *See* Joint Statement Ex. A (doc. no. 77-1). The parties also represented that they identified two additional current class members, bringing the total number to 34. *See* Joint Statement (doc. no. 72) at 15.

The number of current class members is supplemented by an additional number of future class members. The

"fluid nature of a plaintiff class--as in the prison-litigation context--counsels in favor of certification of all present and future members." *Henderson v. Thomas*, 289 F.R.D. 506, 510 (M.D. Ala. 2012) (Thompson, J.).

In this case, future class members include hundreds of people who have already been charged with a crime and who are awaiting an outpatient mental examination. Approximately 28 % of persons ordered to receive such examinations will be found incompetent to stand trial and committed to the Department's custody for competency restoration treatment. *See* Ex. E, Simpler Dep. (doc. no. 77-6) at 93:10-21. In addition, some persons who undergo outpatient examinations can be expected to be ordered to undergo a more comprehensive inpatient examination where necessary for a court to make a final determination as to that person's competency. *See* Ala. R. Crim. P. 11.3(c)(3) (authorizing inpatient examinations if the initial "examiner reports that confinement for evaluation is

indispensable to a clinically valid diagnosis and report"). Future class members also include those who will later be charged with a crime and ordered to undergo an inpatient mental evaluation or competency-restoration treatment during the pendency of the agreement. The future class members will easily bring the number of total class members to well in excess of 100.

In light of the evidentiary showing that there are at least--and probably quite substantially more than--100 current class members, and in light of precedent making clear that it is appropriate in this context to consider future and as-yet-unidentifiable class members in determining whether joinder is impracticable or indeed impossible, the court finds that the class meets the numerosity requirement of subpart (a)(1) of Rule 23.

### 2. Commonality

Subpart (a)(2) of Rule 23 requires plaintiffs

seeking class certification to show that "there are questions of law or fact common to the class." In *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), the Supreme Court explained that class members must have "suffered the same injury. ... [T]his does not mean merely that they have all suffered a violation of the same provision of law. ... [Rather,] [t]heir claims must depend upon a common contention ... [which] must be of such a nature that it is capable of classwide resolution--which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke. What matters to class certification ... is not the raising of common 'questions'--even in droves--but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id*. at 350 (citation and internal quotation marks omitted). In short, commonality requires a showing that there is "some glue" holding the claims together. *Id*. at 352.

Plaintiffs seeking to demonstrate commonality under subpart (a)(2) need not show that common questions "predominate" over individual questions as required under Rule 23(b)(3); indeed, "even a single common question will do," provided there are not "[d]issimilarities within the proposed class" that "have the potential to impede the generation of common answers." *Wal-Mart*, 564 U.S. at 359, 351 (citations and alterations omitted).

The named pretrial detainees have raised a single claim on behalf of the class: whether the ADMH's failure to provide inpatient mental-health services to the class in a timely manner, combined with the class members' detention in a jail or prison, violates their rights under the Due Process Clause of the Fourteenth Amendment.

The class members experience the constitutional harm in somewhat divergent ways. Some class members have already been found incompetent and are awaiting inpatient treatment to restore them to competency;

others are awaiting an inpatient examination to determine whether they are incompetent. Moreover, class members are detained in various city and county jails spread throughout Alabama, and therefore experience the harm--the delayed receipt of inpatient mental-health services--in different settings. However, the commonality requirement may be satisfied "even if some factual differences concerning treatment" are present. *In re Checking Account Overdraft Litigation*, 307 F.R.D. 656, 668 (S.D. Fla. 2015) (King, J.).

Despite these factual distinctions, a classwide proceeding would have "generate[d] common *answers* apt to drive the resolution of the litigation," *Wal-Mart*, 564 U.S. at 350 (citation and internal quotation marks omitted); principally, the proceeding would have answered the factual questions of whether the Department has failed to provide court-ordered inpatient mental-health services to detainees committed to its custody for that purpose in a constitutionally

permissible period of time; and, if so, it would resolve the sole legal question, namely whether that failure violates class members' due-process rights. Plaintiffs not only alleged in their complaint that this failure violated the Due Process Clause; they presented evidence to show as much in support of their motion for a preliminary injunction. While the court would of course have had to weigh this evidence against any contrary evidence presented by defendant ADMH Commissioner had this case proceeded to a merits adjudication, plaintiffs "affirmatively demonstrate[d] [their] compliance with [] Rule" 23(a)(2). *Wal-Mart*, 564 U.S. at 350.

The commonality requirement is satisfied.


### 3. Typicality

Although the commonality and typicality inquiries "tend to merge," the typicality requirement--which is "somewhat of a low hurdle"--focuses on "whether a sufficient nexus exists between the claims of the named

representatives and those of the class at large." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982). A class representative's claims are typical if they "arise from the same event or pattern or practice and are based on the same legal theory" as the class claims; they need not be identical. *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1357 (11th Cir. 2009) (citation omitted).

This court has previously found the typicality requirement satisfied where "the named plaintiffs' legal claim ... is identical to the class's claim." *Henderson*, 289 F.R.D. at 511. Here, too, the named detainee plaintiffs brought the same due-process claim as the class based upon the Department's failure to provide timely inpatient mental-health services. The claim of both the named plaintiffs and the class are also based on the same legal theory: that the delays in the provision of services provides unjustified punishment in violation of the Due Process Clause. *See Disability Law Ctr. v. Utah*, No. 2:15-cv-00645-RJS,

2016 WL 5396681 at *17-18 (D. Utah. Sept. 27, 2016) (Shelby, J.) (concluding that typicality requirement was met where the claim of named plaintiffs and class rested on same theory, "that the substantive due process right of incompetent defendants requires injunctive relief against the allegedly unconstitutional delays").

Moreover, the distinctions within the class are mirrored by the named plaintiffs:  the class consists of both (1) persons already found incompetent and awaiting treatment, and seven named plaintiffs are in that circumstance, and (2) persons awaiting an inpatient competency examination, and one named plaintiff is in that circumstance.

The court is satisfied that the named pretrial-detainee plaintiffs, as a group, adequately represent the particular interests of all class members.

