UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| DEMONTRAY HUNTER, by and through his next friend, Rena Hunter; RUSSELL D. SENN, by and through his next friend, Irene Senn; TRAVIS S. PARKS, by and through his next friend, Catherine Young; VANDARIUS S. DARNELL, by and through his next friend, Bambi Darnell; FRANK WHITE, JR., by and through his next friend, Linda White; MARCUS JACKSON, by and through his next friend Michael P. Hanle; TIMOTHY D. MOUNT, by and through his next friend, Dorothy Sullivan; HENRY P. MCGHEE, by and through his next friend, Barbara Hardy, individually and on behalf of all others similarly situated; and the ALABAMA DISABILITIES ADVOCACY PROGRAM,<br><br>Plaintiffs,<br><br>v.<br><br>LYNN T. BESHEAR, in her official capacity as Commissioner of the Alabama Department of Mental Health,<br><br>Defendant. | CASE NO. 2:16-cv-00798-MHT-CSC<br><br>CLASS ACTION FOR DECLARATORY AND INJUNCTIVE RELIEF |

**JOINT REPORT ON STATUS OF COMPLIANCE WITH CONSENT DECREE**

The named Plaintiffs as class representatives, the Alabama Disabilities Advocacy Program, and Lynn T. Beshear, Commissioner of the Alabama Department of Mental Health, jointly submit this report on the status of compliance with the Consent Decree entered in this action on January 25, 2018. *See* Order Directing Status Report, ECF No. 95; Consent Decree, ECF No. 94. This report is submitted pursuant to the Court's August 14, 2020 Order, ECF No. 156, directing the parties to prepare and submit same.

# I. JOINT REPORT ON COMPLIANCE WITH TERMS OF CONSENT DECREE

## A. Timelines for Provision of Court-Ordered Psychiatric Services

The Consent Decree mandates that the ADMH Commissioner provide Outpatient Mental Evaluations (and ensure the submission of reports regarding same to the relevant circuit court), Inpatient Mental Evaluations (together with submission of relevant reports), and Competency Restoration Treatment to class members within 30 days of the ADMH Commissioner's receipt of a court order for same by 24 months following its entry.[1] ECF No. 94, 13. The Consent Decree further provides that, starting in May 2019, Substantial Compliance with this 24 month benchmark requires that the average time period for the provision of court-ordered psychiatric services and the submission of reports regarding same not exceed 34 days (i.e., the average time period does not exceed 12% of the 30 day time period). *Id*. at 13.

### 1. Outpatient Mental Evaluations of Incarcerated Persons

#### a. Provision of Outpatient Mental Evaluations

Since the parties' previous status report in this matter, the timelines for providing Outpatient Mental Evaluations have remained fairly consistent, with some minor fluctuations. The ADMH Commissioner's average time periods for the provision of Outpatient Mental Evaluations during the 31 months following entry of the Consent Decree are set forth below. For the convenience of the Court, the parties have also reproduced the data from the first 24 months following entry of the Consent Decree as it was entered into the first Joint Status Report in this matter, which was filed

[1] Additionally, the Consent Decree required that the ADMH Commissioner provide Outpatient Mental Evaluations (and ensure the submission of reports regarding same to the relevant circuit court), Inpatient Mental Evaluations (together with submission of relevant reports), and Competency Restoration Treatment to class members within 45 days of the ADMH Commissioner's receipt of a court order for same by 12 months following its entry; thus the average time period for the provision of court-ordered psychiatric services and the submission of reports regarding same could not exceed 54 days (i.e., the average time period does not exceed 20% of the 45 day time period). *Id*. at 13.

with the court on January 25, 2019, and the second Joint Status Report in this matter, which was filed with the court on January 22, 2020. *See* ECF No. 116, ECF No. 142. The parties have also included graphs representing the overall downward trend in wait times for provision of Outpatient Mental Evaluations.

**Provision of Outpatient Mental Evaluations from the Period of January 25, 2018 – January 25, 2019[2]**

| | |
|---|---|
| April 25 – April 30, 2018 | 294.5 days |
| May 1 – May 31, 2018 | 35 days |
| June 1 – June 30, 2018 | 280.46 days |
| July 1 – July 31, 2018 | 252.05 days |
| August 1 – August 31, 2018 | 209.17 days |
| September 1 – September 30, 2018 | 135.83 days |
| October 1 – October 31, 2018 | 136.61 days |
| November 1 – November 30, 2018 | 248.20 days |
| December 1 – December 31, 2018 | 163.51 days |
| January 1 – January 24, 2019 | 224.93 days |

**Provision of Outpatient Mental Evaluations from the Period of January 25, 2019 – January 20, 2020**

| | |
|---|---|
| February 1 – 28, 2019 | 202.41 days |
| March 1 – March 31, 2019 | 120.80 days |
| April 1 – April 30, 2019 | 168.43 days |
| May 1 – May 31, 2019 | 101.2 days |

[2] Pursuant to the Consent Decree, compliance monitoring began in the fourth month following entry of the Consent Decree. *See* ECF No. 94, at 23 (Section VII.7).

| | |
|---|---|
| June 1 – June 30, 2019 | 101.6 days |
| July 1 – July 31, 2019 | 82.9 days |
| August 1 – August 31, 2019 | 65.3 days |
| September 1 – September 30, 2019 | 68.9 days |
| October 1 – October 31, 2019 | 77.1 days |
| November 1 – November 30, 2019 | 97.2 days |
| December 1 – December 31, 2019 | 57.1 days |
| January 1 – January 31, 2020 | 85.9 days |

**Provision of Outpatient Mental Evaluations from the Period of February 1, 2020 – July 31, 2020**

| | |
|---|---|
| February 1 – 29, 2020 | 66.7 days |
| March 1 – March 31, 2020 | 58.6 days |
| April 1 – April 30, 2020 | 86.3 days |
| May 1 – May 31, 2020 | 61.6 days |
| June 1 – June 30, 2020 | 81.5 days |
| July 1 – July 31, 2020 | 79.7 days |




Additionally, beginning with the Monitoring Period for August 1, 2019 through October 31, 2019, and for all Monitoring Periods thereafter, the Monitor calculated compliance based on the provision and submission of Outpatient Mental Evaluations in the date-of-receipt order specified by the Consent Decree, in addition to calculating compliance based on the total provision and submission of Outpatient Mental Evaluations as a whole. For individuals who did not receive an Outpatient Mental Evaluation during the month in question, the Monitor used for its calculations the number of days that individual had been waiting for the provision of their Outpatient Mental Evaluation at the time that the waitlist for that month was provided to the Monitor.

**Provision of Outpatient Mental Evaluations in Date-of-Receipt Order from the Period of August 1, 2019 – January 20, 2020**

| | |
|---|---|
| August 1 – August 31, 2019 | 139.7 days |
| September 1 – September 30, 2019 | 155.9 days |
| October 1 – October 31, 2019 | 132.5 days |
| November 1 – 30, 2019 | 163.6 days |
| December 1 – 30, 2019 | 128.4 days |

| | |
|---|---|
| January 1 – 30, 2020 | 122.7 days |
| February 1 – 29, 2020 | 141.5 days |
| March 1 – 31, 2020 | 110.4 days |
| April 1 – 30, 2020 | 180.9 days |
| May 1 – 31, 2020 | 126.3 days |
| June 1 – 30, 2020 | 118 days |
| July 1 – 31, 2020 | 119.4 days |




In March 2020, the ADMH Commissioner began providing the county in which class members were awaiting and/or receiving Outpatient Mental Evaluations. The ADMH Commissioner does not appear to be prioritizing larger counties over smaller counties, or to have a mechanism by which specific counties are addressed in a given month. This is exemplified by the fact that no evaluations were provided in Jefferson County, the state's most populous, in July

2020, but evaluations were completed in much smaller counties like Walker, Chilton, Covington, and Clarke.

