IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| DEMONTRAY HUNTER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:16cv798-MHT |
| | ) | (WO) |
| KIMBERLY G. BOSWELL, in | ) | |
| her official capacity as | ) | |
| the Commissioner of the | ) | |
| Alabama Department of | ) | |
| Mental Health, | ) | |
| | ) | |
| Defendant. | ) | |

OPINION AND ORDER

The claim presented in this long-running class action

is that the Alabama Department of Mental Health (ADMH)

fails to provide timely evaluations of the competency to

stand trial of pretrial detainees in Alabama and timely

competency restoration treatment for those detainees

found incompetent to stand trial.[1]   The claim rests on

---

1.   In *Hunter v. Boswell*, No. 2:16-cv-798-MHT, 2021
WL 972879 (M.D. Ala. Feb. 25, 2021), the court set forth
in some detail its understanding of the process by which
pretrial detainees in the Alabama state court system have
their competency to stand trial evaluated and receive
competency restoration treatment when found incompetent.

the Due Process Clause of the Fourteenth Amendment, as enforced through 42 U.S.C. § 1983.

A consent decree was entered in this case in January 2018, *see Hunter v. Beshear*, No. 2:16-cv-798-MHT, 2018 WL 564856 (M.D. Ala. Jan. 25, 2018), and the parties subsequently agreed upon a plan to remediate ADMH's noncompliance with the consent decree, *see* Joint Plan (Doc. 137).  The monitoring of this consent decree was originally scheduled to end in January 2021, but it has been extended twice: first to January 2022 as part of the parties' remedial plan, and more recently to January 2023.  *See* Orders (Doc. 138 & Doc. 181).  Following a report by the parties in January 2020 showing continued noncompliance by ADMH, *see* Joint Report (Doc. 142), the court scheduled a series of status conferences to take place every six months to follow up on the State's progress toward compliance. *See* Order (Doc. 148).

---

At a hearing on February 26, 2021, the parties verbally agreed that the court's understanding is correct.

At the second of these scheduled bi-annual status conferences on February 22, 2021, the plaintiffs expressed growing concern that ADMH still appeared not to be making significant progress toward compliance on several critical areas of deficiency.  Two problems lie at the heart of this litigation: Pretrial detainees wait too long to have their competency evaluated, and those found incompetent wait too long to be admitted for competency restoration treatment.  The data presented by the plaintiffs at the February 22 status conference showed that, more than three years after the court entered the consent decree agreed upon by the parties, wait times for outpatient evaluations remain above the substantial compliance thresholds established by the parties' agreements, and wait times for inpatient evaluations and treatment admissions have barely improved at all since the consent decree was entered.

Pursuant to the consent decree, pretrial detainees should at this point wait no more than 34 days to receive a competency evaluation after such an evaluation is

ordered.   They should then wait no more than 34 days to enter treatment after being found incompetent to stand trial.   There are two types of competency evaluations at issue: outpatient evaluations, which are conducted in jails,   prisons,   or   non-institutional   therapeutic settings; and inpatient evaluations, which are conducted in the State's hospitals.   The consent decree subjects each type of evaluation to the same 34-day deadline.[2]

The   timelines   for   outpatient   and   inpatient evaluations   and   for   detainees   to   be   admitted   for treatment following a finding of incompetence are the three primary metrics monitored under the consent decree. Of   these   three,   only   the   wait   times   for   outpatient evaluations have shown any improvement over the course of the monitoring period, and the State continues to be non-compliant in most months on those evaluations.   In

---

2.   The consent decree in fact mandates wait times of   no   more   than   30   days   for   both   evaluations   and admissions.   *See* Consent Decree (Doc. 94) at 10-11.   The court is giving the State the benefit of using the substantial compliance threshold rather than the actual requirements of the consent decree.   *See id.* at 13.

April 2018, detainees for whom outpatient evaluations were requested waited 294.5 days on average to receive their evaluations.[3]  *See* January 2021 Compliance Report (Doc. 168) at 3.  By January 2021, the average wait for outpatient evaluations in date-of-receipt order was 137.3 days, or 81.3 days when considered without regard to detainees whose turn to receive an evaluation has been skipped.  *See* Supplement to January 2021 Compliance Report (Doc. 172) at 5.[4]  With the exception of an outlier in May 2018, the months of September through November

---

3.  April 2018 is the first month for which monitoring data are included in the parties' compliance reports.

4.  The consent decree requires ADMH to provide evaluations in the order in which it receives evaluation requests, but the agreement has been modified to allow ADMH some flexibility to provide outpatient evaluations out of order when necessary.  As a result, compliance reports now show two numbers for a given month's outpatient evaluation wait time: one reflecting the average delay for the evaluations actually completed during that month, and the other including in that average the amount of time that detainees have been waiting who have not yet been evaluated, but who would have been evaluated if ADMH were proceeding in date-of-receipt order.  *See, e.g.,* January 2021 Compliance Report (Doc. 168) at 4-5.  The latter number is consistently greater than the former.

2020 were the only months since monitoring began in which the State has been below the substantial compliance threshold for outpatient evaluations, and in none of those months was the State compliant with the mandated timelines when considered in date-of-receipt order.

