UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| DEMONTRAY HUNTER, by and through his next friend, Rena Hunter; RUSSELL D. SENN, by and through his next friend, Irene Senn; TRAVIS S. PARKS, by and through his next friend, Catherine Young; VANDARIUS S. DARNELL, by and through his next friend, Bambi Darnell; FRANK WHITE, JR., by and through his next friend, Linda White; MARCUS JACKSON, by and through his next friend Michael P. Hanle; TIMOTHY D. MOUNT, by and through his next friend, Dorothy Sullivan; HENRY P. MCGHEE, by and through his next friend, Barbara Hardy, individually and on behalf of all others similarly situated; and the ALABAMA DISABILITIES ADVOCACY PROGRAM,<br><br>Plaintiffs,<br><br>v.<br><br>KIMBERLY G. BOSWELL, in her official capacity as Commissioner of the Alabama Department of Mental Health,<br><br>Defendant. | CASE NO. 2:16-cv-00798-MHT-CSC<br><br>CLASS ACTION FOR DECLARATORY AND INJUNCTIVE RELIEF |

**PLAINTIFFS' FILING OF SUPPLEMENTAL DATA REFLECTING COMPLIANCE WITH CONSENT DECREE**

The named Plaintiffs as class representatives and the Alabama Disabilities Advocacy Program submit this report reflecting the most recent status of compliance with the Consent Decree entered in this action on January 25, 2018. *See* Consent Decree, ECF No. 94. This report encompasses all new data that Defendant has provided to Plaintiffs since the last supplemental data filings on August 16, August 19, 2022, and November 2, 2022. *See* Plaintiffs' Filing of Supplemental Data Reflecting Compliance with Consent Decree (August 16, 2022), ECF No. 228,

Plaintiffs' Filing of Supplemental Data Reflecting Compliance with Consent Decree (August 19, 2022), ECF No. 230, Plaintiffs' Filing of Supplemental Data Reflecting Compliance with Consent Decree (November 2, 2022), ECF No. 233. For the Court's convenience, this report reproduces the data from the November 2 report, and incorporates all data transmitted since that report was filed.

All compliance measures referenced below, other than those pertinent to requests for treatment under the Emergency Treatment Protocol (ETP), must adhere to a timeframe of 34 days or less for completion of the relevant service. Thus, where evaluations are ordered, they must be completed within 34 days of Defendant's receipt of the order directing same. The reports on those evaluations must be submitted to the relevant circuit court within another 34 days (for a total of 68 days from the entry of the order to when the report on the evaluation must be submitted). Where a class member is ordered to be admitted to Taylor Hardin, Hill Crest, Bryce, or the Norman-McClendon Facility for Competency Restoration Treatment, that individual must be admitted to the facility within 34 days following Defendant's receipt of the order directing same. For identification and treatment of class members under the ETP, the following timeframes are in place:

1. ADMH officials must provide notice to the Monitor of request for evaluation for emergency treatment within 48 hours of receiving same;
2. ADMH officials must ascertain whether the person referred for an evaluation for emergency treatment is a class member, and if the individual is a class member, arrange for a clinical professional to visit the class member to conduct an assessment of the class member's need for emergency treatment within 4 business days of the ADMH Designee's receipt of the notice of the class member's need for emergency treatment;

3. ADMH officials must arrange for the provision of emergency treatment to class members who, following an emergency evaluation for treatment, are deemed by a clinical professional to need early admission into a facility for purposes of receiving a court-ordered inpatient mental evaluation or competency restoration treatment within 7 days of the clinical professional's in-person visit;
4. ADMH officials must advise the Monitor of the clinical professional's determination regarding the class member's need for emergency treatment within 48 hours of the professional's in-person visit with the class member;
5. ADMH officials must advise the Monitor of any refusal by county jail officials to ADMH officials seeking access to a person referred for an evaluation for emergency treatment within 24 hours; and
6. ADMH officials must forward notice of an incarcerated criminal defendant believed to be suicidal to the Monitor within 24 hours.