## 4. Adequacy

Rule 23(a)(4) requires the court to find that the "representative parties will fairly and adequately protect the interests of the class." This analysis "encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003) (citation omitted).

"Adequate representation is usually presumed in the absence of contrary evidence," and generally exists for injunctive-relief classes, because there is no monetary pie to be sliced up. *Access Now, Inc. v. Ambulatory Surgery Ctr. Grp., Ltd.*, 197 F.R.D. 522, 528 (S.D. Fla. 2000) (Seitz, J.). Here, although some members of the class are awaiting inpatient admission for different services (either a competency examination or treatment), the representatives include members of both groups. Further, in the usual circumstance, class

members will be provided admission according to the date of receipt of the court order requiring ADMH to provide the services. Accordingly, there is no reason to think that providing inpatient admission to one member of the class would harm another member of the class (apart from the obvious and unavoidable consequence that one class member was provided admission earlier than another).

The settlement authorizes the ADMH to provide services outside the standard waiting list in several circumstances: it can engage in 'line jumping' by providing services for a particular individual earlier than dictated by the waiting list, and it can also 'skip' persons because of a "demonstrable and compelling obstacle to the provision of the ordered evaluation or treatment at that time." Settlement Agreement (doc. no. 60-1) §§ VI.D.iii & VI.E.iv. However, these exceptions do not stand to benefit any particular subset of class members to the detriment of any other. Nor is there evidence that the exceptions

will inure to the benefit of the class representatives over other class members.

The court concludes that there are no substantial conflicts of interest between the representatives and the class.

Turning now to the second aspect of subpart (a)(4) of Rule 23: "The vigor with which [] named representative[s] and [their] counsel will pursue the class claims is assessed by considering the competency of counsel and the rationale for not pursuing further litigation." *Ass'n for Disabled Ams., Inc.*, 211 F.R.D. 457, 464 (S.D. Fla. 2002) (Gold, J.) (citing *Griffin v. Carlin*, 755 F.2d 1516, 1533 (11th Cir. 1985)). The competency of counsel for plaintiffs in this case is reflected in their involvement in a large number of successful class actions vindicating the constitutional or federal statutory rights of classes of persons with mental illness and/or intellectual disabilities, including counsel that specialize in representing

inmates housed in Alabama county jails. *See* Joint Statement (doc. no. 72) at 28-30.

Class counsel's rationale for not pursuing further litigation is equally plain from the fact that, after extensive negotiation and after filing a motion for preliminary injunction, they reached a settlement highly favorable to all members of the class. In this circumstance, "continued litigation would only serve to delay class relief ...." *Ass'n for Disabled Ams.*, 211 F.R.D. at 464.

Rule 23(a)(4) is satisfied.


### iv.  Rule 23(b)(2)

A class satisfies Rule 23(b)(2) where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2).

As plaintiffs have repeatedly explained (and indeed offered some evidence to demonstrate) throughout the litigation of this case, the problems of which they complain reflect a *systemic* failure; the Department's practice of failing to provide timely inpatient admissions to criminal defendants in Alabama awaiting court-ordered competency examinations and competency treatment affects all members of the class. Moreover, the plaintiffs seek a transformation of that system, such as through increased bed capacity to enable more prompt admissions.

Class certification pursuant to subpart (b)(2) is appropriate.

### B.  Settlement Approval: Rule 23(e)

Before approving a settlement agreement in a class action, "a court has a heavy, independent duty to ensure that the settlement is 'fair, adequate, and reasonable.'" *Laube v. Campbell*, 333 F. Supp. 2d 1234, 1238 (M.D. Ala. 2004) (Thompson, J.) (quoting Fed. R.

Civ. P. 23(e)(2), additional citation omitted). This careful inspection is "essential to ensure adequate representation of class members who have not participated in shaping the settlement." Fed. R. Civ. P. 23(e) advisory committee note. In the course of this review, the court must determine whether notice to the class was adequate, and must consider the comments made and objections raised by class members (as well as, as in this case where the members may be mentally incompetent, their representatives and others interested in their well-being), and the opinions of class counsel. *See Laube*, 333 F. Supp. 2d at 1238.

### i. Notice to Class Members

"The court must ensure that all class members are informed of the agreement[] and have the opportunity to voice their objections." *Laube*, 333 F. Supp. 2d at 1240; *see also* Fed. R. Civ. P. 23(e)(1).

The court's order preliminarily approving the settlement agreement contained specific procedures for

the parties to give notice of the settlement to the members of the provisionally certified class. The court also approved four separate notice and comment forms: (1) notice to class members; (2) notice to class members' defense counsel, family members, and legal guardians; (3) notice for publication in Alabama trial courts; and (4) a letter to trial court clerks explaining the notice for publication. Substantively, the two-page notice form included a description of the case, a definition of the class, a list of the primary provisions of the settlement agreement, and an indication that the agreement would release the ADMH Commissioner from any further liability for the claim. Additionally, the notice included contact information for class counsel along with an invitation for those receiving notice to inquire about the settlement, an announcement of the fairness hearing, and instructions for those receiving notice to comment on or object to the settlement. The comment form requested basic contact information, included ample space for a

33

description of the objection or comment, and allowed the commenter to indicate whether he or she wished to provide oral testimony. The notice and comment form was sent, along with a copy of the proposed settlement and a self-addressed, stamped envelope, to all putative class members on the waiting list for admission to the Taylor Hardin Secure Medical Facility as of April 27, 2017.

Because of the mental state of the class members--having either been declared incompetent or suspected of being incompetent--the court requested, and the parties proposed, a notice procedure that extended beyond the class members themselves. "[A] court should be even more circumspect about accepting a settlement where ... members of the plaintiff class are not themselves capable of assessing the settlement and voicing their views on whether it is fair, reasonable and adequate, and the court must therefore rely on comments from such secondary sources as public interest groups and organizations." *Dunn v. Dunn*, 197 F. Supp.

3d 1331, 1333 (M.D. Ala. 2016) (Thompson, J.) (quotation marks and citation omitted). Accordingly, the parties also sent a similar notice and comment form, along with the proposed settlement, to counsel of record in the criminal case for each putative class member, again based on the April 27, 2017, waiting list. The notice expressly requested that defense counsel share the notice, settlement, and comment form with family members and known legal guardians of the class members and encourage them to submit objections or comments.