### b. Submission of Outpatient Mental Evaluations

Since the parties' previous status report in this matter, the timelines for submitting reports on Outpatient Mental Evaluations have continued to fluctuate. The ADMH Commissioner's average time periods for submission of reports on Outpatient Mental Evaluations during the 31 months following entry of the Consent Decree are set forth below. For the convenience of the Court, the parties have also reproduced the data from the first 24 months following entry of the Consent Decree as it was entered into the first Joint Status Report in this matter, which was filed with the court on January 25, 2019, and the second Joint Status Report in this matter, which was filed with the court on January 22, 2020. *See* ECF No. 116, ECF No. 142. The parties have also included graphs representing the overall downward trend in wait times for provision of Outpatient Mental Evaluations. The average time periods for the submission of reports regarding the general variability of submission of reports on Outpatient Mental Evaluations to relevant circuit courts are set forth below.

**Submission of Reports for Outpatient Mental Evaluations from the Period of January 25, 2018 – January 25, 2019[3]**

| | |
|---|---|
| April 25 – April 30, 2018 | No reports submitted |
| May 1 – May 31, 2018 | 39.33 days |
| June 1 – June 30, 2018 | 55.50 days |
| July 1 – July 31, 2018 | 25.52 days |
| August 1 – August 31, 2018 | 27.46 days |

[3] Pursuant to the Consent Decree, compliance monitoring began in the fourth month following entry of the Consent Decree. *See* ECF No. 94, at 23 (Section VII.7).

| | |
|---|---|
| September 1 – September 30, 2018 | 27.87 days |
| October 1 – October 31, 2018 | 48.51 days |
| November 1 – November 30, 2018 | 19.50 days |
| December 1 – December 31, 2018 | 29.13 days |
| January 1 – January 24, 2019 | 40.93 days |

**Submission of Reports for Outpatient Mental Evaluations from the Period of January 25, 2019 – January 20, 2020**

| | |
|---|---|
| February 1 – 28, 2019 | 25.93 days |
| March 1 – March 31, 2019 | 19.88 days |
| April 1 – April 30, 2019 | 33.73 days |
| May 1 – May 31, 2019 | 28.6 days |
| June 1 – June 30, 2019 | 33.7 days |
| July 1 – July 31, 2019 | 38.4 days |
| August 1 – August 31, 2019 | 31.5 days |
| September 1 – September 30, 2019 | 23.2 days |
| October 1 – October 31, 2019 | 22.8 days |
| November 1 – 30, 2019 | 30.5 days |
| December 1 – 30, 2019 | 34.4 days |
| January 1 – 31, 2020 | 40.7 days |

**Submission of Reports for Outpatient Mental Evaluations from the Period of February 1, 2020 – July 31, 2020**

| | |
|---|---|
| February 1 – February 29, 2020 | 23.9 days |

| | |
|---|---|
| March 1 – 31, 2020 | 31.9 days |
| April 1 – 30, 2020 | 69.1 days |
| May 1 – 31, 2020 | 49.9 days |
| June 1 – 30, 2020 | 21.9 days |
| July 1 – 31, 2020 | 28.3 days |

The average time periods for the provision of Outpatient Mental Evaluations do not satisfy either the 54-day or the 34-day standard for Substantial Compliance for the second 12-month period following entry of the Consent Decree, nor do the average time periods for the submission of reports for Outpatient Mental Evaluations. As is illustrated above, the wait times for provision of Outpatient Mental Evaluations still remain well above both the 54-day and the 34-day Substantial Compliance standards.

Timeframes for submission of Outpatient Mental Evaluations have been, in many months, below the 54-day and 34-day standards for Substantial Compliance, although almost every month so far has had a few significant outliers who wait 70 days or more for their reports to be submitted. While the ADMH Commissioner has recently begun including with the monitoring data sufficiently individualized narrative reasons why class members are skipped in the provision of Outpatient Mental Evaluations, and although Plaintiff finds those reasons generally adequate to explain the continued out-of-order provision of services, the data does not indicate why certain individuals experience exceedingly long wait times for the submission of their reports.

**Defendant's Response to I.A.1. (Outpatient Mental Evaluations of Incarcerated Persons)**

The Defendant acknowledges that evaluations are not always done in order of receipt. However, the Defendant would submit that the practical realities and logistics of Outpatient

Evaluations lend themselves to this outcome. For example, an evaluator may be assigned ten evaluations in a particular county and all of said defendants are in the county jail. To maximize efficiency and allocation of resources, common sense dictates that all ten defendants should be evaluated while the evaluator is present at the jail. To do otherwise would unnecessarily delay evaluations that could be timely completed.

Also, completion of evaluations is dependent upon submission of certain records by prosecutors and defense attorneys. These records are necessary for an accurate evaluation. Sometimes, counsel do not submit these records in a timely manner, delaying completion of an evaluation. It is impractical to delay other evaluations that are otherwise ready to be completed because of a delay by counsel. However, both prosecutors and defense counsel have become more timely with submission of records as a result of educational efforts since the Consent Decree was entered.

**2. Inpatient Mental Evaluations of Incarcerated Persons**

**a. Provision of Inpatient Mental Evaluations**

Since the parties' previous status report in this matter, the timelines for submitting reports on Outpatient Mental Evaluations have continued to fluctuate, but generally remain exceptionally high. The ADMH Commissioner's average time periods for provision of Inpatient Mental Evaluations during the 31 months following entry of the Consent Decree are set forth below. For the convenience of the Court, the parties have also reproduced the data from the first 24 months following entry of the Consent Decree as it was entered into the first Joint Status Report in this matter, which was filed with the court on January 25, 2019, and the second Joint Status Report in this matter, which was filed with the court on January 22, 2020. *See* ECF No. 116, ECF No. 142. The parties have also included graphs representing the significant variability in wait times for

provision of Inpatient Mental Evaluations. The average time periods for the submission of reports on Inpatient Mental Evaluations also continue to fluctuate, but are generally low. The average time periods for the submission of reports on Inpatient Mental Evaluations to relevant circuit courts are set forth below. The ADMH Commissioner's average time periods for the provision of Inpatient Mental Evaluations during the first 31 months following entry of the Consent Decree are set forth below. For the convenience of the Court, the parties have also reproduced the data from the first 24 months following entry of the Consent Decree as it was entered into the first Joint Status Report in this matter, which was filed with the court on January 25, 2019, and the second Joint Status Report in this matter, which was filed with the court on January 22, 2020. *See* ECF No. 116, ECF No. 142. The parties have also included graphs representing the fluctuation in wait times for provision of Inpatient Mental Evaluations.[4]

**Provision of Inpatient Mental Evaluations from the Period of January 25, 2018 – January 25, 2019[5]**

| | |
|---|---|
| April 25 – April 30, 2018 | No inpatient evaluations conducted |
| May 1 – May 31, 2018 | 229.33 days |
| June 1 – June 30, 2018 | 311.67 days |
| July 1 – July 31, 2018 | 349.17 days |
| August 1 – August 31, 2018 | 386.67 days |
| September 1 – September 30, 2018 | 318 days |
| October 1 – October 31, 2018 | 377.5 days |
| November 1 – November 30, 2018 | 385.25 days |

[4] Note that zeroes or gaps in the graphs indicate no evaluations were provided during that month.
[5] Pursuant to the Consent Decree, compliance monitoring began in the fourth month following entry of the Consent Decree. *See* ECF No. 94, at 23 (Section VII.7).

| | |
|---|---|
| December 1 – December 31, 2018 | 356.8 days |
| January 1 – January 24, 2019 | No inpatient evaluations conducted |

**Provision of Inpatient Mental Evaluations from the Period of January 25, 2019 – January 20, 2020**

| | |
|---|---|
| February 1 – 28, 2019 | 397.71 days |
| March 1 – March 31, 2019 | 413.75 days |
| April 1 – April 30, 2019 | 250 days |
| May 1 – May 31, 2019 | 562 days |
| June 1 – June 30, 2019 | No inpatient evaluations conducted |
| July 1 – July 31, 2019 | 534.5 days |






During the Monitoring Period beginning August 1, 2019 and ending October 31, 2019, the ADMH Commissioner began providing lists of Inpatient Mental Evaluations as conducted at each ADMH facility (Taylor Hardin Secure Medical Facility, Hillcrest Hospital, and Bryce Hospital). The data below therefore delineates the provision of Inpatient Mental Evaluations by facility, rather than as a whole.