More troublingly, wait times for inpatient evaluations have remained stagnant at best through the entire period of monitoring. In May 2018, the first month for which data are available, wait times for inpatient evaluations averaged 229.33 days. *See* January 2021 Compliance Report (Doc. 168) at 11. In January 2021, the wait times for inpatient evaluations averaged 155 days, and they averaged 282 days the previous month. *See* Filing of Supplemental Data (Doc. 175) at 5. Excluding the women's ward at Bryce Hospital, which generally has shown shorter delays throughout this litigation, the wait time for inpatient evaluations in January 2021 was 441 days. *See id.* at 6. While in most months these numbers reflect just one or a few evaluations--in January 2021, for instance, only one male

6

detainee received an inpatient evaluation--the long wait times are persistent across months.  *See id.*  As the plaintiffs say, the timelines for inpatient evaluations "generally remain exceptionally high."  *Id.* at 4.

The same pattern of stagnation or regression applies to the wait times for male detainees in particular to be admitted for competency restoration treatment once they are found incompetent.  Wait times for admissions into Taylor Hardin Hospital--the only male ward in operation at the time the consent decree was entered--averaged 216.67 days in May 2018, the first month with available data.  *See* January 2021 Compliance Report (Doc. 168) at 20.  Today, wait times to be admitted to Taylor Hardin for competency restoration treatment average 365.9 days. *See* Supplement to January 2021 Compliance Report (Doc. 172) at 8.  Wait times at Hillcrest Hospital, the male ward that opened after monitoring began, average 347 days.  *See id.* at 9.  In most months, the wait times for men to be admitted for treatment fall "between 300 and 500 days," which is "well out of range" of the substantial

7

compliance threshold of 34 days.  Filing of Supplemental

Data (Doc. 175) at 10.   Though these monthly averages

again reflect a small number of detainees admitted in any

given month, these figures also remain stubbornly high

across months, and moreover they do not reflect how long

any detainees who were not admitted that month may have

been waiting for treatment.

In other words, a male pretrial detainee ordered to

receive an outpatient competency evaluation at the time

the consent decree was entered in this case three years

ago could expect to wait about 511 days to be evaluated

and admitted to Taylor Hardin for treatment.  In January

2021, three years into the monitoring period, that same

detainee could expect to wait 503 days.[5]  A male detainee

ordered to receive an inpatient evaluation three years

---

5.    These figures do not include the time it takes
for evaluators to complete their reports after an
evaluation takes place, a metric on which ADMH has been
near compliance since the consent decree was entered.
*See* January 2021 Compliance Report (Doc. 168) at 6.  Nor
do these numbers include the time it takes for state
courts to find detainees incompetent after receiving such
evaluation reports.

ago would have expected to wait 446 days to be evaluated and admitted to Taylor Hardin; the same detainee should expect to wait nearly twice that long, about 807 days, today.  Given that the consent decree requires ADMH by now to have brought these wait times down to about two months in total, the court cannot fault the plaintiffs for their concern that  "there does not appear to be a pattern or trend indicating progress toward sustained, long-term compliance with the terms of the Consent Decree."  *Id.* at 12.[6]

As both parties agreed during a follow-up status conference held on February 26, 2021, it appeared that ADMH was unlikely to achieve the necessary improvements to its competency evaluation and restoration process

---

6.  The State notes that it has made significant strides on one issue: reducing the backlog of outstanding outpatient evaluations, which stood at around 400 when this lawsuit was initiated and has been reduced to approximately 50.  *See* January 2021 Compliance Report (Doc. 168) at 28.  This achievement is commendable but does not relieve the State of its obligations to reduce wait times for inpatient evaluations and treatment admissions, responsibilities for which, as noted above, the State has shown little if any progress.

before January 2022, when monitoring of this suit was at

that point scheduled to expire.  Accordingly, the parties

agreed to extend monitoring to January 2023.  *See* Joint

Request for Extension of Consent Decree (Doc. 180) at 2.

The parties have also presented two additional proposals

for what should be done to remedy ADMH's continued

failure to make noticeable progress on several of the

central issues identified by this litigation.  The first

of these proposals is that the provision of competency

evaluations should be de-coupled from the provision of

evaluations of detainees' sanity at the time of their

charged offense.   According to the parties, these

evaluations are often ordered by state courts at the same

time and provided to those courts simultaneously,

allegedly for the sake of efficiency.   But sanity

evaluations--which this suit does not address--are much

more complicated than competency evaluations, and the

time it takes for an evaluator to conduct the former

delays unnecessarily the provision of the latter when the

two are joined together.   The parties propose that the

evaluations should be separated, with the competency evaluations conducted first so that they can take place more quickly.

Based on the representations made at the status conferences on February 22 and February 26, 2021, the court is skeptical that de-coupling these evaluations will have a transformative effect on the lengthy competency evaluation and restoration delays at the heart of this suit. Timelines for outpatient evaluations have shown some improvement even though they apparently continue to be coupled with sanity evaluations, while delays for inpatient evaluations at Hillcrest Hospital have not improved even though the State has already de-coupled those evaluations. But moreover, the court has serious concerns that the parties' de-coupling proposal, if it were not accompanied by some assurance that state judges will act on competency evaluation reports when they receive them, could have the effect of improving the data monitored in this case without

actually improving the length of time that pretrial
detainees wait for competency treatment.