## I. Identification and Treatment of Class Members Under the Emergency Treatment Protocol

Since the August 16, 2022 supplemental filing in this matter, three (3) individuals have been referred for treatment under the ETP. Defendant notified Plaintiffs within the appropriate timeframes of each individual's initial referral. One individual was identified as potentially needing emergency treatment on October 21 and Defendant was notified on October 24; Defendant in turn notified Plaintiffs on October 25. Defendant notified Plaintiffs on October 28 that the individual was not approved for emergency treatment based on his evaluation by the local CMHC. Although it is not clear exactly what day the individual was evaluated, it appears based on the timeframe of Defendant's communication with Plaintiffs that he was timely evaluated. Defendant notified Plaintiffs on October 28 that two requests for emergency treatment had been received on

October 27. As of November 2, it was not clear whether either individual had been evaluated. As of December 12, it is still not clear what the outcome of those referrals was.

## II. Outpatient Mental Evaluations

Defendant provided Plaintiffs with data on Outpatient Mental Evaluations as conducted and submitted for the months of August through November 2022 at the beginning of each of the following months as part of Defendant's routine monthly transmission to Plaintiffs of some limited monitoring data. This section includes all data Plaintiffs have received regarding the provision and submission of Outpatient Mental Evaluations since the previous supplemental filings in this matter. *See* ECF Nod. 228, 230, 233.

The number of Outpatient Mental Evaluations performed remained consistent during the Monitoring Period, with 34, 41, 42, and 41 evaluations conducted in each month respectively. In total, Defendant conducted a total of 158 evaluations. Wait times for Outpatient Mental Evaluations remained consistently low when taking into account "skips and jumps," for wait times of 19.8 days in August 2022, 24.5 days in September 2022, 21.9 days in October 2022, and 24.5 days in November 2022. But when calculated in date-of-receipt order, wait times for provision and submission of Outpatient Mental Evaluations continued to climb. Average wait times were 47.7 days in August 2022, 45.7 days in September 2022, 45 days in October 2022, and 61.5 days in November 2022. Plaintiffs acknowledge that it does appear that the increased wait times are due at least in part to the presence of a few outliers who have particularly complex cases and/or where there are other obstacles to evaluation, such as an uncooperative jail or a defendant who refuses to appear for an evaluation. However, as discussed below, the reasons for most of the delays in service provision are unclear.

The parties have agreed that out-of-order service provision can be counted toward compliance where Defendant provides substantive, understandable narrative reasons for why class members were skipped. However, while Defendant did provide substantive reasons for some skips and jumps, there were significant gaps in the provision of the required narratives. It is therefore not clear why there are enough individuals waiting more than 34 days for their evaluations that the average wait time for same, when calculated in date-of-receipt order, has continued to increase to the extent it has. For example, between July and November 2022, a total of 123 class members waited more than 34 days to receive their evaluations.[1] Of those 123 delays, substantive reasons were only provided for 54 of them.[2] As the table below illustrates, this failure to provide information is drastically out of step with the 11 months preceding July 2022, where Defendant provided reasons for the majority of delays in provision of Outpatient Mental Evaluations.

| Month | Average Wait Time | Average Wait Time (Date-of-Receipt Order) | Number of Evaluations Conducted | Number of Class Members Waiting >34 Days (Date-of-Receipt Order) | Number of Reasons Provided for Delays in Service Provision |
|---|---|---|---|---|---|
| 11/2020 | 17.1 days | 138.4 days | 16 | 16 | 13 reasons provided, but mostly consisted of "no DA info" or "no def info." |
| 12/2020 | 125 days | 205.6 days | 26 | 26 | 26 reasons provided, but mostly consisted of "no DA info" or "no def info." |
| 1/2021 | 81.3 days | 137.3 days | 27 | 27 | 5 |

[1] When calculated in date-of-receipt order.

[2] To be clear, at this time, Plaintiffs are not making any assertions about what exactly constitutes a "substantive" reason for a skip or a jump. For the 69 class members whose evaluations were delayed for an unknown reason, the issue is that Defendant simply provided *no* reason at all.

| | | | | | |
|---|---|---|---|---|---|
| 2/2021 | 42 days | 97.5 days | 23 | 23 | 15 |
| 3/2021 | 40.5 days | 97 days | 35 | 32 | 27 |
| 4/2021 | 58.1 days | 94.3 days | 34 | 34 | 14 |
| 5/2021 | 65 days | 81.5 days | 29 | 26 | 10 |
| 6/2021 | 40.5 days | 48.3 days | 42 | 24 | 12 |
| 7/2021 | 37.1 days | 40 days | 40 | 19 | 5 |
| 8/2021 | 26.8 days | 34.8 days | 34 | 14 | 13 |
| 9/2021 | 27.3 days | 34.1 days | 42 | 12 | 9 |
| 10/2021 | 21.9 days | 25.4 days | 41 | 4 | 3 |
| 11/2021 | 20.8 days | 23.4 days | 27 | 2 | 2 |
| 12/2021 | 20 days | 28 days | 40 | 10 | 2[3] |
| 1/2022 | 22.5 days | 30.8 days | 36 | 12 | 9 |
| 2/2022 | 20.3 days | 31.6 days | 36 | 10 | 7 |
| 3/2022 | 23.6 days | 28.4 days | 37 | 7 | 6 |
| 4/2022 | 18.6 days | 29.2 days | 29 | 6 | 6 |
| 5/2022 | 19.9 days | 29.6 days | 36 | 10 | 7 |
| 6/2022 | 21.5 days | 38 days | 25 | 8 | 6 |
| 7/2022 | 27 days | 43.2 days | 37 | 21 | 11 |
| 8/2022 | 19.8 days | 47.7 days | 34 | 23 | 9 |
| 9/2022 | 25.4 days | 45.7 days | 41 | 28 | 15 |
| 10/2022 | 21.6 days | 45 days | 42 | 23 | 8 |
| 11/2022 | 24.5 days | 61.5 days | 41 | 28 | 11 |

In total, of the 95 individuals who waited more than 34 days for their evaluations between August 2021 and June 2022, Defendant provided Plaintiffs with reasons for the service delays in 70 (about 73.7%) of those instances. By contrast, of the 123 individuals who waited more than 34 days for their evaluations between July 2022 and November 2022, Defendant provided reasons for the service delays in only 54 (about 44%) of those cases. As such, for the remaining 69 individuals—more than half of the class members who waited more than 34 days to receive their evaluations when calculated in date-of-receipt order—Plaintiffs have no way to know why their evaluations were delayed.

[3] While it probably would have been good practice to submit more narratives during December 2021, Plaintiffs acknowledge that narratives are not quite as critical during months where Defendant is compliant with timeframes for service provision both when taking into account skips and jumps, and when timeframes are calculated in date-of-receipt order.

Submitting substantive narrative reasons for skips and jumps in service provision is more than a simple clerical matter. It is vitally important to Plaintiffs' and this Court's understanding of the reasons behind noncompliance with the outpatient services-related terms of the Consent Decree. It is especially critical that Defendant provide narratives in gray-area months where the average wait time for provision of services when taking into account skips and jumps is within the Substantial Compliance timeframe, but falls outside of that timeframe when calculated in date-of-receipt order. For example, in August 2021, September 2021, and June 2022, Plaintiffs were able to count Defendant as compliant with the 34-day timeframe for provision of Outpatient Mental Evaluations even though the average wait time was above 34 days when calculated in date-of-receipt order. Plaintiffs were able to count Defendant as compliant during these months precisely *because* Defendant provided Plaintiffs with reasons for most of the skips and jumps. Plaintiffs were therefore able to discern that many of the skips and jumps were due to issues outside of Defendant's control, such as, for example, a jail's refusal to admit an evaluator or the unique complexity of a class member's specific case.

Conversely, with so little information about skips and jumps between July and November 2022, Plaintiffs have no way of knowing whether the considerable increase in average wait times is due to issues beyond Defendant's control, or whether it is due to simple mismanagement of Defendant's operational capacity. While Plaintiffs acknowledge that there will likely always be *some* delays for reasons beyond Defendant's control, it would be inappropriate to simply assume that that is the case where Plaintiffs do not have the information to justify such a conclusion. In sum, with Plaintiffs having been provided such a dearth of information, Plaintiffs cannot count

Defendant as having been compliant with the timeframes for provision of Outpatient Mental Evaluations during the months of July, August, September, October, or November 2022.[4]

As in previous reports, compliance was calculated based on the provision and submission of Outpatient Mental Evaluations in the date-of-receipt order specified by the Consent Decree, in addition to calculating compliance based on the total provision and submission of Outpatient Mental Evaluations as a whole. For individuals who were skipped and did not receive an Outpatient Mental Evaluation during the month in question, Plaintiffs used for compliance calculations the number of days that individual had been waiting for the provision of their Outpatient Mental Evaluation at the time that the waitlist for that month was finalized.

**Provision of Outpatient Mental Evaluations**

| Performance Period | Total Days Between Date Order Received and Date of Evaluation | Total Number of Evaluations | Average Time Period | Substantial Compliance Timeframe | Status |
|---|---|---|---|---|---|
| 8/1-31/2022 | 672 | 34 | 19.8 days | 34 days | Noncompliant |
| 9/1-30/2022 | 1,041 | 41 | 25.4 days | 34 days | Noncompliant |
| 10/1-31/2022 | 908 | 42 | 21.6 days | 34 days | Noncompliant |
| 11/1-30/2022 | 1,005 | 41 | 24.5 days | 34 days | Noncompliant |

[4] Plaintiffs do still agree with Defendant's assertion in her Petition for Relief from Reporting Outpatient Evaluation Statistics to Monitor, ECF No. 226, that the Department had complied with the 34-day timeframe for provision of Outpatient Mental Evaluations and submission of reports on same for the ten (10) months preceding July 2022. As such, Plaintiffs acknowledge that the final decision on whether to grant said petition rests with this Court.

**Provision of Outpatient Mental Evaluations in Date-of-Receipt Order**

| Performance Period | Total Days Between Date Order Received and Date of Evaluation | Total Number of Evaluations | Average Time Period | Substantial Compliance Timeframe | Status |
|---|---|---|---|---|---|
| 8/1-31/2022 | 1,621 | 34 | 47.7 days | 34 days | Noncompliant |
| 9/1-30/2022[5] | 1,875 | 41 | 45.7 days | 34 days | Noncompliant |
| 10/1-31/2022 | 1,888 | 42 | 45 days | 34 days | Noncompliant |
| 11/1-30/2022 | 2,523 | 41 | 61.5 days | 34 days | Noncompliant |

The average time period for submission of reports on Outpatient Mental Evaluations remained below the Substantial Compliance timeframe.

**Submission of Reports on Outpatient Mental Evaluations to Courts**

| Performance Period | Total Days Between Date of Evaluation and Submission to Court | Total Number of Submissions | Average Time Period | Substantial Compliance Timeframe | Status |
|---|---|---|---|---|---|
| 8/1-31/2022 | 1,545 | 47 | 32.8 days | 34 days | Compliant |
| 9/1-30/2022 | 1,132 | 42 | 27 days | 34 days | Compliant |
| 10/1-31/2022 | 1,155 | 47 | 24.5 days | 34 days | Compliant |
| 11/1-30/2022 | 845 | 34 | 24.9 days | 34 days | Compliant |

## III. Inpatient Mental Evaluations

Wait times for Inpatient Mental Evaluations remain high; however, Defendant has made a concerted effort to admit class members to facilities for inpatient-based services and provide those same services in or very close to date-of-receipt order. It is Plaintiffs' understanding that the data provided on the provision and submission of Inpatient Mental Evaluations for males is no longer

[5] It appears that the previous supplemental data filing submitted in this matter incorrectly represented the total number of evaluations and the average wait time for provision of same in date-of-receipt order for the month of September 2022. The correct data is contained in this table.

delineated per facility and instead the data reflects an aggregate across all facilities that accept males (Taylor Hardin, Hill Crest, and Norman-McClendon).

**Provision of Inpatient Mental Evaluations (Males – All Facilities)**

| Performance Period | Total Days Between Date Order Received and Date of Evaluation | Total Number of Evaluations | Average Time Period | Substantial Compliance Timeframe | Status |
|---|---|---|---|---|---|
| 8/1-31/2022 | 680 | 2 | 340 days | 34 days | Noncompliant |
| 9/1-30/2022 | 232 | 1 | 232 days | 34 days | Noncompliant |
| 10/1-31/2022 | 978 | 2 | 489 days | 34 days | Noncompliant |
| 11/1-30/2022 | No data | No data | No data | 34 days | N/A |

**Provision of Inpatient Mental Evaluations (Females)**

| Performance Period | Total Days Between Date Order Received and Date of Evaluation | Total Number of Evaluations | Average Time Period | Substantial Compliance Timeframe | Status |
|---|---|---|---|---|---|
| 5/1-31/2022 | N/A | N/A | N/A | 34 days | N/A |
| 6/1-30/2022 | N/A | N/A | N/A | 34 days | N/A |
| 10/1-31/2022 | N/A | N/A | N/A | 34 days | N/A |
| 11/1-30/2022 | No data | No data | No data | 34 days | N/A |

**Submission of Reports on Inpatient Mental Evaluations (Males – All Facilities)**

| Performance Period | Total Days Between Date of Evaluation and Submission to Court | Total Number of Submissions | Average Time Period | Substantial Compliance Timeframe | Status |
|---|---|---|---|---|---|
| 8/1-31/2022 | 11 | 1 | 11 days | 34 days | Compliant |
| 9/1-30/2022 | 74 | 2 | 37 days | 34 days | Noncompliant |
| 10/1-31/2022 | 11 | 1 | 11 days | 34 days | Compliant |
| 11/1-30/2022 | No data | No data | No data | 34 days | N/A |

**Submission of Reports on Inpatient Mental Evaluations (Females)**

| Performance Period | Total Days Between Date of Evaluation and Submission to Court | Total Number of Submissions | Average Time Period | Substantial Compliance Timeframe | Status |
|---|---|---|---|---|---|
| 5/1-31/2022 | N/A | N/A | N/A | 34 days | N/A |
| 6/1-30/2022 | N/A | N/A | N/A | 34 days | N/A |
| 10/1-31/2022 | N/A | N/A | N/A | 34 days | N/A |
| 11/1-30/2022 | No data | No data | No data | 34 days | N/A |

## IV. Competency Restoration Treatment

For males, wait times for facility admission to begin receiving Competency Restoration Treatment (CRT) remain consistently in excess of 100 days, but Defendant continues to make efforts to admit class members to facilities in order for CRT. Wait times for females to be admitted to Bryce for CRT have increased substantially.

It is Plaintiffs' understanding that the data provided on admissions of males to facilities for CRT is no longer delineated per facility and instead the data reflects an aggregate across all facilities that accept males (Taylor Hardin, Hill Crest, Norman-McClendon).

**Males – All Facilities**

| Performance Period | Total Days Between Date Order Received and Date of Admission | Total Number of Admissions | Average Time Period | Substantial Compliance Timeframe | Status |
|---|---|---|---|---|---|
| 8/1-31/2022 | 14 | 1 (ETP) | 14 days | 34 days | N/A |
| 9/1-30/2022 | 0 | 0 | N/A | 34 days | N/A |
| 10/1-31/2022 | 395 | 1 | 395 days | 34 days | Noncompliant |
| 11/1-30/2022 | No data | No data | No data | 34 days | N/A |

**Bryce Hospital**

| Performance Period | Total Days Between Date Order Received | Total Number of Admissions | Average Time Period | Substantial Compliance Timeframe | Status |
|---|---|---|---|---|---|

| | and Date of Admission | | | | |
|---|---|---|---|---|---|
| 8/1-31/2022 | 215 | 2 | 107.5 days | 34 days | Noncompliant |
| 9/1-30/2022 | 314 | 2 | 157 days | 34 days | Noncompliant |
| 10/1-31/2022 | 273 | 2 | 136.5 days | 34 days | Noncompliant |
| 11/1-30/2022 | No data | No data | No data | 34 days | N/A |

## V. Hospital Forensic Beds

The Consent Decree requires that no fewer than 25 hospital forensic beds be added and operationalized between 12 and 24 months after entry of the Consent Decree.[6] The deadline for same was therefore January 24, 2020. By that time, the ADMH Commissioner had added and operationalized 15 hospital forensic beds at Hill Crest Hospital in Birmingham. Plaintiffs understand that, following some delays which were out of the Department's control, the Department opened a 16-bed facility in Greenville, Alabama in the fall of 2021.

Plaintiffs were able to inspect the Norman-McClendon facility in Greenville on October 14, 2022. Plaintiffs were able to tour the facility and meet with staff and residents. Plaintiffs also had the opportunity for an extensive discussion with Dr. Virginia Scott-Adams and facility staff regarding the new techniques being implemented for CRT at Norman-McClendon and how those techniques improve the delivery of competency services. Plaintiffs were impressed with the nature of the program and the therapeutic environment of the facility. The ADMH Commissioner has achieved Substantial Compliance with the terms of the Consent Decree as they relate to the addition and operationalization of hospital forensic beds.

## VI. Community Forensic Beds

---

[6] This is in addition to the 25 beds required to be added and operationalized in Year One, all of which were online at Taylor Hardin Secure Medical Facility as of July 2017. *See Hunter*, 2018 U.S. Dist. LEXIS 12086, at *18 (Section VI.2.A.i-iii).

The Consent Decree requires that 32 community forensic beds be added and operationalized between 12 and 24 months after entry of the Consent Decree.[7] The data that ADMH officials have provided to Plaintiffs to date indicates that ADMH officials have added and operationalized a total of 32 community forensic beds since the Consent Decree was entered on January 25, 2018. It is Plaintiffs' understanding that ADMH officials had, by January 24, 2020, secured a contract for 17 community forensic beds with JBS. ADMH officials have indicated that another 20 community forensic beds were added and operationalized in 2020.

Plaintiffs had the opportunity to visit the JBS MOM (Medication/Observation/Meals) supported apartments in Birmingham on October 12, 2022. Plaintiffs were able to meet with the majority of residents, as well as staff. Plaintiffs were generally impressed with the quality of the program. The ADMH Commissioner has achieved Substantial Compliance with the terms of the Consent Decree as they relate to the addition and operationalization of community forensic beds.

Dated: December 12, 2022 Respectfully submitted,

Shandra N. Monterastelli

Shandra N. Monterastelli (ASB-1016-N00Q)
William Van Der Pol, Jr. (ASB-2112-114F)
Larry G. Canada (ASB-3153-N73L)
Lonnie J. Williams (ASB-2866-I35W)
ALABAMA DISABILITIES ADVOCACY PROGRAM
2008 12th Street
Box 870395
Tuscaloosa, AL 35487-0395
Telephone: (205) 348-4928
Facsimile: (205) 348-3909
Email: smonterastelli@adap.ua.edu
wvanderpoljr@adap.ua.edu

[7] These 32 beds are in addition to the 20 beds that the Consent Decree required the ADMH Commissioner to add and operationalize during Year One. *See Hunter*, 2018 U.S. Dist. LEXIS 12086, at *19 (Section VI.2.B.i-iii).

lcanada@adap.ua.edu
lwilliams@adap.ua.edu

*Attorneys for Plaintiffs Demontray Hunter, Russell D. Senn, and Travis S. Parks, Vandarius S. Darnell, Frank White, Jr., Marcus Jackson, Timothy D. Mount, and Henry P. McGhee and Plaintiff Alabama Disabilities Advocacy Program*

Henry F. (Hank) Sherrod III (ASB-1200-D63H)
HENRY F. SHERROD III, P.C.
119 South Court Street
Florence, AL 35630
Telephone: (256) 764-4141
Facsimile: (877) 864-0802
Email: hank@alcivilrights.com

Tish G. Faulks
ACLU of Alabama Foundation
P.O. Box 6179
Montgomery, AL 36106-0179
Telephone: (334) 420-1741
Facsimile: (334) 269-5666

*Attorneys for Plaintiffs Demontray Hunter, Russell D. Senn, and Travis S. Parks, Vandarius S. Darnell, Frank White, Jr., Marcus Jackson, Timothy D. Mount, and Henry P. McGhee*

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I have caused a true and correct copy of the foregoing to be served on the counsel of record listed below by filing same with the Clerk of Court this 12th day of December, 2022.

| | |
|---|---|
| Shandra N. Monterastelli<br>William Van Der Pol, Jr.<br>Larry G. Canada<br>Lonnie J. Williams<br>Alabama Disabilities Advocacy Program<br>2008 12th Street<br>Box 870395<br>Tuscaloosa, AL 35487-0395<br>smonterastelli@adap.ua.edu<br>wvanderpoljr@adap.ua.edu<br>lcanada@adap.ua.edu<br>lwilliams@adap.ua.edu | Thomas B. Klinner<br>Edward C. Hixon<br>Ashley L. Nichols<br>Nancy S. Jones<br>Alabama Department of Mental Health<br>RSA Union Building<br>100 North Union Street<br>Montgomery, Alabama 36104<br>Tommy.Klinner@mh.alabama.gov<br>Eddie.Hixon@mh.alabama.gov<br>Ashley.Nichols@mh.alabama.gov<br>Nancy.Jones@mh.alabama.gov |
| Henry F. (Hank) Sherrod III<br>Henry F. Sherrod III, P.C.<br>119 South Court Street<br>Florence, AL 35630<br>hank@alcivilrights.com | |
| Tish G. Faulks<br>ACLU of Alabama Foundation<br>P.O. Box 6179<br>Montgomery, AL 36106-0179<br>tgfaulks@aclualabama.org | |

Shandra N. Monterastelli

Shandra N. Monterastelli (ASB-1016-N00Q)
*Counsel for Plaintiffs*