In addition, the parties mailed a three-page notice to the clerk of court for the trial court in each of Alabama's 67 counties, together with a letter requesting that the clerk post the notice in a central location within the courthouse. The notice encouraged defense counsel, family members, and legal guardians of class members to submit objections or comments. Because of the importance in this case of ensuring that other interested parties beyond the class members were

aware of the settlement, the court required the parties
to conduct spot checks to ensure the notice had been
posted, and ideally in a central location in the
courthouse.  When preliminary results identified a low
rate of compliance with the request to post the notice,
the parties voluntarily added the additional step of
electronically disseminating the notice via the Alabama
Criminal Defense Lawyers Association e-mail listserv.
By June 2017, the parties confirmed, either by physical
observation or by representation of the county clerk,
that the notice had been posted in at least 40 county
courthouses, and an additional nine county clerks
agreed to post the notice after speaking with counsel.
*See* Joint Status Report (doc. no. 68) ¶¶ 3, 5, 7 &
Status of Notice Posting, Ex. A (doc. no. 68-1).  In
addition, the parties provided notice by publication
twice in each of five newspapers across the State of
Alabama.

The notice and comment form and the agreement was
mailed to class members and their criminal defense

counsel on May 22, 2017, and class members, their representatives, and other interested persons and groups were given until June 26, 2017, to submit comments. Comments received by mail by June 30, 2017, were still docketed. Seven written responses were received: five from putative class members and two from criminal defense counsel of putative class members. *See* Comments and Objections to Proposed Settlement (doc. no. 69-1). In addition, the parties received two calls from families of potential class members. *See* Joint Statement (doc. no. 72) at 26.

The court concludes that the extensive measures undertaken by the parties to provide notice of the agreement and invite the feedback of current class members and others were sufficient to satisfy the notice requirement of subpart (e) of Rule 23 of the Federal Rules of Civil Procedure.

### ii. Objections and Comments

The seven written responses raised a number of issues, some of which were relevant but many of which were not. The comment portion of one response form was entirely blank. Others offered examples of the extensive delays that plaintiffs allege violate their constitutional rights, but did not offer any substantive feedback on the settlement. A detainee awaiting inpatient admission for a competency examination indicated that he did not understand the notice and requested a lawyer; his criminal defense counsel later submitted a letter indicating that he had explained the proposed settlement to his client, who subsequently withdrew the objection. One respondent stated that he had been waiting nine months for a second evaluation concerning his mental state at the time of the offense. He inquired if his constitutional rights had been infringed by this extensive delay and noted that he had attempted suicide while detained in a county jail.

Only one written response raised a pertinent objection to the settlement. The objection was filed by criminal defense counsel Michael D. Haynes, who represents a putative class member found incompetent in November 2016 based on an initial examination that diagnosed the putative member with psychosis as a consequence of schizophrenia. Haynes's client was ordered to receive competency restoration treatment and committed to ADMH's custody in January 2017, but as of June 2017 was still awaiting admission so that treatment could begin. The objection indicated that the putative class member has lost over 30 pounds during his incarceration; moreover, in the months after he was found incompetent but awaiting treatment to begin, he became violent, hit his head against the wall, ate his own feces, and refused to take medication. *See* Haynes Objection (doc. no. 69-1) at 5. Haynes objected to the settlement's failure to provide any immediate relief for clients such as his: "While the proposed settlement may address concerns in 24

months, it does nothing to address the injustices that are occurring right now not only for my client, but for others who need immediate attention." *Id*.

Subsequent to the objection, Haynes's client was transferred to Taylor Hardin and began to receive competency restoration treatment. Accordingly, as to that putative class member, the agreement's phased-in provisions--which do not require the Department to meet certain deadlines for admission until 12 and 24 months after final approval--do not pose an ongoing problem. Nonetheless, Haynes's objection required the court to focus on the issue of immediate relief under the agreement for individuals committed to ADMH's custody but not yet transferred to one of its facilities, some of whom may have a serious mental illness but are detained in a jail with little to no mental-health treatment. The court will address that issue in greater depth in a subsequent section of this opinion.

The court has carefully considered the comments and objections filed by class members and their

representatives.  Although they reflect existing
problems with delays in providing inpatient competency
examinations and treatment, none calls into serious
question the fairness or adequacy of the settlement
agreement.


### iii.  View of the Parties

The parties contend that the settlement agreement
is "fair, reasonable, and adequate."  Fed. R. Civ. P.
23(e)(2).  They contend that the settlement avoids the
necessity of complex and time-consuming litigation over
plaintiffs' claim while plaintiffs'
conditions--incarceration in a city or county jail
without adequate mental health treatment--requires
time-sensitive relief.  Further litigation to resolve
the claim would require the resolution of numerous
disputed factual issues and extended expert discovery
and briefing.  By agreeing to the settlement, they
avoided not only a trial, but also the possibility of
appellate review, all while class members continued to

languish in jails before receiving examinations or treatment.  In light of the circumstances of class members, the parties contend that delayed relief would be detrimental to the class members.  The parties also contend that that delay would be unwarranted in light of the plaintiffs' probability of success on the merits, as demonstrated in their preliminary injunction brief.

The parties acknowledge that they reached a settlement at a relatively early stage of the litigation--approximately six months after the initial complaint and three months after the filing of an amended complaint and motion for preliminary injunction--but nonetheless engaged in extensive, substantive discovery before concluding the agreement. The parties served five requests for production, eight third-party subpoenas for records, produced approximately 3,500 pages of documents, served more than 300 interrogatories, and conducted one deposition. *See* Joint Statement (doc. no. 72) at 32.  In addition,

the settlement agreement was not reached abruptly: the parties appeared before the magistrate judge on ten separate occasions over a two-month period for "vigorous, adversarial, court-supervised negotiations." *Id*. at 33. The parties represent that, during the negotiations, each side made "difficult concessions," but did so while being represented by vigorous advocates. *Id*. Plaintiffs were represented by three separate legal organizations (ADAP, the ACLU, and outside counsel), and defendant ADMH Commissioner was represented by counsel from the Department as well as outside counsel. *Id*. at 34.

Finally, the parties argue that the systemic relief provided in the settlement is commensurate with the recovery that would be available to the named plaintiffs and class members if successful at trial. The plaintiffs initially sought both injunctive and declaratory relief; although the settlement does not provide for declaratory relief, the parties argue that the settlement provides the equivalent of the

injunctive relief that the plaintiffs could have received in the event of a favorable judgment.

### iv.  Court's Assessment

The court must also assess for itself, based on the evidence and argument presented by the parties and by class members who submitted comments and objections, whether the settlement is fair, adequate, and reasonable.  "Relevant factors include the stage in the proceedings; the plaintiffs' likelihood of success at trial; the complexity, expense, and likely duration of the lawsuit; and the range of possible recovery." *Laube*, 333 F. Supp. 2d at 1246.

As to the substantive provisions of the agreement, the court finds that they represent a favorable result for the plaintiff class.  The plaintiffs in this case challenged the ADMH's failure to provide timely admissions for state criminal defendants subject to competency examinations or treatment at a systemic level.  They argued that the Department's practice was

a blatant constitutional violation because it subjected pretrial detainees to punishment in violation of the due process clause under *Bell v. Wolfish*, 441 U.S. 520 (1979), and they cited several courts across the country that have found similar practices infringed pretrial detainees' due-process rights.

The settlement agreement essentially gives the class all of the remedies plaintiffs sought at the outset of this litigation. Notably, even if plaintiffs had proceeded to and prevailed at trial on their claim, the parties would have still been confronted with the task of fashioning a remedial plan. Any such plan would likely have closely resembled that contained in the settlement agreement currently before the court. Moreover, because such systemic changes are involved (for example, the creation and operation of new facility space and the hiring of new staff), it would not have been feasible to order significantly more rapid compliance than is contemplated in the settlement

agreement. If anything, settlement means that change will come more quickly.

During and shortly following the preliminary approval hearing and again at the fairness hearing, the court expressed significant concerns regarding several particular provisions of the settlement agreement, as well as concerns about the impact of the settlement on particular populations. However, after considerable discussion and briefing, the parties have resolved these issues to the satisfaction of the court by entering into binding stipulations.

## 1. Immediate Relief

Defense counsel Michael D. Haynes, who represents a putative class member, submitted a pertinent objection regarding immediate relief under the agreement for individuals such as his client who are committed to ADMH's custody but not yet transferred to one of its facilities. Some of these individuals suffer from serious mental illness and are unable to receive mental

health treatment at these facilities. Haynes's objection raises two distinct but related issues: (1) what immediate relief is available under the settlement agreement for individuals in emergency need of treatment; and (2) whether such relief is available prior to the 12- and 24-month phase-in provisions of the agreement.

The court raised these issues with the parties at the fairness hearing on August 3, 2017, including the ancillary problem of identifying prisoners in need of emergency treatment. The parties subsequently conferred and submitted a second stipulated modification of the agreement addressing this issue. *See* Second Stipulation (doc. no. 89).

The stipulation provides that the ADMH Commissioner shall annually designate an ADMH official "to receive notice from current and future class members' criminal defense counsel and/or Alabama circuit court judges that a class member needs emergency treatment." *Id*. ¶ 1(b). Upon receipt of such notice, the ADMH Designee

will communicate that notice to ADAP within 48 hours and will determine if that individual is a class member. If the individual is a class member, the ADMH Designee will arrange for a clinical professional to visit the class member to conduct an in-person assessment within four days of the ADMH Designee's receipt of notice regarding the class member. If the clinical professional determines the class member needs emergency treatment, the ADMH Designee will communicate this determination to ADAP, and the ADMH Commissioner shall arrange for early admission (a 'line jump') within seven calendar days of the in-person assessment.

The stipulation further provides that the parties will work with officials of the Alabama State Bar to annually disseminate notice to members of the Alabama State Bar about this process and identifying the ADMH Designee, and will also independently provide such notice annually to trial judges in each Alabama county. *Id*. ¶ 1(a). Finally, the stipulation establishes a protocol for responding to class members who may be

suicidal, which requires the ADMH Designee to communicate notice of such individuals to ADAP within 24 hours, and, if the individual is a class member, to notify the sheriff of the county and officials of the jail or ADOC facility where the individual is incarcerated. *Id*. ¶ 1(c).

The court is satisfied that the above protocols for immediate identification and treatment of individuals in urgent need of care, which are to take effect upon settlement approval and are not subject to the phase-in requirements elsewhere in the settlement, adequately address Haynes's objection and the court's concerns on this issue.

## 2. Funding

In Section XII of the agreement, titled "Funding," the parties expressly acknowledge the importance of funding to the implementation of the settlement, including funding dependent on the Alabama Legislature, which is not a party to this lawsuit. In particular,

the parties agreed "that implementation of the terms of this Agreement and any plan necessary to effectuate its terms are subject to the availability and receipt of appropriated funds." Settlement Agreement (doc. no. 60-1) § XII.1. The parties also acknowledged "that additional funding and the cooperation of third parties is necessary to the ADMH Commissioner's full performance in accordance with the terms of this Agreement," but then provided that the lack of funding does not prevent the court from entering a subsequent order to achieve compliance. *Id*. Sec. XII.2. The parties are to make "all possible good faith efforts to seek all necessary funding," but can approach the court for assistance if they disagree about whether sufficient funding is available to implement the agreement. *Id*. Sec. XII.3.

Almost immediately, these provisions garnered the court's concern. Having approved countless consent decrees, the court is not accustomed to these types of

provisions.[2]  More fundamentally, the rights guaranteed under the United States Constitution, as enforced by the orders of the federal courts, are not subject to the whims of a state body. *See Cooper v. Aaron*, 358 U.S. 1, 18 (1958) ("If the legislatures of the several states may, at will, annul the judgments of the courts of the United States, and destroy the rights acquired under those judgments, the constitution itself becomes a solemn mockery." (quoting *United States v. Peters*, 5 Cranch 115, 136 (1809) (Marshall, C.J.))).  As applied in *Cooper*, that principle meant that an allegedly

---

2.  Nor are such provisions included in factually analogous consent decrees in cases cited by the parties.  For example, another recent settlement concerning delays in competency restoration treatment recognized that the defendants' performance was dependent on circumstances beyond their control, but expressly excluded funding from the legislature as such a circumstance.  See Proposed Settlement Agreement ¶ 23(b), *Disability Law Ctr. v. Utah*, No. 2:15-cv-00645-RJS (D. Utah June 12, 2017) (doc. no. 85-1) ("The failure or refusal of the Utah Legislature to adequately fund Defendants' operations, programs, or the Plan shall not be considered a Departmental Special Circumstance for purposes of this Settlement Agreement.").

"serious financial burden" placed on the school district by desegregation could not preclude enforcement of a constitutionally-required decree. *Id*. at 13. Thus, were the settlement to condition implementation on the availability of funding authorized by the state legislature, it would provide substantially less relief to the plaintiffs than they would be eligible to obtain had they succeeded at proving a due-process violation at trial.

Similarly, it is well-established that inadequate funding does not preclude a court from holding state officers liable for constitutional violations.[3] *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1266-67 (M.D. Ala. 2017) (Thompson, J.). In *Edelman v. Jordan*, 415 U.S. 651, 668 (1974), the Supreme Court noted that the Eleventh Amendment did not bar suits that had "fiscal

_____

    3. No issue concerning the doctrine of *Ex parte Young*, 209 U.S. 123 (1908), has been raised in the course of approving this settlement. But as the defendant is a state official, the availability of relief on the merits, were this case to proceed to (continued...)

consequences to state treasuries" that "were the
necessary result of compliance with decrees which by
their terms were prospective in nature."  The Court in
*Edelman* also observed that having to spend more money
from the state treasury because the State needs to
conform its conduct to the court order is an "ancillary
effect" that is "a permissible and often an inevitable
consequence of the principle announced in *Ex parte
Young*[, 209 U.S. 123 (1908)]."  *Id*. at 668.  In fact,
rather than precluding relief, courts have found
inadequate funding to be a basis for finding
constitutional violations.  *See, e.g.*, *Wellman v.
Faulkner*, 715 F.2d 269, 273 (7th Cir. 1983) (noting
that "woefully inadequate" salary for psychiatric
personnel contributes to Eighth Amendment finding).

Having raised these concerns with the parties, they
modified the settlement with a stipulation that the
funding provisions "serve neither as a condition

---

trial, would depend on the availability of prospective
relief against her pursuant to the doctrine.

precedent to performance nor a basis for excusing the Parties' performance obligations under the Settlement Agreement." Stipulation (doc. no. 84) ¶ 3. The provisions instead merely reflect an acknowledgment of the "practical reality" of the annual legislative appropriation process. *Id*. With that understanding, the settlement, as modified by stipulation, resolves the court's concern.

### 3.  Remedies

In preparation of the settlement agreement for approval, the court asked the parties to address whether the remedial provisions of the settlement agreement are consistent with the court's remedial authority under Federal Rule of Civil Procedure 60(b), *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1982), and relevant Eleventh Circuit law, including whether the relief available in the event of noncompliance is limited to contempt proceedings, *see Reynolds v. McInnes*, 338 F.3d 1201, 1208 (11th Cir.

2003). The parties responded to the court's concern in a joint statement, concluding that the remedial provisions of the agreement as written are consistent with prevailing law. *See* Joint Statement in Support of Proposed Settlement (doc. no. 72).

Federal Rule of Civil Procedure 60(b) and *Rufo* place certain limits on the ability of courts to modify and grant relief from existing judgments. Rule 60(b) empowers courts to grant parties relief from a final judgment or order on the basis of enumerated grounds including but not limited to mistake, newly discovered evidence, the judgment having been satisfied or discharged, and "any other reason that justifies relief." Fed. R. Civ. P. Rule 60(b). Under *Rufo*, "a party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision," and that "[o]rdinarily ... modification should not be granted where a party relies upon events that actually were

anticipated at the time it entered into a decree." 502 U.S. at 383-84.

Apart from issues of modification, the Eleventh Circuit has held that consent decrees must be enforced through the trial court's contempt power, as properly invoked through contempt proceedings. *McInnes*, 338 F.3d at 1208. However, where all parties seek to enforce a consent decree using a procedure other than contempt proceedings, the contemporaneous objection rule bars the parties from later objecting to a ruling on the basis that contempt proceedings were not used. *Id*. at 1209-12.

Here there are four remedial provisions of the settlement that raise potential concerns. *First*, the agreement provides for a "dispute resolution process" under which the parties must meet and confer in good faith to resolve issues that plaintiffs raise as to ADMH's compliance. Settlement Agreement (doc. no. 60-1) § VIII. "In the event that the Parties are unable to resolve any issue(s) after attempting to do so in good

faith, they shall submit their dispute to the magistrate judge assigned to the case or to the district court in the event no magistrate judge is assigned. Both parties shall have the right to appeal any magistrate judge's decision to the district court for review." *Id*.

*Second*, the agreement provides that, "If Plaintiffs believe that the ADMH Commissioner has not achieved Substantial Compliance with the timelines ... specified in Section VI.1.E. above for at least nine consecutive (9) months preceding the end date of the Agreement, Plaintiffs shall file a motion to extend jurisdiction and monitoring with the Court...." *Id*. § X.2. The court is then to determine "after an evidentiary hearing" whether the ADMH Commissioner has achieved substantial compliance, as defined in the agreement. *Id*.

*Third*, the agreement provides that, "Three months prior to the end of the term of the Agreement, if the Parties agree that the ADMH Commissioner has not

achieved Substantial compliance, the Parties may agree in writing to extend the term of the Agreement for a specified period, and by joint motion, seek the Court's approval of their agreed-upon extension without an evidentiary hearing to determine compliance." *Id*. § X.3.

*Fourth*, the agreement provides that, "If the term of Agreement is extended pursuant to Subsection X.2 above, Plaintiffs may seek additional extensions of the term of this Agreement by demonstrating that the ADMH Commissioner cannot demonstrate Substantial Compliance with the timelines ... specified in Section VI.1 for at least nine (9) consecutive months preceding any scheduled expiration or termination of the Agreement." *Id*. § X.4.

The parties contend, and the court agrees, that none of the agreement's remedial provisions implicates the court's remedial authority under either Rule 60(b) or *Rufo*, since they do not entail modifications of the agreement. *See* Joint Statement In Support of Proposed

Settlement (doc. no. 72) at 35-36. Rather, these sections involve the monitoring and enforcement of existing obligations, as well as potential time extensions of the agreement. Notably, Section X.1 of the agreement states, "The Parties agree that the term of this Agreement shall be *three (3) years* from the date of Final Approval by the Court, *subject to the provisions below*." Settlement Agreement (doc. no. 60-1) § X.1 (emphasis added). As this language clearly indicates--and indeed as may have been clear even without this express language--any extensions of the agreement ordered pursuant to the terms of the agreement are not "modifications," but rather the operation of the agreement pursuant to its existing terms. Therefore none of the agreement's provisions implicate either Rule 60(b) or *Rufo*.

With regard to *McInnes*, The parties submit that the first remedial provision, Section VIII, does not implicate the court's enforcement power because it "simply impose[s] a process for resolving conflicts

that is designed to be efficient and cost-effective."
Joint Statement In Support of Proposed Settlement (doc.
no. 72) at 35.    The court understands the parties'
desire for a conflict-resolution mechanism that is more
efficient and cost-effective than returning to litigate
before a district court, but is not as certain that the
issues addressed in *McInnes* are not implicated by the
agreement.    This issue is therefore left open, with a
caution to the parties that any ultimate invocation of
this court's enforcement power under the agreement may
need to be made, as the Eleventh Circuit has
instructed, through the mechanism of contempt
proceedings.


### 4.    Impact on Non-Class Members

The agreement has provisions affecting two groups
of people who are not class members:  persons found not
guilty by reason of insanity and awaiting inpatient
treatment by ADMH ("NGRIs") and persons ordered to
receive outpatient mental examinations.    The court

raised the concern that notice of the agreement was not provided to these groups, who, although not class members, are impacted by it. The court also raised the concern that ADAP, as both class counsel and counsel for members of these groups, could have a conflict. Based upon the representations made during the fairness hearing and the provisions in the settlement designed to guard against unfavorable treatment, the court concludes that the settlement does not prejudice these two groups of non-parties.

*NGRIs*: The settlement generally requires the Department *not* to skip the admission of NGRIs in favor of pretrial detainees awaiting a competency examination or treatment. *See* Settlement Agreement (doc. no. 60-1) § VI.1.D.ii. The settlement acknowledges, however, that in "exceptional circumstances" the Department may need to skip the admission of an NGRI who is next in line to receive services in favor of a person ordered to receive a competency examination or treatment. *Id*. At the fairness hearing, class counsel suggested that

legitimate justifications for a 'skip' could include a medical issue or a delay in transferring the person into an ADMH facility.

The settlement guards against illegitimate 'skips,' which could theoretically have the effect of increasing ADMH's rate of compliance under the agreement to the detriment of NGRIs, in two ways. First, the settlement requires ADMH to begin to provide services to the 'skipped' NGRI within 60 days; if that deadline is not met, the skipped NGRI will be included in the calculation of the average monthly compliance rate, unless ADMH provides "good grounds" for why the individual should not be included. *Id.*; § VI.1.E.iv. (Ordinarily, because NGRIs are not class members, their wait time is not included in the Department's average monthly compliance rate.) Plaintiffs' counsel may use the dispute resolution process in Section VIII to challenge the existence of 'good grounds' for excluding an NGRI who has been skipped for more than 60 days from ADMH's compliance rate. Second, the settlement requires

ADMH to provide notice to class counsel within ten days of a 'skip,' which must include a written explanation of the justification for that particular NGRI not receiving services based on chronological order. *Id.*; § VI.1.E.iv. Plaintiffs' counsel may use the dispute-resolution process in Section VIII to challenge the exclusion of a skipped NGRI from ADMH's compliance rate, even prior to the end of the 60-day period, on the ground that there is not a legitimate basis for the skip.

The court also raised the issue of a possible conflict on the part of ADAP as it decides whether to challenge the delayed treatment of an NGRI in favor of a class member, because ADAP serves as counsel for both class members and NGRIs under state law. Counsel for ADAP represented at the fairness hearing that it would make arrangements to appoint an alternative lawyer for an NGRI if a conflict of interest ripened, and that through its work it has developed a network of

attorneys to whom it refers clients and who may be willing to take on such a case.

*Persons Ordered to Receive Outpatient Competency Examinations*: Although persons ordered to receive an outpatient competency examination by ADMH are not class members, did not receive notice of the settlement, and were not a focus of the amended complaint, the settlement also has provisions applicable to them; principally, the settlement requires ADMH to conduct outpatient examinations within certain time periods.[4]

---

4. According to the procedural rules governing competency examinations, all court-ordered mental examinations for competency should be performed on an outpatient basis "where feasible." This suggests that the number of persons ordered to receive outpatient examinations (who are not class members) is much larger than the number of persons ordered to receive inpatient examinations (who are class members). The circuit court should order an inpatient exam only if: "(1) the defendant cannot be examined on an out-patient basis; (2) examination in an out-patient setting is unavailable; or (3) the appointed examiner reports that confinement for evaluation is indispensable to a clinically valid diagnosis and report." Ala. R. Crim. P. 11.3(b). Thus, the restrictions on use of inpatient examinations ensure that defendants are not subjected to commitment "unless a less restrictive alternative (such as local out-patient services of a community (continued...)

However, at the fairness hearing in this matter, the parties agreed that persons ordered to receive outpatient competency examinations are *not* bound by the terms of the settlement except to the extent that they seek to enforce or obtain the benefits of the settlement; that is, they could sue ADMH or Taylor Hardin for additional relief beyond the terms of this settlement, and would not be prejudiced by it.

With these protections in place, the court concludes that the settlement does not prejudice non-party NGRIs and persons ordered to receive an outpatient competency examination.[5]

_____

mental health center) is unavailable." Ala. R. Crim. P. 11.3 comm. cmts. See, e.g., Gamble v. State, 791 So. 2d 409, 420 (Ala. Crim. App. 2000) (describing State's motion to amend trial court order to request out-patient examination, which could be scheduled "almost immediately," because inpatient examination would have required several months delay).

5. While the parties contend that this litigation is not covered by the Prison Litigation Reform Act (PLRA), the court has some concerns, for the PLRA applies to "any civil action with respect to prison conditions," 18 U.S.C. § 3626(a)(1), where "prison" means "any Federal, State or local facility that (continued...)

## 5.  Female Class Members

During the fairness hearing, the parties were unable to describe the status of female class members or their particular experience on a waiting list for admission for the purposes of a competency examination or treatment.  Further, while the settlement provided that new bed spaces would be built at Taylor Hardin (the facility for men), it did not provide for any new

---

*incarcerates or detains* juveniles or adults *accused of*, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law," *id.* § 3626(g)(2) (emphasis added).  Nevertheless, this issue need not be resolved for the court believes that the settlement meets the PLRA's three central requirements: that "relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." *Id.* § 3626(a)(1).  True, the settlement does mention certain third parties, but this is to assure, expressly, that the settlement's impact on those parties is limited as to them and not detrimental to them.  In other words, the settlement is narrowly tailored in that it attempts to limit any unintended impact on others.  Moreover, the court has considered "any adverse impact on public safety or the operation of a criminal system caused by the relief," *id.*, and finds no such adverse impact--in fact, the relief provided is likely to contribute positively to the efficient operation of the criminal (continued...)

bed spaces at Bryce Hospital (the facility for women).

Accordingly, the court became concerned that the

parties had not adequately considered the impact of the

settlement agreement on women.

Subsequently, the parties reported on the

experience of women awaiting admission into Bryce

Hospital. While there are no current female class

members, 17 women have had to wait for admission into

Bryce Hospital since January 1, 2017, for either a

competency examination or treatment. *See* Second

Stipulation (doc. no. 89) ¶ 2. However, unlike the

male prisoners such as named plaintiffs, who wait on

average six to eight months for admission, women have

had to wait on average seven days from ADMH's receipt

of a court order, with no wait longer than ten days.

*Id*. It appears that, at least in 2017, the waiting

times for females into Bryce Hospital are far shorter

than even the 30 days required by the settlement

---

justice system, by ensuring timely transfer of inmates
for competency evaluation and restoration.

agreement.  The parties agreed that all provisions of the settlement apply with equal force to male and female class members.  Further, the parties represented that, although the increased bed capacity under the settlement would be dedicated entirely to Taylor Hardin, that would indirectly lead to additional space at Bryce Hospital because, in addition to serving women, Bryce Hospital also receives overflow placements from Taylor Hardin.

While the court applauds ADMH's current ability to admit female class members in relatively short order, the court notes that the dramatically lower wait times for women at the time of approval could skew the measurement of ADMH's substantial compliance with the time periods for admission.  In other words, buoyed by the short wait times for women, ADMH could achieve substantial compliance despite delays persisting for men well in excess of the required 30- and 45-day time periods.  Of course, the fact that there are relatively few female compared to male class members, and that

female class members are on the waiting list only intermittently (there were no women on the waiting list as of early August 2017), should keep that effect to a minimum. Nonetheless, the court recommends that, over the course of its monitorship, ADAP should monitor the delays specific to male and female class members to ensure that shorter delays in admission are achieved for both groups of class members.

### C. Class Counsel and Fees: Rule 23(g) and (h)

#### i. Rule 23(g)

Subpart (g) of Rule 23 requires the court to appoint (and also to assess the suitability of plaintiffs' counsel to serve as) class counsel. The rule requires the court to consider "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable

law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). The court must conclude that class counsel will "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4).

Lawyers affiliated with ADAP, Henry (Hank) F. Sherrod III, P.C., and the ACLU of Alabama Foundation, Inc., have represented named plaintiffs in litigating and negotiating the settlement of this case, and seek appointment as class counsel. The record in this case as well as affidavits submitted by plaintiffs' counsel reflect that these attorneys have substantial experience in litigating class actions and in the complex substantive areas of both prisoner- and disability-rights law.

These lawyers have also devoted a significant amount of time and energy to identifying and developing the claim and evidence in this case. They identified plaintiffs, investigated their allegations, drafted a lengthy complaint, appeared at numerous court hearings

and conferences, participated in days of mediation, and responded to questions raised by the court and comments made by class members regarding the settlement agreement.

Finally, the court cannot identify--and neither defendants nor the prisoners who have commented on the settlement agreement have suggested--any reason to believe that these attorneys have not fairly and adequately represented the interests of the class, or will not do so in the future.

The court therefore concludes that plaintiffs' counsel should be appointed class counsel.


### ii. Rule 23(h)

Subpart (h) of Rule 23 requires that, when class counsel seek fees and costs "that are authorized by law or by the parties' agreement," they must move for those fees and provide notice to the class. Fed. R. Civ. P. 23(h)(1). Class members (and also defendants, absent a settlement) must be given notice and an opportunity to

object, and the court must find that the award sought is reasonable.  Fed. R. Civ. P. 23(h)(2), (h)(3).

The settlement agreement provides that defendants will pay plaintiffs' counsel $ 275,000 for all fees and expenses incurred up to March 13, 2017, $275 per hour plus reasonable expenses incurred on and after March 14 until final settlement approval, as well as additional fees (subject to caps) of $ 195.00 per hour for attorneys and $65 for paralegals, law clerks, and members of ADAP's monitoring unit for monitoring services.  For litigation arising out of the consent decree, plaintiffs' counsel will be entitled to fees (again, subject to caps) only if the court finds that their services were necessary and that they attempted to resolve the issue informally.

Because this provision was included in the settlement agreement, class members received notice of it.  None of the comments received objected to the fee provision. For the reasons that follow, the court

concludes that the fees contemplated by the settlement agreement are appropriate.

Even when both parties agree to an award, the court has an independent responsibility to assess its reasonableness, in order to guard against the risk that class counsel might agree to enter into a settlement less favorable to their clients in exchange for inappropriately high fees. *See Piambino v. Bailey*, 610 F.2d 1306, 1328 (5th Cir. 1980).[6] The court uses the lodestar method, multiplying the number of hours reasonably expended by a reasonable hourly rate, *see Norman v. Hous. Auth. of Montgomery*, 836 F.2d 1292, 1299 (11th Cir. 1988), and then considering whether an upward or downward adjustment is warranted in light of

---

6. The Eleventh Circuit Court of Appeals has adopted as precedent all decisions of the former Fifth Circuit Court of Appeals rendered prior to October 1, 1981. See Bonner v. Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

the factors set out in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974).[7]

In support of the attorney fees provision of the settlement agreement, the parties have jointly represented that plaintiffs' counsel incurred approximately $ 374,000 in fees litigating this case as of March 13; the agreed award of $ 275,000 would cover approximately 74 % of that figure. Evidence submitted by plaintiffs shows that this rate of adjustment from the lodestar figure is consistent with or below the adjustments deemed reasonable in other civil-rights cases in Alabama.

---

7. These factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

In addition, plaintiffs' counsel request $ 275 per hour plus reasonable expenses incurred for the period March 14 until final settlement approval, as well as additional fees (subject to caps) of $ 195.00 per hour for attorneys and $ 65 for paralegals, law clerks, and members of ADAP's monitoring unit for monitoring services. Evidence submitted by plaintiffs shows that this rate is consistent with or below rates deemed reasonable in other civil rights cases in Alabama. The court also finds the parties' joint statement that plaintiffs' counsel expended 783.4 hours as of March 13 to be entirely convincing, given the court's own knowledge of the amount of time numerous attorneys have spent in court and in mediation. Based on these findings, the lodestar figure amounts to the $ 374,062.50 provided for in the settlement agreement, of which the parties have negotiated a reduction to $ 275,000.

After considering the *Johnson* factors, the court finds that no further downward adjustment of the

lodestar figure is warranted. This litigation, which has been ongoing since September 2016, is large in scope; it concerns both prisoners subject to examination for their competency to stand trial as well as those subject to competency-restoration therapy, and it sought and achieved a settlement that mandates a significant transformation in the way that the Department treats such prisoners. The range of complex legal and factual questions presented by the plaintiffs' claim, and the amount of time plaintiffs' attorneys spent in gathering evidence and preparing the complaint, and in negotiating and securing approval of the settlement agreement over several conferences before the magistrate judge, warrant the sizeable fee award. Moreover, the court is convinced that the experienced attorneys who litigated this case, and who took it on without any guarantee of compensation, would have been entitled to a higher hourly rate had they litigated a contested fee motion.

## III. CONCLUSION

This settlement reflects the ADMH's commitment to making manifest the rights of prisoners in its custody who are in need of competency determinations and restoration treatment; it represents the shouldering of significant responsibility, and presents an equally significant opportunity, by delineating a years-long process of ensuring compliance with the dictates of federal law. The court understands the ADMH's investment in this process to be genuine, and commends it for it.

The court also recognizes the important role played by detainees in need of mental-health evaluation and treatment in bringing this litigation, and commends both the named plaintiffs and the detainees and others who submitted comments for their advocacy on behalf both of themselves and of others.

Finally, the court expresses its appreciation to United States Magistrate Judge Charles S. Coody for his

extensive efforts in helping the parties to reach this settlement agreement.

* * *

In accordance with the foregoing opinion, it is ORDERED as follows:

(1) An injunctive-relief settlement class is certified under Federal Rule of Civil Procedure 23(a) and (b)(2), defined as "All persons who have been, or will be during the period that this Agreement remains in effect, charged with a crime, within the meaning of Rule 1.4(b) of the Alabama Rules of Criminal Procedure, in a court of competent jurisdiction in the State of Alabama, and detained in an Alabama city or county jail or Alabama Department of Corrections facility while awaiting a court-ordered Mental Evaluation or court-ordered Competency Restoration Treatment

(i) For whom a Circuit Court has determined

that reasonable grounds exist for a mental examination into the person's competency to stand trial under Rule 11 of the Alabama Rules of Criminal Procedure and committed the person to the custody of [Alabama Department of Mental Health (ADMH)] under Rule 11.3 of the Alabama Rules of Criminal Procedure by court order for an inpatient evaluation, whether or not the court's order references any provision of law in so ordering; or (ii) Who is found incompetent to stand trial under Rule 11 of the Alabama Rules of Criminal Procedure and committed to the custody of ADMH under Rule 11.6 of the Alabama Rules of Criminal Procedure by court order for Competency Restoration Therapy, whether or not the court's order references any provision of law in so ordering."

(2) The Alabama Disabilities Advocacy Program, Henry (Hank) F. Sherrod III, P.C., and the ACLU

of Alabama Foundation are appointed as class counsel to represent the settlement class under Federal Rule of Civil Procedure 23(g).

(3) The parties' settlement agreement (doc. no. 60-1), as amended, is approved, subject to the above constructions of Sections VIII, X.2, and X.4.

(4) The objections to the settlement agreement (doc. no. 69-1) are overruled.

(5) The parties' stipulated modifications (doc. nos. 84 and 89) are adopted.

(6) The settlement agreement, as modified by the stipulations, is entered as a separate consent decree. Defendant Lynn T. Beshear, in her official capacity as the Commissioner of the Alabama Department of Mental Health, is to commence compliance with its terms.

(7) The settlement agreement's provisions regarding attorneys' fees are approved. Plaintiffs' counsel are instructed to submit a motion for

attorneys' fees within 14 days of this order,in accordance with Federal Rule of Civil Procedure 54(d)(2).

(8) The parties are to meet and confer and submit to the court by no later than February 15, 2018, a plan for providing notice to class members of the entry of this consent decree and for ensuring that class members have access during the pendency of the consent decree to both it and this opinion. In particular, this notice must describe in lay terms, understandable to a person of limited education, the rights set out in the decree. The clerk of the court is DIRECTED to enter this document on the civil docket as a final judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure.

This case is closed.

DONE, this the 25th day of January, 2018.

                              /s/ Myron H. Thompson
                              UNITED STATES DISTRICT JUDGE