**Provision of Inpatient Mental Evaluations at Taylor Hardin from the Period of August 1, 2019 – January 31, 2020**

| | |
|---|---|
| August 1 – August 31, 2019 | 431.3 days |
| September 1 – September 30, 2019 | 354.3 days |
| October 1 – October 31, 2019 | 427 days |
| November 1 – November 30, 2019 | 560.2 days |
| December 1 – December 31, 2019 | 559.4 days |
| January 1 – January 31, 2020 | 267.9 days |

**Provision of Inpatient Mental Evaluations at Hillcrest Hospital from the Period of August 1, 2019 – January 31, 2020**

| | |
|---|---|
| August 1 – August 31, 2019 | 303 days |
| September 1 – September 30, 2019 | 369.3 days |
| October 1 – October 31, 2019 | No inpatient evaluations conducted |
| November 1 – November 30, 2019 | No inpatient evaluations conducted |
| December 1 – December 31, 2019 | No inpatient evaluations conducted |
| January 1 – January 30, 2020 | No inpatient evaluations conducted |

**Provision of Inpatient Mental Evaluations at Bryce Hospital from the Period of August 1, 2019 – January 31, 2020**

| | |
|---|---|
| August 1 – August 31, 2019 | 354.5 days |
| September 1 – September 30, 2019 | No inpatient evaluations conducted |
| October 1 – October 31, 2019 | No inpatient evaluations conducted |
| November 1 – November 30, 2019 | 115 days |
| December 1 – December 31, 2019 | 278 days |
| January 1 – January 31, 2020 | No inpatient evaluations conducted |

**Provision of Inpatient Mental Evaluations at Taylor Hardin from the Period of February 1, 2020 – July 31, 2020**

| | |
|---|---|
| February 1 – February 29, 2020 | 499.5 days |
| March 1 – March 31, 2020 | 304.1 days |
| April 1 – April 30, 2020 | 1,028.7 days |
| May 1 – May 31, 2020 | 523.5 days |
| June 1 – June 30, 2020 | No inpatient evaluations conducted |

| | |
|---|---|
| July 1 – July 31, 2020 | No inpatient evaluations conducted |

**Provision of Inpatient Mental Evaluations at Hillcrest Hospital from the Period of February 1, 2020 – July 31, 2020**

| | |
|---|---|
| February 1 – February 29, 2020 | No inpatient evaluations conducted |
| March 1 – March 31, 2020 | 297.3 days |
| April 1 – April 30, 2020 | No inpatient evaluations conducted |
| May 1 – May 31, 2020 | 315 days |
| June 1 – June 30, 2020 | No inpatient evaluations conducted |
| July 1 – July 31, 2020 | 294 days |

**Provision of Inpatient Mental Evaluations at Bryce Hospital from the Period of February 1, 2020 – July 31, 2020**

| | |
|---|---|
| February 1 – February 29, 2020 | 256 days |
| March 1 – March 31, 2020 | 106 days |
| April 1 – April 30, 2020 | No inpatient evaluations conducted |
| May 1 – May 31, 2020 | No inpatient evaluations conducted |
| June 1 – June 30, 2020 | 36 days |
| July 1 – July 31, 2020 | No inpatient evaluations conducted |


Inpatient Evaluations at THSMF: Aug 2019 - Jul 2020
1200
1000
800
600
400
200
0
431.3
354.3
427
560.2
559.4
267.9
499.5
304.1
1028.7
523.2
August 2019
September 2019
October 2019
November 2019
December 2019
January 2020
February 2020
March 2020
April 2020
May 2020
June 2020
July 2020


Inpatient Evaluations at Hillcrest: Aug 2019 - Jul 2020
450
400
350
300
250
200
150
100
50
0
425
297.3
315
294
August 2019
September 2019
October 2019
November 2019
December 2019
January 2020
February 2020
March 2020
April 2020
May 2020
June 2020
July 2020


Inpatient Evaluations at Bryce: Aug 2019 - Jul 2020
400
350
300
250
200
150
100
50
0
354.5
115
278
256
108
36
August 2019
September 2019
October 2019
November 2019
December 2019
January 2020
February 2020
March 2020
April 2020
May 2020
June 2020
July 2020

**Submission of Reports for Inpatient Mental Evaluations from the Period of January 25, 2018 – January 25, 2019[6]**

| | |
|---|---|
| April 25 – April 30, 2018 | 8.67 days |
| May 1 – May 31, 2018 | 14.5 days |
| June 1 – June 30, 2018 | 25.83 days |
| July 1 – July 31, 2018 | 5.5 days |
| August 1 – August 31, 2018 | 25.4 days |
| September 1 – September 30, 2018 | 7.67 days |
| October 1 – October 31, 2018 | 8.29 days |
| November 1 – November 30, 2018 | 29.5 days |
| December 1 – December 31, 2018 | 22.67 days |
| January 1 – January 24, 2019 | 70 days |

**Submission of Reports for Inpatient Mental Evaluations from the Period of January 25, 2019 – January 20, 2020**

| | |
|---|---|
| February 1 – 28, 2019 | 41.40 days |
| March 1 – March 31, 2019 | 18.13 days |
| April 1 – April 30, 2019 | 21.25 days |
| May 1 – May 31, 2019 | 41.3 days |
| June 1 – June 30, 2019 | 72.5 days |
| July 1 – July 31, 2019 | 27.6 days |
| August 1 – August 31, 2019 | 31.5 days |
| September 1 – September 30, 2019 | 23.2 days |

[6] Pursuant to the Consent Decree, compliance monitoring began in the fourth month following entry of the Consent Decree. *See* ECF No. 94, at 23 (Section VII.7).

| | |
|---|---|
| October 1 – October 31, 2019 | 22.8 days |






During the Monitoring Period beginning August 1, 2019 and ending October 31, 2019, the ADMH Commissioner began providing lists of Inpatient Mental Evaluations as submitted from each ADMH facility (Taylor Hardin Secure Medical Facility, Hillcrest Hospital, and Bryce Hospital). The data below therefore delineates the submission of Inpatient Mental Evaluations by facility, rather than as a whole.

**Submission of Inpatient Mental Evaluations from Taylor Hardin from the Period of August 1, 2019 – January 31, 2020**

| | |
|---|---|
| August 1 – August 31, 2019 | 51.2 days |
| September 1 – September 30, 2019 | 27.4 days |
| October 1 – October 31, 2019 | 30.3 days |
| November 1 – November 30, 2019 | 22.2 days |
| December 1 – December 31, 2019 | 22.8 days |
| January 1 – January 31, 2020 | 14.3 days |

**Submission of Inpatient Mental Evaluations from Hillcrest Hospital from the Period of August 1, 2019 – January 31, 2020**

| | |
|---|---|
| August 1 – August 31, 2019 | 55 days |
| September 1 – September 30, 2019 | 55 days |
| October 1 – October 31, 2019 | No inpatient evaluations submitted |
| November 1 – November 30, 2019 | No inpatient evaluations submitted |
| December 1 – December 31, 2019 | No inpatient evaluations submitted |
| January 1 – January 30, 2020 | No inpatient evaluations submitted |

**Submission of Inpatient Mental Evaluations from Bryce Hospital from the Period of August 1, 2019 – January 31, 2020**

| | |
|---|---|
| August 1 – August 31, 2019 | 4 days |
| September 1 – September 30, 2019 | No inpatient evaluations submitted |
| October 1 – October 31, 2019 | No inpatient evaluations submitted |
| November 1 – November 30, 2019 | No inpatient evaluations submitted |
| December 1 – December 31, 2019 | No inpatient evaluations submitted |
| January 1 – January 30, 2020 | 24 days |

**Submission of Inpatient Mental Evaluations at Taylor Hardin from the Period of February 1, 2020 – July 31, 2020**

| | |
|---|---|
| February 1 – February 29, 2020 | 23.6 days |
| March 1 – March 31, 2020 | 29.3 days |
| April 1 – April 30, 2020 | 26 days |
| May 1 – May 31, 2020 | 14.8 days |
| June 1 – June 30, 2020 | 16.5 days |
| July 1 – July 31, 2020 | No inpatient evaluations submitted |

**Submission of Inpatient Mental Evaluations at Hillcrest Hospital from the Period of February 1, 2020 – July 31, 2020**

| | |
|---|---|
| February 1 – February 29, 2020 | No inpatient evaluations submitted |
| March 1 – March 31, 2020 | 23.3 days |
| April 1 – April 30, 2020 | No inpatient evaluations submitted |
| May 1 – May 31, 2020 | 61 days |
| June 1 – June 30, 2020 | No inpatient evaluations submitted |
| July 1 – July 31, 2020 | No inpatient evaluations submitted |

**Submission of Inpatient Mental Evaluations at Bryce Hospital from the Period of February 1, 2020 – July 31, 2020**

| | |
|---|---|
| February 1 – February 29, 2020 | 12 days |
| March 1 – March 31, 2020 | 29 days |
| April 1 – April 30, 2020 | 69.5 days |
| May 1 – May 31, 2020 | No inpatient evaluations submitted |
| June 1 – June 30, 2020 | 23 days |
| July 1 – July 31, 2020 | No inpatient evaluations submitted |









The average time periods for the provision of Inpatient Mental Evaluations do not satisfy either the 54-day or 34-day standards for Substantial Compliance for the second 12-month period following entry of the Consent Decree, nor do the average time periods for the submission of reports for Inpatient Mental Evaluations. As is illustrated above, the average wait times for provision of Inpatient Mental Evaluations still remain well above both the 34-day and 54-day Substantial Compliance standards, and are still generally exceptionally high. Further, although the timeframes for submission of Inpatient Mental Evaluations have been, in many months, below both the 54-day and 34-day standards for Substantial Compliance, the fact that the provision and submission of Inpatient Mental Evaluations generally occurred outside of the date-of-receipt order specified by the Consent Decree[7] precludes a finding of Substantial Compliance.

**Defendant's Response to I.A.2 (Inpatient Mental Evaluations of Incarcerated Persons)**

The Defendant would point out that reports were submitted timely in the majority of the months counted during the Monitoring Periods since the Consent Decree. Also, for the reasons pointed out previously related to evaluations out of order, the same reasoning would apply to

[7] *See* ECF No. 94 at 17.

submission of reports. Due to the COVID-19 pandemic, ADMH had to temporarily suspend admissions to Taylor Hardin. This fact contributed to the completion of less reports.

**3. Competency Restoration Treatment of Incarcerated Persons**

The ADMH Commissioner's average time periods for the admission of males ordered to receive Competency Restoration Treatment (CRT) into Taylor Hardin Secure Medical Facility and Hillcrest Hospital, and the admission of females into Bryce Hospital during the first 31 months following entry of the Consent Decree are set forth below. For the convenience of the Court, the parties have also reproduced the data from the first 24 months following entry of the Consent Decree as it was entered into the first Joint Status Report in this matter, which was filed with the court on January 25, 2019, and the second Joint Status Report in this matter, which was filed with the court on January 22, 2020. *See* ECF No. 116, ECF No. 142. The parties have also included graphs representing the fluctuation in wait times for CRT admissions.[8]

**Admission of Males into Taylor Hardin from the Period of January 25, 2018 – January 25, 2019[9]**

| | |
|---|---|
| April 25 – April 30, 2018 | No admissions into Taylor Hardin for CRT |
| May 1 – May 31, 2018 | 216.67 days |
| June 1 – June 30, 2018 | 233 days |
| July 1 – July 31, 2018 | 237 days |
| August 1 – August 31, 2018 | 276.67 days |
| September 1 – September 30, 2018 | 302 days |
| October 1 – October 31, 2018 | 302 days |

[8] Note that zeroes or gaps in the graphs indicate no evaluations were provided during that month.
[9] Pursuant to the Consent Decree, compliance monitoring began in the fourth month following entry of the Consent Decree. *See* ECF No. 94, at 23 (Section VII.7).

| | |
|---|---|
| November 1 – November 30, 2018 | 251.4 days |
| December 1 – December 31, 2018 | 324 days |
| January 1 – January 24, 2019 | 229.33 days |

**Admission of Males into Hillcrest from the Period of January 25, 2018 – January 25, 2019[10]**

| | |
|---|---|
| January 1 – January 24, 2019 | 327 days |

**Admission of Females into Bryce Hospital from the Period of January 25, 2018 – January 25, 2019[11]**

| | |
|---|---|
| April 25 – April 30, 2018 | No admissions |
| May 1 – May 31, 2018 | 4.5 days |
| June 1 – June 30, 2018 | 142 days |
| July 1 – July 31, 2018 | No admissions |
| August 1 – August 31, 2018 | No admissions |
| September 1 – September 30, 2018 | No admissions |
| October 1 – October 31, 2018 | No admissions |
| November 1 – November 30, 2018 | No admissions |
| December 1 – December 31, 2018 | No admissions |
| January 1 – January 24, 2019 | No admissions |

**Admission of Males into Taylor Hardin from the Period of January 25, 2019 – January 20, 2020**

| | |
|---|---|
| February 1 – 28, 2019 | 299.38 days |

[10] Beds at Hillcrest Hospital did not come online until January 2019 and as such there were no admissions to that facility until then.

[11] Pursuant to the Consent Decree, compliance monitoring began in the fourth month following entry of the Consent Decree. *See* ECF No. 94, at 23 (Section VII.7).

| | |
|---|---|
| March 1 – March 31, 2019 | 219.40 days |
| April 1 – April 30, 2019 | 190.67 days |
| May 1 – May 31, 2019 | 179 days |
| June 1 – June 30, 2019 | 178.7 days |
| July 1 – July 31, 2019 | No admissions to Taylor Hardin for CRT |
| August 1 – August 31, 2019 | No admissions to Taylor Hardin for CRT |
| September 1 – September 30, 2019 | No admissions to Taylor Hardin for CRT |
| October 1 – October 31, 2019 | No admissions to Taylor Hardin for CRT |
| November 1 – November 30, 2019 | 180.3 days |
| December 1 – December 31, 2019 | 146.8 days |
| January 1 – January 31, 2020 | 161.5 days |

**Admission of Males into Hillcrest from the Period of January 25, 2019 – January 20, 2020**

| | |
|---|---|
| February 1 – 28, 2019 | 298 days |
| March 1 – March 31, 2019 | 442.5 days |
| April 1 – April 30, 2019 | No admissions to Hillcrest for CRT |
| May 1 – May 31, 2019 | 229 days |
| June 1 – June 30, 2019 | 104 days |
| July 1 – July 31, 2019 | 161 days |
| August 1 – August 31, 2019 | No admissions to Hillcrest for CRT |
| September 1 – September 30, 2019 | No admissions to Hillcrest for CRT |
| October 1 – October 31, 2019 | 124 days |

| | |
|---|---|
| November 1 – November 30, 2019 | No admissions to Hillcrest for CRT |
| December 1 – December 31, 2019 | No admissions to Hillcrest for CRT |
| January 1 – January 31, 2020 | No admissions to Hillcrest for CRT |

**Admission of Females into Bryce from the Period of January 25, 2019 – January 20, 2020**

| | |
|---|---|
| February 1 – 28, 2019 | 90 days |
| March 1 – March 31, 2019 | 27 days |
| April 1 – April 30, 2019 | 24 days |
| May 1 – May 31, 2019 | 43.3 days |
| June 1 – June 30, 2019 | 76 days |
| July 1 – July 31, 2019 | No admissions to Bryce for CRT |
| August 1 – August 31, 2019 | 45 days |
| September 1 – September 30, 2019 | 13 days |
| October 1 – October 31, 2019 | No admissions to Bryce for CRT |
| November 1 – November 30, 2019 | No admissions to Bryce for CRT |
| December 1 – December 31, 2019 | No admissions to Bryce for CRT |
| January 1 – January 31, 2020 | No admissions to Bryce for CRT |

**Admission of Males into Taylor Hardin from the Period of February 1, 2020 – July 31, 2020**

| | |
|---|---|
| February 1 – 29, 2020 | 200.8 days |
| March 1 – March 31, 2020 | 170.4 days |
| April 1 – April 30, 2020 | No admissions to Taylor Hardin for CRT |
| May 1 – May 31, 2020 | No admissions to Taylor Hardin for CRT |

| | |
|---|---|
| June 1 – June 30, 2020 | 36 days |
| July 1 – July 31, 2020 | No admissions to Taylor Hardin for CRT |

**Admission of Males into Hillcrest Hospital from the Period of February 1, 2020 – July 31, 2020**

| | |
|---|---|
| February 1 – 29, 2020 | No admissions to Hillcrest for CRT |
| March 1 – March 31, 2020 | No admissions to Hillcrest for CRT |
| April 1 – April 30, 2020 | No admissions to Hillcrest for CRT |
| May 1 – May 31, 2020 | No admissions to Hillcrest for CRT |
| June 1 – June 30, 2020 | 73 days |
| July 1 – July 31, 2020 | 296 days |

**Admission of Females into Bryce Hospital from the Period of February 1, 2020 – July 31, 2020**

| | |
|---|---|
| February 1 – 29, 2020 | 9 days |
| March 1 – March 31, 2020 | No admissions to Bryce for CRT |
| April 1 – April 30, 2020 | No admissions to Bryce for CRT |
| May 1 – May 31, 2020 | No admissions to Bryce for CRT |
| June 1 – June 30, 2020 | 62.3 days |
| July 1 – July 31, 2020 | No admissions to Bryce for CRT |


CRT Admissions to THSMF - Total
350
300
250
200
150
100
50
0
216.67
233
237
276.67
302
302
251.4
324
290.14
299.38
219.4
190.67
179
178.7
180.3
146.8
161.5
200.8
170.4
36
April 2018
May 2018
June 2018
July 2018
August 2018
September 2018
October 2018
November 2018
December 2018
January 2019
February 2019
March 2019
April 2019
May 2019
June 2019
July 2019
August 2019
September 2019
October 2019
November 2019
December 2019
January 2020
February 2020
March 2020
April 2020
May 2020
June 2020
July 2020


CRT Admissions to Hillcrest - Total
500
400
300
200
100
0
327
298
442.5
229
104
161
124
73
296
January 2019
February 2019
March 2019
April 2019
May 2019
June 2019
July 2019
August 2019
September 2019
October 2019
November 2019
December 2019
January 2020
February 2020
March 2020
April 2020
May 2020
June 2020
July 2020


CRT Admissions to Bryce - Total
160
140
120
100
80
60
40
20
0
4.5
142
90
27
24
43.3
76
45
13
9
62.3
April 2018
May 2018
June 2018
July 2018
August 2018
September 2018
October 2018
November 2018
December 2018
January 2019
February 2019
March 2019
April 2019
May 2019
June 2019
July 2019
August 2019
September 2019
October 2019
November 2019
December 2019
January 2020
February 2020
March 2020
April 2020
May 2020
June 2020
July 2020

The average time periods for the admission of males into Taylor Hardin and Hillcrest for Competency Restoration Treatment remain exceptionally high and therefore do not satisfy either the 54-day or 34-day standards for Substantial Compliance in the second 12-month period following entry of the Consent Decree. The average time periods for admission of females into Bryce Hospital for the months of March, April, and September 2019, as well as February 2020, does satisfy the 54-day Substantial Compliance measure (for the months of March and April 2019), as well as the 34-day Substantial Compliance measure (for the month of September 2019), but the average time period for admission of females into Bryce Hospital for the months of February, May, June, and August 2019 does not satisfy either the 54-day (for the month of February 2019) or the 34-day Substantial Compliance measure (for the months of May, June, and August 2019, and the month of July 2020).

**4. Evaluations and Treatment of Incarcerated Females**

The average time periods for the evaluation and/or treatment of females ordered to receive Outpatient Mental Evaluations, Inpatient Mental Evaluations, and Competency Restoration Treatment (CRT) at Bryce Hospital are incorporated into the time periods reported in Sections 2 and 3 above. The average time periods for admission into Bryce for CRT met the 34-day Substantial Compliance standard in February 2020. Further, the timeframe for provision of Inpatient Mental Evaluations were out of compliance in February, March, and June 2020 because all timeframes were outside of the 34-day Substantial Compliance standard. However, the ADMH Commissioner was compliant with the timeframe for submission of Inpatient Mental Evaluations conducted for females at Bryce during February, March, and July 2020. Because females and males are commingled for purposes of data collection in connection with Outpatient Mental

Evaluations, the ADMH Commissioner's noncompliance with regard to the provision and submission of same applies equally to males and females. *See* Sections 1, 2, and 3 above.

### 5. Order of Evaluation and Treatment of Incarcerated Persons

The parties have extensively discussed the ongoing issue of out-of-order provision of court-ordered competency services. In the ADMH Commissioner's effort to address the backlog of ordered mental evaluations and inpatient admissions for Competency Restoration Treatment, a significant number of individuals have been evaluated and admitted outside of the order specified by Section VI.1.D of the Consent Decree. ECF No. 94 at 11-13. Because of the continued provision of court-ordered competency services outside of date-of-receipt order, otherwise timely-provided psychiatric services fail to constitute substantial compliance given that they were performed out of order. The ADMH Commissioner has begun providing individualized narrative reasons why some individuals receive their Outpatient Mental Evaluations out-of-order, which Plaintiffs expect will help the ADMH Commissioner move closer to compliance with that specific measure. However, the reasons for out-of-order submission of Outpatient Mental Evaluations, provision and submission of Inpatient Mental Evaluations, and admissions for CRT (particularly to Taylor Hardin and Hillcrest) remain unclear.

**Defendant's Response to I.A.5 (Order of Evaluation and Treatment of Incarcerated Persons**

The Defendant acknowledges that evaluations are not always done in order of receipt. However, the Defendant would submit that the practical realities and logistics of Outpatient Evaluations lend themselves to this outcome. For example, an evaluator may be assigned ten evaluations in a particular county and all of said defendants are in the county jail. To maximize efficiency and allocation of resources, common sense dictates that all ten defendants should be

evaluated while the evaluator is present at the jail. To do otherwise would unnecessarily delay evaluations that could be timely completed.

Also, completion of evaluations is dependent upon submission of certain records by prosecutors and defense attorneys. These records are necessary for an accurate evaluation. Sometimes, counsel do not submit these records in a timely manner, delaying completion of an evaluation. It is impractical to delay other evaluations that are otherwise ready to be completed because of a delay by counsel. However, both prosecutors and defense counsel have become more timely with submission of records as a result of educational efforts since the Consent Decree was entered.

JBS Mental Health has divided the state into five geographic regions. Evaluators are assigned to each region. Evaluations are conducted in each region on an ongoing basis regardless of the county. This system prevents smaller counties from being overlooked as compared to larger counties.

ADMH has updated its data collection software to more clearly reflect out of order evaluations. ADMH has significantly reduced the number of outpatient evaluations that were pending for over 100 days. At the end of July 2020, the number of outstanding outpatient evaluations had been reduced to approximately 50 from a backlog of approximately 400 that existed at the beginning of the lawsuit. This progress continues despite the challenges COVID-19 presented to assessing defendants in jails and prisons.

**B. Operationalization of Hospital and Community Forensic Beds**

**1. Hospital Forensic Beds**

The Consent Decree requires the ADMH Commissioner to add and operate, consistent with existing licensure and certification standards, 25 hospital forensic beds between 12 and 24 months

following entry of the Consent Decree. ECF No. 94 at 28 (Section VI.2.A.ii)[12] , and not fewer than 25 additional beds by 24 months following entry of the Consent Decree. *Id*. at 28 (Section VI.2.A.ii.). As of August 2020, the ADMH Commissioner had added and operationalized 20 hospital forensic beds at Hillcrest Hospital. The ADMH Commissioner must therefore add and operationalize an additional 5 hospital forensic beds to achieve Substantial Compliance with the Year 2 requirement that 25 additional hospital forensic beds be added and operationalized no later than 24 months following entry of the Consent Decree. The deadline for same was January 24, 2020.

**Defendant's Response to I.B.1 (Hospital Forensic Beds)**

The Plaintiffs correctly state that an additional 10 hospital forensic beds are needed to achieve substantial compliance. The Defendant contracted in early 2019 to have a 16 bed facility in place for this purpose by January 2020. However, those arrangements were later cancelled due to unforeseen circumstances beyond the Defendant's control. Arrangements are now underway to complete an identical 16 bed facility in a different location. Due to the fact that the Defendant had to start over, this facility will not be functional until early 2021.

**2. Community Forensic Beds**

The Consent Decree requires the ADMH Commissioner, by and through ADMH and/or its contractors and/or other lawful providers, to add and operate, consistent with existing licensure and certification standards, 52 forensic beds in group homes of no greater than 16 beds. ECF No. 94. at 18-19. New Community Forensic Beds may not be operated on the grounds of any existing

[12] This is in addition to the Consent Decree's requirement that the ADMH Commissioner add and operationalize 25 hospital forensic beds by 12 months following the entry of the Consent Decree. ECF No. 94 at 28. The ADMH Commissioner added and operationalized 25 new hospital forensic beds at Taylor Hardin Secure Medical Facility in July 2017, and achieved Substantial Compliance with that requirement. *See* ECF No. 116 at 9.

state hospital. *Id*. at 7 (definition of Community Forensic Bed). Between 12 months following entry of the Consent Decree, the ADMH Commissioner must add and operate 20 community forensic beds, and between 12 and 24 months following entry of the Consent Decree, the ADMH Commissioner must add and operationalize a further 32 community forensic beds. *Id*. at 19 (Section VI.2.B.i.). A minimum of 5 of these 32 community beds must be located where a Registered Sex Offender may be housed. *Id*. (Section VI.2.B.ii). The 5 new community forensic beds set aside for Registered Sex Offenders may only be used to serve Registered Sex Offenders unless there are fewer than 5 Registered Sex Offenders in need of a community placement.

To date, ADMH officials have added and operationalized a total of 32 community forensic beds since the Consent Decree was entered on January 25, 2018. *See* ECF No. 116 at 10; ECF No. 142 at 19. As of August 2019, 16 beds (including five (5) sex offender beds) had come online at a forensic group home operated by East Alabama Mental Health Center, and that 16 more beds had come online at another forensic group home operated by Northwest Alabama Mental Health Center. *See* ECF No. 116 at 10; ECF No. 142 at 19. ADMH has added 20 Forensic Community beds (MOMs) through JBS Mental Health, thus meeting the total of 52 beds. ADMH is also working with East Central Mental Health to secure 10 or more additional community beds.

### C. Training to Relevant State Personnel

#### 1. Court Personnel and Sheriffs

Per the Consent Decree, the Department's obligation to provide training to state personnel began in 2017 and extended for two years thereafter, therefore ending in calendar year 2019. Thus, training of state personnel will no longer be monitored or calculated as a compliance measure.

**Defendant's Response to I.C.1 (Court Personnel and Sheriffs)**

The Defendant continued to conduct training in 2019 to continue its educational effort, including the Alabama Criminal Defense Lawyers Conference, the Alabama District Attorneys Conference, the Alabama State Bar Conference, and the Alabama Judicial Conference.

**2. Attorneys Representing Persons Affected by ADMH-Connected Orders**

Within 12 months of its entry, the Consent Decree required the ADMH Commissioner to distribute to each Alabama circuit court a publication (the "Section VI.3.B Publication"), mutually agreed upon between the ADMH Commissioner and Plaintiffs' Counsel, for dissemination to attorneys representing persons ordered to receive Outpatient Mental Evaluations, Inpatient Mental Evaluations, and Competency Restoration Treatment. *See* ECF No. 94 at 20. The ADMH Commissioner substantially complied with this requirement in Year 1, and there is no separate educational requirement for Year 2. *See* ECF No. 116 at 12-12; *see also* ECF No. 94 at 20.

**Defendant's Response to I.C.2 (Attorneys Representing Persons Affected by ADMH-Connected Orders)**

The Defendant continued to conduct training in 2020 to continue its educational efforts as set out above. ADMH has scheduled a CLE for Judges in October 2020.

**3. Members of the Alabama State Bar**

The Consent Decree requires the ADMH Commissioner, within 12 months of entry of the Consent Decree, to distribute a letter or email to all members of the Alabama State Bar enclosing the publication defined in Section VI.3.B. The Consent Decree further requires the ADMH Commissioner to make reasonable efforts to disseminate the specified publication to members of the criminal defense bar through electronic mail and listservs. Beginning in calendar year 2017, and for two years thereafter, the ADMH Commissioner must also offer annual training to members of the Alabama State Bar regarding the timelines for the provision of Outpatient Mental Evaluations, Inpatient Mental Evaluations, and Competency Restoration Treatment specified by

the Consent Decree and the ADMH Commissioner's duty to comply with same. As described more fully in Section I.E. below, a copy of the Notice of Entry of Consent Decree, the Final Settlement Approval Order, and the Consent Decree is disseminated to members of the Alabama Criminal Defense Lawyers Association monthly through its listserv.

The requirement that the ADMH Commissioner provide annual training to members of the Alabama State Bar terminated in 2019, per the Consent Decree. *See* ECF No. 94 at 21. The ADMH Commissioner provided training to members of the Alabama State Bar at the ASB Summer Conference in July 2019, and also provided training at the Alabama Criminal Defense Lawyers' Conference in June 2019, achieving Substantial Compliance with the obligation to offer annual training to members of the Alabama State Bar for calendar year 2019. Thus, annual training to members of the Alabama State Bar will no longer be monitored or calculated as a compliance measure.

**Defendant's Response to I.C.3 (Members of the Alabama State Bar)**

The Defendant continued to conduct training in 2020 to continue its educational efforts as set out above.

**C. Reporting and Admissions Pursuant to Emergency Treatment Protocol**

During the period since the previous status conference in this matter, 10 people believed to be suicidal or otherwise in need of emergency treatment were referred for evaluation pursuant to the Emergency Treatment Protocol (the "ETP") set forth in Section XV of the Consent Decree. ECF No. 94, at 30-33. Each of the people referred pursuant to the ETP were provided an evaluation by a clinician, and 4 of the persons evaluated were admitted into Taylor Hardin for expedited treatment. The remaining 6 persons referred for evaluation were determined not to require

emergency treatment, although in several instances arrangements were made to provide pharmacological or other appropriate mental health interventions in the jail setting.

During Monitoring Period November 1, 2019 – January 31, 2020, the ADMH Commissioner generally timely provided the Monitor with notice of the referral of class members for evaluation. For all individuals referred during this monitoring period, ADMH officials notified the Monitor of the individual's referral for treatment on the same day that they were notified of same. All individuals were evaluated by the local Community Mental Health Center (CMHC) within the timeframes dictated by the Consent Decree. Two individuals were approved for emergency placement. One was placed at Taylor Hardin eight (8) days after his evaluation. The Consent Decree requires that individuals approved for emergency placement be placed within seven (7) calendar days of the original approval; however, placing that individual within eight (8) days represented a substantial improvement in ADMH's speedily placing individuals who have been approved for emergency treatment. The other individual was approved for emergency placement on January 28, 2020 and placed at Taylor Hardin six (6) days later, on February 4, 2020.

During Monitoring Period February 1, 2020 – April 30, 2020, ADMH officials continued to improve on this compliance measure, although some minor difficulties remained in terms of data tracking. Four individuals were referred for emergency treatment under the Emergency Treatment Protocol during the current Monitoring Period. For three of those individuals, ADMH officials notified the Monitor of the individual's referral for treatment on the same day that they were notified of same; for the other, ADMH notified the Monitor within one business day of their receipt of that individual's referral for emergency treatment. All individuals were evaluated by the local Community Mental Health Center (CMHC) within the timeframes dictated by the Consent Decree. One individual was approved for emergency placement on April 27, 2020, and

ADMH officials notified the Monitor of same on April 29, 2020, noting that that individual's admission to Taylor Hardin may be delayed by new protocols that Taylor Hardin has put in place in connection with the ongoing COVID-19 crisis.

During Monitoring Period May 1, 2020 – July 31, 2020, ADMH officials continued to improve on this compliance measure, although some minor difficulties remained in terms of data tracking. Three (3) individuals were referred for emergency treatment under the Emergency Treatment Protocol during the current Monitoring Period. For two of those individuals, ADMH officials notified the Monitor of the individual's referral for treatment the same day that they were notified of same. Both individuals were evaluated the day following their referral. For one individual, ADMH notified the Monitor two business days following his evaluation that that individual was not recommended for emergency placement. However, for the other individual, ADMH did not notify the Monitor of his approval for emergency placement until nine (9) days following his evaluation. That individual was admitted to Taylor Hardin on June 19, 2020.

One other individual was referred for emergency placement during the Monitoring Period when her defense attorney contacted the Monitor. The individual's defense attorney initially contacted the Monitor on April 10, 2020 for assistance with initiating the emergency placement process. The Monitor discussed the process with the defense attorney, and, on May 4, 2020 advised her to contact relevant ADMH officials to initiate a referral for emergency treatment. On June 25, 2020, the defense attorney again contacted the Monitor to advise that ADMH officials had not responded to her attempts to initiate the emergency referral process, and requested assistance with same. The Monitor contacted ADMH Legal that same day, and the individual was evaluated for possible emergency placement the following day. However, ADMH officials did not notify the Monitor until six (6) days later that the individual was not recommended for emergency placement.

The Parties have continued to work with the Alabama State Bar, the Administrative Office of the Courts, and the Alabama Criminal Defense Lawyers Association to regularly disseminate Notice of the Consent Decree, which includes directions for invoking the ETP, the Final Settlement Approval Order (ECF No. 93), and the Consent Decree to circuit courts and members of the criminal defense bar regularly throughout the period of 12-24 months following entry of the Consent Decree. Class counsel has been contacted by criminal defense attorneys serving as counsel to class members on several occasions regarding the operation of the ETP. The Parties believe that state courts and the criminal defense bar are generally familiar with the ETP and have invoked the ETP where warranted. The Parties are unaware of any suicide attempts by class members during the period since the previous status conference in this matter.

### D. Ongoing Notice to Class Members and Defense Bar

Class counsel has continued to mail copies of the court-approved Notice of Entry of Consent Decree, the Court's Final Settlement Approval Order, and the Consent Decree (collectively, the "Notice Packet") to class members and their defense counsel of record. Class counsel has communicated with class members who have contacted counsel upon receiving the Notice Packet regarding the terms of the Consent Decree, as well as with defense counsel who have likewise contacted class counsel following receipt of the Notice Packet.

## II. PARTIES' RESPONSE TO NONCOMPLIANCE

The parties filed their first Joint Status Report in this matter on January 25, 2019. ECF No. 116. After that report, which detailed the extensive degree of the Defendant's noncompliance with the terms of the Consent Decree, the parties worked together in good faith to develop a remedial plan to address the Defendant's continued noncompliance with the Consent Decree. ECF No. 137. That plan was approved by the Court on November 4, 2019. ECF No. 138. The background of the

development and approval of the remedial plan is set forth more fully in Section III below. Sections III and IV below also detail the status of the Defendant's attempts to remediate its noncompliance with the Consent Decree thus far, as well as the general terms of the remedial plan approved by this Court on November 4, 2019 (ECF No. 137, ECF No. 138), and the further modifications to the Consent Decree approved by this Court on February 24, 2020 (ECF No. 151).

## III. REMEDIAL PLAN AND PROGRESS TOWARD COMPLIANCE

1. On January 25, 2019, the parties submitted a Joint Status Report (ECF No. 116) detailing the extent and nature of the Defendant's noncompliance with the Consent Decree (ECF No. 94).

2. The parties filed a further Joint Status Report on April 1, 2019 (ECF No. 122), and subsequently submitted a proposed order on the status of noncompliance (ECF No. 124), which provided for the engagement of a compliance consultant and the development of a remedial plan thereafter. The Court adopted the joint proposed order on April 12, 2019 (ECF No. 125).

3. The Consultant prepared two reports, dated July 16, 2019 and July 31, 2019. In the first report, the Consultant identified many barriers to compliance. In the second report, the Consultant proposed various evidence-based recommendations to correct deficiencies identified by the Consultant, and to eliminate barriers to compliance.

4. The Court ordered the Defendant to prepare a remedial plan for Plaintiffs, and that plan was submitted on August 21, 2019. Plaintiffs reviewed that plan and determined that Defendant had made a good faith attempt to formulate a plan reasonably designed which, if implemented, could lead to compliance. However, the plan lacked certain particularized details, lacked some crucial requirements, and was sufficiently vague in some instances such that plaintiffs could not accept the same.

5. The Parties requested, and the Court approved, an extension to allow the parties to explore the possibility of submitting a joint remediation plan. The parties have negotiated in good faith, and presented a plan which the parties believe provides Defendant a viable path to reach compliance.

6. The Court in the Middle District of Alabama entered an order extending deadlines in the Joint remedial plan for noncompliance with the consent decree. The Joint Motion to Extend Deadlines was granted and entered new deadlines.

7. The Defendant in accordance with the new guidelines presented Plaintiffs with a written status report on compliance following implementation of plan.

8. On February 5, 2020, the Court held a status conference to address Defendant's continuing noncompliance with the terms of the Consent Decree, and to question the parties on their attempts to solve the problem of continuing noncompliance.

9. The Court then directed the parties to develop a plan for addressing Defendant's noncompliance, with specific regard to the provision of services outside of the date-of-receipt order.

10. On February 14, 2020, the parties submitted a joint motion to modify the Consent Decree further (ECF No. 149), and that motion was granted on February 24, 2020 (ECF No. 151).

## IV. STATUS REPORT ON IMPLEMENTATION OF PLAN

1. The Commissioner created the Office of Forensic Mental Health Services ("OFMHS") under the Division of Mental Health and Substance Abuse services under the direction of its Associate Commissioner on December 12, 2019. 2. The Joint Plan to Remediate Defendant's Noncompliance with Consent Decree hereinafter "Agreement" also directed that the OFMHS shall be led by a "Director". The ADMH division of Human Resources announced that

position on October 25, 2019. (Please find attached a copy of that announcement as Exhibit H). A Director was hired on May 11, 2020. The Director is Dr. Virginia Scott-Adams. The court and plaintiff counsel were notified on June 18, 2020.

3. The Agreement also directed that the Department assign a data analyst. The Associate Commissioner of Mental Health and Substance Abuse has assigned a person as of December 3, 2019, to collect, gather, sort, and analyze data.

This person shall also provide those items detailed in said agreement including:

A. A list, provided at the end of every month, of each individual admitted into Taylor Hardin and/or Hillcrest and/or Bryce and/or other facilities as contemplated in Section B(i)(3) of this plan, with the following information clearly delineated:

    i. The specific reason for that individual's admission (inpatient eval or CRT)

    ii. The date that the individual was ordered to Taylor Hardin/Hillcrest/Bryce

    iii. The date that the individual was actually admitted to Taylor Hardin/Hillcrest/Bryce

B. Notification, as outlined in the Consent Decree, of each and every individual who receives services outside of the date-of-receipt order specified in the Consent Decree, to contain the specific reason for the skip (must be a "compelling obstacle" to providing that person with services when they reach the front of the line, as specified in the Consent Decree). Such notification must be provided with the monthly monitoring data.

4. The Agreement also directed that a list is provided at the end of every quarter of any education completed in accordance with the Consent Decree. Materials used for any seminars, trainings, conferences, or other educational outreach related to Hunter should be provided along with the list.

5. The Defendant will comply with the mandates set out in II.A.4&5 (pages 5 and 6 of the Agreement).

6. The Agreement directs the Defendant to continues ongoing training and education for Certified Forensic Examiners. (II.ii, page 6) We will continue to coordinate these events with Dr. Robert Bare.

7. The Defendant will oversee the liaisons to jails and local correctional facilities to ensure the proper flow of information to/from the jails to/from ADMH for the purposes of streamlining admissions, ensuring continuity of care, as well as coordination of logistical issues such as transportation, and adequate space for evaluations;

a) Defendant agrees to develop a plan for ongoing assessment of needed resources to ensure compliance with the terms of the Consent Decree.

i. Oversee the liaisons to relevant state courts and relevant state court personnel to increase efficiency of forensic evaluation systems to avoid delays due to problems such as missing, incomplete, or ambiguous orders, gathering of necessary records, expediting competency hearings, and problem solving complex emergency admissions;

ii. Defendant agrees to transmit to Plaintiffs, within 30 days of the approval of this plan, as new policies are created, the internal policies and procedures applicable to this process, as well as a written directive for moving this responsibility under the Director's control, as found in the Agreement.

8. The Director of the OFMHS was hired on May 11, 2020 and has begun to implement the systems, training, and oversight upon appointment. Since the required elements are

so expansive, the parties acknowledge that ADMH cannot implement every system immediately. The Director shall prioritize those tasks which are deemed most crucial and most directly impact the current barriers to compliance with the Consent Decree. The Director will use his/her best efforts to implement all elements of the required duties within nine (9) months of the effective date of the Plan. Plaintiffs reserve the right to file appropriate notices, under Section VIII of the final Consent Decree, if Plaintiffs believe that ADMH is not making sufficient progress in addressing critical goals within the nine (9) month period.

9. Within 120 days of the effective date of this plan, sufficient staff shall be assigned to the OFMHS to collect, store and analyze data, at a minimum.

10. At least annually the Associate Commissioner of MHSA shall analyze and assess the need to add additional staff to the OFMHS.

i. Not later than 30 days after the analysis, the Associate Commissioner of MHSA, in writing, shall prepare a request for additional staff (if appropriate), identifying the exact personnel needed.

11. ADMH agreed to increase compensation for psychiatrists by 10%, to take effect on or before October 16, 2019. ADMH shall reallocate each current Psychologist at its mental illness facilities to the next level classification effective October 16, 2019, or the date in which the incumbent can meet the minimum qualifications of the new classification. ADMH shall explore the need for an increase in compensation for direct care staff vacancies at THSMF/Bryce. This has been completed by ADMH.

12. ADMH shall pursue a collaborative agreement between ADMH and the University of Alabama, Department of Psychology, to access an increased group of student trainees who may assist clinicians, where appropriate as a short term stopgap measure. The contract has been drafted

and is awaiting final approval from the University of Alabama. The contract will be provided once executed. ADMH will comply with ADMH policies regarding use of students.

13. DMH or its designee shall investigate access to additional licensed and certified hospital beds in an inpatient hospital or hospital-like setting. These beds may be provided through a contract between ADMH and a third-party provider, such as a Community Mental Health Center or designated Mental Health Center as provided by Ala. Code §§15-16-61(5), 22-51-1, et seq., 22-56-5 and 22-2-90(1), and/or other JCO or CMS accredited facilities willing to house, assess, and treat class members.

14. ADMH agreed to implement the OCRP program in Jefferson County contemplated in their proposed plan, for low level offenders with low risk factors. ADMH shall use best efforts to persuade the relevant state court(s) to not unduly limit access to the program for patients based on index crime, or risk of dangerousness, as the Circuit Court allows. ADMH shall provide Plaintiff's counsel any objective criteria utilized by the referring clinical staff, or the court, in referring and approving placement. During the period of Court Supervision, ADMH shall report quarterly on the number of referrals, and results of such referrals and plaintiffs' counsel. The OCRP program should be functional in Jefferson County by six months following the date of this agreement. The OCRP has begun recruiting initial referrals from the Circuit Court of Jefferson County.

15. ADMH shall explore the possibility of expanding the Jefferson County OCRP to additional counties. Class counsel recommends that ADMH explore expanding to counties within other large metropolitan areas, such as Montgomery, Mobile, and Huntsville. ADMH shall provide quarterly information on the status of attempts to expand the program to the Court and Plaintiffs' counsel.

16. ADMH shall have located appropriate alternate placements of class members sent for restoration services who, based on cognitive deficits (e.g., a diagnosis of intellectual disability), are unlikely to be restored to competency, and should be referring all such patients to those alternative placements.

17. The parties have endeavored to create a joint plan to correct ADMH's failures to comply with the Consent Decree in this case. In negotiating a joint plan, the parties have avoided the more costly need to litigate this matter, and spared precious judicial resources. ADMH agrees to pay counsel for the plaintiffs $195 per hour with a cap of $40,000 in full satisfaction of services performed in litigating ADMH's non-compliance with the terms of the Consent Decree up to the date of the approval of this agreement. ADMH shall pay such sum within one hundred eighty (180) days of the effective date of this plan. The Defendant understands the monitoring period shall be extended one (1) year, until January 28, 2022.

Dated: August 19, 2020

Respectfully submitted,

/s/ Shandra N. Monterastelli
Shandra N. Monterastelli (ASB-1016-N00Q)
William Van Der Pol, Jr. (ASB-2112-114F)
Larry G. Canada (ASB-3153-N73L)
Lonnie J. Williams (ASB-2866-I35W)
ALABAMA DISABILITIES ADVOCACY PROGRAM
500 Martha Parham West
Box 870395
Tuscaloosa, AL 35487-0395
Telephone: (205) 348-4928
Facsimile: (205) 348-3909
Email: smonterastelli@adap.ua.edu
wvanderpoljr@adap.ua.edu
lcanada@adap.ua.edu
lwilliams@adap.ua.edu

*Attorneys for Plaintiffs Demontray Hunter, Russell D. Senn, and Travis S. Parks, Vandarius S. Darnell, Frank White, Jr.,*

*Marcus Jackson, Timothy D. Mount, and Henry P. McGhee and Plaintiff Alabama Disabilities Advocacy Program*

Henry F. (Hank) Sherrod III (ASB-1200-D63H)
HENRY F. SHERROD III, P.C.
119 South Court Street
Florence, AL 35630
Telephone: (256) 764-4141
Facsimile: (877) 864-0802
Email: hank@alcivilrights.com

Randall C. Marshall (ASB-3023-A56M)
ACLU OF ALABAMA FOUNDATION
P.O. Box 6179
Montgomery, AL 36106-0179
Telephone: (334) 420-1741
Facsimile: (334) 269-5666
rmarshall@aclualabama.org

*Attorneys for Plaintiffs Demontray Hunter, Russell D. Senn, and Travis S. Parks, Vandarius S. Darnell, Frank White, Jr., Marcus Jackson, Timothy D. Mount, and Henry P. McGhee*

/s/ Thomas B. Klinner____________________________

Thomas B. Klinner
Edward C. Hixon
Ashley L. Nichols
Nancy S. Jones
ALABAMA DEPARTMENT OF MENTAL HEALTH
RSA Union Building
100 North Union Street
Montgomery, Alabama 36104
Tommy.Klinner@mh.alabama.gov
Eddie.Hixon@mh.alabama.gov
Ashley.Nichols@mh.alabama.gov
Nancy.Jones@mh.alabama.gov

*Attorneys for Defendant Lynn T. Beshear*

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I have caused a true and correct copy of the foregoing to be served on the counsel of record listed below by filing same with the Clerk of Court via the CM/ECF system this 19th day of August, 2020.

| | |
|---|---|
| Shandra N. Monterastelli<br>William Van Der Pol, Jr.<br>Larry G. Canada<br>Lonnie J. Williams<br>Alabama Disabilities Advocacy Program<br>500 Martha Parham West<br>Box 870395<br>Tuscaloosa, AL 35487-0395<br>smonterastelli@adap.ua.edu<br>wvanderpoljr@adap.ua.edu<br>lcanada@adap.ua.edu<br>lwilliams@adap.ua.edu | Thomas B. Klinner<br>Edward C. Hixon<br>Ashley L. Nichols<br>Nancy S. Jones<br>Alabama Department of Mental Health<br>RSA Union Building<br>100 North Union Street<br>Montgomery, Alabama 36104<br>Tommy.Klinner@mh.alabama.gov<br>Eddie.Hixon@mh.alabama.gov<br>Ashley.Nichols@mh.alabama.gov<br>Nancy.Jones@mh.alabama.gov |
| Henry F. (Hank) Sherrod III<br>Henry F. Sherrod III, P.C.<br>119 South Court Street<br>Florence, AL 35630<br>hank@alcivilrights.com | |
| Randall C. Marshall<br>ACLU of Alabama Foundation<br>P.O. Box 6179<br>Montgomery, AL 36106-0179<br>rmarshall@aclualabama.org | |

/s/ Shandra N. Monterastelli_____________
Shandra N. Monterastelli (ASB-1016-N00Q)
*Counsel for Plaintiffs*