As noted above, the parties have represented that
competency and sanity evaluations are typically ordered
simultaneously by state judges, and they say that common
practice in the state courts is to wait to act on a
competency evaluation report until the court receives the
sanity evaluation report as well.  However, the consent
decree in this case does not monitor the amount of time
that detainees wait between the submission of the
competency evaluation report to the state court and the
state court's determination that the detainee is
incompetent to stand trial.  Thus, as the parties
acknowledged on the record during the February 26 status
conference, if ADMH de-coupled competency and sanity
evaluations and provided competency evaluation reports
to the state courts as soon as the reports were complete,
but those courts continued not to schedule competency
hearings until the sanity reports were finished as well,
this de-coupling would not increase at all the speed with

which people are found incompetent and obtain competency restoration treatment.  Instead, the de-coupling would shift the locus of some of the delays that detainees experience into a segment of the process that the consent decree does not track, making the State appear to be progressing without actually changing overall wait times for the plaintiffs or similarly situated pretrial detainees.

This suit concerns persistent delays throughout the State's competency evaluation and restoration treatment process.  The fact that delays arising while state courts are considering competency evaluation reports fall outside the specific ambit of the consent decree does not free the parties to finesse the data they track to make the State seem to be making more progress than it is. The court is accordingly troubled that both parties failed to make explicit the likelihood that the results of this de-coupling proposal may be more cosmetic than substantive.

The parties' second proposal was that the State develop a remedial plan and present it for consideration by the plaintiffs and the court.  The court will adopt this proposal, as it appropriately provides the State the opportunity to make the first attempt at fixing its ongoing deficiencies before more significant intervention is necessary.  The State asked for 90 days to develop this remedial plan; the plaintiffs suggested 60 days instead.  The court will use the plaintiffs' proposed timeline, dated from the February 26 status conference at which the court made clear that it would adopt this proposal.

However, this proposal alone is not sufficient.  Well over a year ago, the parties similarly agreed on a plan proposed by ADMH to remediate its noncompliance with the consent decree.  *See* Joint Plan (Doc. 137) at 2.  In short, the plan did not work; the State remains not far from square one more than three years after the consent decree was entered.  More regular scrutiny of the State's efforts to comply with the consent decree is necessary

**14**

to ensure real progress and to avoid further protraction of court monitoring in this case.

As such, in addition to ordering the defendant to develop a proposed remedial plan and provide it to the court and the plaintiffs within 60 days, the court will schedule further status conferences in this case to determine what actions ADMH is taking to achieve substantial compliance with the consent decree and whether such actions are effective. These status conferences will take place every six weeks, beginning once the State's proposed remedial plan is complete, until either monitoring in this case concludes or the State makes sufficient progress that such conferences become unnecessary. Ahead of each conference, the parties should file a joint report detailing what steps have been taken since the previous conference to bring ADMH closer to compliance, and they should be prepared to discuss why these steps have been taken and whether they have been effective.

Finally, in preparing the previous remedial plan to address ADMH's noncompliance, the parties obtained the services of a consultant, which provided two reports identifying barriers to compliance and recommending ways to eliminate these barriers and correct the State's deficiencies.   *See* Joint Plan (Doc. 137) at 2.   The parties should consider whether and how this consultant or another outside expert could assist the State in making the major improvements necessary for it to achieve substantial compliance with the consent decree.

* * *

Accordingly, it is ORDERED that:

(1) Defendant should prepare a proposed remedial plan to address ADMH's continued noncompliance with the consent decree.  This proposed plan should be filed with the court and provided to the plaintiffs on or before April 27, 2021.  This plan should identify the State's barriers to compliance and propose solutions for addressing those barriers.

16

(2) The plaintiffs should file a response to the State's proposed remedial plan and suggest any alterations to it by May 18, 2021.  The court will determine at that time whether to hold a hearing on the proposed plan and the plaintiffs' response.

(3) By 5:00 p.m. on March 26, 2021, the parties should file a joint report explaining whether and how the consultant previously retained in this case or another outside expert could assist the State in developing its proposed remedial plan or otherwise achieving substantial compliance with the consent decree.

(4) Status conferences to assess the State's progress will be held at 9:00 a.m. on each of the following dates: May 28, 2021; July 9, 2021; August 20, 2021; October 1, 2021; November 12, 2021; and December 23, 2021.  The courtroom deputy is to arrange for these status conferences to be conducted by videoconference. After the last of the conferences listed above, the court will re-assess whether further conferences are necessary. This order supersedes the court's previous order setting

17

status conferences every six months regarding defendant's

noncompliance.   *See* Order (Doc. 148).

(5)  Three days before each status conference listed

above, the parties should file a joint report explaining

what    steps    have    been    taken    to    improve    ADMH's

noncompliance since the previous status conference.

DONE, this the 22nd day of March, 2021.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE